Madden, Judge,
delivered the opinion of the court:
The plaintiff, a Portuguese corporation, sues the United States for breach of contract. Under the reciprocity provisions of 28 U.S.C. 2502 it has access to this court. The contract in suit was • made on September 11, 1952. On October 27 of that year the United States purported to cancel *73 the contract. The plaintiff says that the purported cancellation was nothing more than a repudiation, and therefore a breach, of a valid contract.
The contract in question was for the sale of tungsten by the plaintiff to the United States, the tungsten to be delivered over a period of 34 months. The Government says that it had the right to cancel the contract, by reason of a reservation in the contract of the right to do so upon the occurrence of a certain contingency, which contingency, it says, occurred, and also by reason of a breach by the plaintiff of a warranty, contained in the contract, against contingent fees. It also says that the plaintiff would not have been able to perform the contract, if it had not been canceled, and therefore was not damaged by not being permitted to attempt to perform it.
We have made voluminous findings of fact, which coincide with the findings made by the commissioner of this court. There were numerous witnesses, and the veracity or the proper interpretation of the testimony of some of them is questioned. The conclusion of the commissioner who heard the testimony and observed the witnesses is entitled to great weight. We shall, in this opinion, narrate the events only to the extent we deem necessary to make our discussion intelligible.
The United States desired to obtain tungsten for American industry and for stockpiling. There were many tungsten mines in Portugal, poorly equipped mechanically. A good deal of tungsten was mined by individuals, with picks and shovels, who then marketed their product through dealers. In spite of its inefficiency, the industry prospered during World War II, but when the demand slackened after the war, there was little production by the smaller mining companies even though prices were still high in comparison to what they had been before the war.
A Portuguese enterpriser, Dr. Soares, began in 1950 to work on a plan, later developed by the plaintiff corporation, which envisaged the organization of production and marketing in such a way that there could be profitable operation of mines which otherwise would not operate. To do this it would be necessary to bring together a number of the small *74 mining enterprisers under one management, and to obtain long-term contracts for the sale of the tungsten which the combined operation would produce.
'An American, Mr. Pulvermann, who had had extensive experience in mine management in Germany before the war, was in Portugal in 1951 to examine a manganese mine. It did not interest him, but he looked into the possibilities of mining tungsten and came to the same conclusion which Dr. Soares had previously reached. He learned of Dr. Soares’ interest and discussed the problem with him for several days. Dr. Soares gave him a 60-day option for the placement in the United States or in Europe of a contract for the sale of specified tonnages of tungsten and tin.
Mr. Pulvermann went to Washington and began to explore the possibilities of selling tungsten to the Government. He discusséd the subject with Colonel Westbrook, with whom he had been associated in prior activities. Pulvermann and Westbrook, after investigation, decided that there was a possibility of getting a contract from the Government for the purchase of tungsten from the plaintiff. They considered the legal arrangement which Dr. Soares’ company should make for the acquisition of the tungsten which it proposed to sell, and the arrangement which they, Pulvermann and Westbrook, should make for their compensation if the venture should succeed.
Pulvermann returned to Portugal. At his suggestion Dr. Soares persuaded several high Portuguese officials to become officers of his company.
Pulvermann and Westbrook began negotiations with United States Government officials for a contract to purchase tungsten from the plaintiff. The negotiations went on from July 1951 to September 11, 1952, when the contract here in suit was signed. Formidable opposition to the contract was offered by American representatives in France, Portugal and England. The character of Dr. Soares and his associates was questioned and investigated. The price tentatively agreed on was greatly reduced at a relatively late period in the negotiations. In April of 1952 the Government sent Mr. Lynton, an engineer selected for his competence in that field, to examine the mines from which the plaintiff expected *75 to obtain its tungsten. Lynton made a long report, in which he concluded that the plaintiff company could obtain the tungsten to fulfill its proposed contract. He recommended that the contract be entered into. As we have said, the contract in question was finally signed on September 11, 1952.
On October 24, an American official in London, General Wilson, telephoned Mr. Larson, the official who had signed the contract on behalf of the Government and advised him that there were “very strong protests” from the American Embassy in Lisbon about the contract, and that the Embassy had informed him of definite attempts on the part of' the plaintiff to purchase tungsten from sources other than sources from which the plaintiff, under its contract, was; permitted to obtain tungsten. Larson asked Wilson to forward to him any “concrete evidence” which he had relating to the latter point. Wilson on the same day sent to Larson a message stating that another company, Pennsalt, had cabled that the plaintiff was offering to buy 100 tons of tungsten from it, Pennsalt, for resale to the United States. Wilson’s message reached Larson on the next working day,. October 27. Larson regarded the Pennsalt cable as “concrete evidence” of violation of its contract by the plaintiff,, and forthwith canceled the contract, so advising the plaintiff in a letter stating that the reason for the cancellation, was the plaintiff’s attempt to buy tungsten in the open-market for delivery under the contract.
At the trial of this case the Government made no effort, to prove that the plaintiff had, in fact, attempted to buy tungsten in the open market to fulfill its obligations under the contract. The stated ground for the cancellation was-therefore nonexistent. The Government argues that Mr. Larson had reason to believe that the stated ground existed. Whether he did or not is irrelevant. One may not repudiate-his contract obligations upon the ground that he reasonably,, though mistakenly, believed that the other party to the contract had breached it.
As we have said, the Government seeks to justify its cancellation of the contract on grounds other than the ground, stated at the time of the cancellation. One of these is that- *76 the plaintiff would not have been able to perform the contract and that therefore the contract was a futile writing, -the repudiation of which by the Government could not have Tiarmed the plaintiff.
The ability of the plaintiff to perform the contract was the subject of discussion and investigation during the more than a year’s time of negotiation of the contract. As we Nave said, the Government sent its own expert to study that very question and he made a detailed report recommending that the contract be made. When a party to a contract has canceled it before performance has even begun, it can hardly ■expect a court to excuse its conduct upon anything less than ■convincing evidence that the contract could not have been ■performed. Our findings show that we do not regard the .■Government’s evidence as convincing.
The Government says that it was entitled to cancel the ■contract because of a violation of the contingent fee provi-rsion in the contract. This provision said:
ARTICLE XVII. CONTINGENT FEES. The Contractor warrants that no person or selling agency has been employed or retained to solicit or secure this Contract upon an agreement or undertaking for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this Contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage or contingent fee.
At the beginning of the negotiations for the contract 'Colonel Westbrook filed with the Government officials with whom he was dealing a copy of the written agreement which lie and Pulvermann had with the plaintiff covering their ■employment and their compensation. This agreement appointed them exclusive sales agents of the plaintiff for ■securing contracts in the United States, Germany and Switzerland for the sale of specified metals, including tungsten. ‘The agreement was for a period of five years, provided for ¡a commission of 5 percent on all sales up to specified tonnages, *77 and retained Westbrook and Pulvermann as industrial consultants without additional compensation.
Our findings show that both these men had unusual qualifications and experience for the work which they undertook for the plaintiff. The plaintiff was a newly organized enterprise. It had no sales agency, and would not have anything to sell unless it could secure contracts which would give stability to the tungsten mining industry for a considerable-period of time. It hired Pulvermann and Westbrook as its-exclusive sales agents for five years in the only countries in which there was a prospect of obtaining such contracts. They worked diligently for more than a year presenting the-plaintiff’s offer on its merits to the numerous Government officials who took part in the negotiations. They gave-valuable assistance to the plaintiff as industrial consultants, concerning the plaintiff’s arrangements with its proposed suppliers of tungsten. We think Pulvermann and West-brook were bona fide employees of the plaintiff.
The Government seems to urge that to be a “bona fide-employee” of one contracting with the Government one must be an employee in the master and servant sense, with power-in the master to control in detail the servant’s activities. That is not the status of a sales agent, who may have several employers. We think the expression “bona fide employee”' in the warranty clause in the contract must receive a rational interpretation consistent with its purpose.
In the years 1949 through 1951 an extensive investigation-of “Influence in Government Procurement” was carried on by-the Investigations Subcommittee of the Senate Committee on Expenditures in the Executive Departments. Hearings; before the Investigations Subcommittee of the Senate Committee on Expenditures in the Executive Departments, 81st Cong., 1st Sess., pursuant to S. Res. 52 (August 8-September 1, 1949), and 82nd Cong., 1st Sess., pursuant to S. Res. 51 (March 14-October 5, 1951). Mr. Larson, who signed the-contract in the instant case, was an important witness at these hearings. At the conclusion of the 1949 hearings-Senate Report No. 1232, 81st Cong., 2d Sess., Jan. 18 (legislative day Jan. 4), 1950, was filed. Mr. Larson’s testimony-at the hearings, and the comment of the members of the- *78 •committee show that the warranty clause in question was not intended to forbid customary and honest business practices in negotiating contracts with the Government.
In the 1949 hearings referred to above, Mr. Larson’s testimony at pages 616-617 is important. He told the Committee «.bout the regulation of his agency requiring one proposing to ■negotiate with his agency to disclose whether he had employed a firm other than a full-time employee to solicit the ■contract, and to agree to furnish information to the contracting officer as requested, relating to the employment. Mr. Larson said that from that information the contracting officer can ascertain
“whether or not in each individual case it is a legitimate attorney, as the chairman has pointed out, a full-time employee, even a contingent fee operation possibly being legitimate.
❖ H: * :}: H?
And he will make the decision then and there.”
In the instant case, as we have seen, the plaintiff’s agents, •at the outset of the negotiations, filed their employment ^agreement with the Government’s negotiating officials. If those officials did not “then and there” decide that the agreement would not be a violation of the warranty clause which would be inserted in any contract which might emanate from ■the negotiations, they recklessly involved numerous Government officials, and the plaintiff and its agents, in more than a year of strenuous negotiations and great expense, to no purpose. It might be suggested that they knew that the •compensation arrangement was improper, but did not raise the question because it would be at the Government’s option whether to take advantage of the impropriety or not. Of ■course no such diabolical thought occurred to them. Their •opinion at the time must have been that the compensation .-arrangement was not in violation of the warranty. We are not persuaded that they were wrong. And if the interpretation of the warranty and its proper application to the instant situation were doubtful, we think it would be a great wrong to permit the Government to awaken such a “sleeper” “to justify its cancellation of a contract which it purported “to cancel on another ground which it cannot now defend. *79 Nothing short of a showing that the evils which the warranty provision was intended to prevent were present in the instant situation would justify such a use of it. The evidence shows that such evils were not present.
As appears from the foregoing, our conclusion is that the 'Government breached its contract with the plaintiff and must pay damages for the breach. We must determine how those damages should be measured. The plaintiff urges that it had the right, under its contract, to obtain- tungsten from any source, including the open market; that the market price went down substantially during the period when it would have been performing its contract; that it could therefore have bought the tungsten at the low market price and delivered it to the Government at the higher contract price; and that it is entitled to recover the difference between the two prices.
We think the plaintiff did not have the right, under the contract, to deliver tungsten bought by it in the open market, except possibly to a minor extent. It was one of the Government’s prime purposes in making the contract to make possible the opening up and development of new sources of tungsten. The contract would not have been made except for the existence of that purpose, and both parties so understood.
The obtaining of tungsten from the mines from which the parties understood that it was to be obtained, would have been more costly than buying it in the open market, after the market price went down. But, as we -have said, the plaintiff was obligated to deliver tungsten from those mines. As best we can determine, its profit would have been $2.00 per short-ton unit. Since that is all that it would have made if it had been permitted to perform its contract, such a judgment will compensate it for the Government’s breach of contract.
The plaintiff may have a judgment for $508,200.
It is so ordered.
Barksdale, District Judge, sitting by designation; Lara-more, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
*80 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:

Contents Findings

I.Jurisdiction_ 1-2
A. Corporate Status of Plaintiff_ 1
B. Portuguese Reciprocity_ 2
II.The Issue: Default or Breach_ 3-5
A. The Contract_ 3
B. The Cancellation_ 4
C. The Contingent Pee Clause_ 5
III. Background_ 6-30’
A. Personnel: Plaintiff_ 6-16
B. Administrative Agencies_ 11-20
C. Tungsten: General_ 21-23
D. Tungsten in Portugal_ 24-30'
IV. Narrative_ 31-128
A. To June 30, 1951_ 31-36
B. July 1 to September 30, 1951_ 37-55
C. October 1 to December 31, 1951_ 56-68'
D. January 1 to March 31, 1952_ 69-77
E. April 1 to June 30, 1952___ 78-91
F. July 1 to September 30, 1952_ 92-111
G. October 1 to December 31, 1952_ 112-128
V.Conclusions_ 129-154
A. Materiality_ 129
B. Credibility_ 130
C. Weight_ 131-134
D. Contingent Compensation_ 135-137
E. The Default Provision_ 138-139
F. Speculation: Intent of Atlántica_ 140-141
G. Speculation: The Hunting License_142-144
H. Governmental Channels: American_ 145
I. Governmental Channels: Portuguese_ 146
J. The Administrative Determination_ 147-148
K. The Ability To Perform_ 149-154
VI.Damages_ 155-168
A. Nature and Extent of Loss_155-157
B. The Market Value_ 158-160
C. The Cost of Performance_ 161-168
*81 I.' JURISDICTION
A. Corporate Status of Plaintiff
1. Plaintiff[1] is a corporation under the laws of the Republic of Portugal.
B. Portuguese Reciprocity
2. Under the laws of Portugal citizens of the United States may sue the Republic of Portugal in the courts of that country.
ft. THE issue: default or breach
A. The Contract
3. (a) The contract[2] in suit was “entered into” on the “* * * 11th day of September, 1952,’ between the United States of America, acting by and through Defense Materials Procurement Agency * * * hereinafter referred to as the ‘Government,’ * * * and Companhia Atlántica de Desenvolvi-mento. e Exploragao de Minas * * * hereinafter referred to as the ‘Contractor.’ ”
. (b) Following are pertinent provisions of the contract:
whereas, the Government is desirous of promoting the development of new sources of tungsten (wolfram-ite) concentrates and in procuring tungsten concentrates in quantity; and
whereas, the Contractor is desirous of increasing the productive capacity of its tungsten mines in Portugal (including the enlargement of its milling facilities) and the productive capacity of other small Portuguese producers with whom Contractor intends to merge, consolidate, or otherwise combine its efforts to- secure increased production of tungsten;
now, therefore, in consideration of the premises and the mutual promises of the parties hereto as hereinafter set forth, the parties agree as follows:
article i. scope of contract. Contractor agrees to sell and deliver to the Government and the Government agrees to purchase from the Contractor not less than two thousand nine hundred and seventy (2,970) short *82 tons (of two thousand [2,000] pounds each), but not in excess of four thousand two hundred and ninety (4,290) short tons (of two thousand [2,000] pounds each) of tungsten concentrates (wo3) at the prices and upon the terms and conditions hereinafter set forth.
* * * * *
article in. rate of delivery. Contractor shall make delivery of tungsten not less often than semi-annually at the following minimum or maximum annual tonnage rates.

Minimum-. Maximum short tons short tons

1st Period_ 550 990
2nd Period_ 880 1320
3rd Period_ 1540 1980
ARTICLE IV. PRICE — DURATION OF CONTRACT. This Contract shall be for a period extending from date of execution hereof and terminating on June 30,1955. It is understood and agreed that the price for each short ton of tungsten concentrates delivered in each successive period during the term .of the contract, shall be determined on an f. o. b. vessel Portuguese port basis, including duties, taxes and all other levies imposed by any authority other than the United States Government, and at the following rates * * *:
1st Period, expiring June 30,1953-$57.00 per short ton unit
2nd Period, expiring June 30,1954-$55.00 per short ton unit
3rd Period, expiring June 30,1955-$50.00 per short ton unit
*****
ARTICLE VIII. WEIGHTS AND PAYMENTS. Payment of the purchase price of tungsten concentrates delivered hereunder shall be made in the following manner.
(a) The Government will establish irrevocable commercial letters of credit opened in favor of the Contractor, in the Banco Nacional Ultramarino, Lisbon, Portugal, or in such other Portuguese bank as may be named by the Contractor and is acceptable to DMPA, in United States currency in amounts in the aggregate adequate to pay all sums due during the respective periods hereunder as such sums become due against which provisional and final drawings may be made upon presentation of sight drafts accompanied by the documents and in accordance with the terms and conditions specified in subparagraphs (b), (c) and (d) of. this article. All costs in connection • with the opening *83 of the aforesaid commercial letter of credit shall be for the account of the Contractor.
ifc * Jfc $
article xiv. option. In consideration of the undertaking of the Government under this Contract, the Contractor hereby grants to the Government an option to purchase the Contractor’s entire production or any part thereof of tungsten (wolframite) meeting the specifications as of the date said option is exercised. This-option shall continue in existence for a period of five (5) years from the date the last shipment of tungsten as called for under this Contract is delivered to and accepted by the Government.
$ * # * *
article xvii. contingent fees. The Contractor warrants that no person or selling agency has been employed or retained to solicit or secure this Contract upon an agreement or undertaking for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business. For breach or violation of tliis warranty, the Government shall have the right to annul this Contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage or contingent fee.
* ❖ Sic * *
article xx. default. Notwithstanding any other provision _ of this Contract, the Government may, by notice in writing to the Contractor, cancel this Contract or any part thereof at any time, without payment of damages or penalty of any kind for such cancellation, in the event (a) a receiver, liquidator or trustee is appointed for Contractor or its property * * * (b) of the liquidation or dissolution of Contractor, whether voluntary or involuntary, (c) default by Contractor in the performance of any of the terms, conditions or covenants of this Contract or any amendment or supplement thereto, (d) of the determination by the Government that the Contractor obtained this Contract for the purpose of speculation.
**#*;$:
article xxiv. cancellation. Notwithstanding any other provision hereof, this Contract shall automatically terminate upon the existence of any condition *84 or conditions preventing the performance of any of the obligations hereunder, arising from an act or failure to act of the Government of Portugal. Such acts include, but are not limited to, the failure of that Government to authorize exports required by this Contract, and its failure to issue an export license necessary for the performance of the obligations hereunder.
(c) The contract was signed (1) on behalf of the United States, by Jess Larson,[3] as Administrator of Defense Materials Procurement Agency (hereinafter referred to as DMPA), and (2) on behalf of plaintiff, by Lawrence West-brook,[4] as attorney in fact. The attest of Colonel[5] West-brook’s signature was signed by Thurman Hill.
B. The Cancellation
4. Following is the text of a letter dated October 27,1952,[6] signed by Jess Larson, as Administrator of DMPA, addressed, mailed, and delivered to Colonel Lawrence West-brook, as attorney in fact for plantiff:
Reference is made to Contract entered into between the United States of America, acting by and through this Agency, and Campanhia [sic] Atlántica De De-senvolvimento E Exploracao De Minas, hereinafter called “Atlántica”, dated September 11, 1952, calling for the delivery of certain tonnages of tungsten by June 30,1955, upon the terms and conditions therein set forth.
The objectives sought to be obtained by the contract and the clear intent of the contracting parties is set forth in those provisions of the contract providing:
“whereas, the Government is desirous of promoting the development of new sources of tungsten (wolfram; ite) concentrates and in procuring tungsten concentrates in quantity; and
whereas, the Contractor is desirous of increasing the productive capacity of its tungsten mines in Portugal (including the enlargement of its milling facilities) and the productive capacity of other small Portuguese pro *85 ducers with whom Contractor intends to merge, consolidate, or otherwise combine its efforts to secure increased production of tungsten;
now, THEREFORE, in consideration of the premises and the mutual premises [sic] of the parties hereto .as hereinafter set forth, the parties agree as follows # * HO? •
It, therefore, was and is the objective and intent of the Contract that the tungsten to be purchased by the C-overnment would be such tungsten that was mined either from mines owned by Atlántica, or from mines ■of such other small Portuguese producers with whom Atlántica would merge, consolidate, or otherwise combine its efforts to secure increased production of tungsten.
Information has been received by the London and 'Washington Offices of this Agency, establishing to its satisfaction, that Atlántica is in the market for the purchase of tungsten ores from producers, other than those enumerated above, at prices less than those set forth in the said contract of September 11, 1952, for ■delivery and resale to the United States Government Tinder said contract.
Article XX of said Contract entitled default reads ¡as follows:
“Notwithstanding any other provision of this Con-stract, the Government may, by notice in writing to the ¡Contractor, cancel this Contract or any part thereof at ¡any time, without payment of damages or penalty of any kind for such cancellation, in the event * * *, (d) of the ■determination by the Government that the Contractor ■obtained this Contract for the purpose of speculation”.
This is to advise you that this Agency has determined that your efforts and conduct in entering the open market for the purchase of wolframite from producers other than those enumerated in the Contract for resale to the Government constitutes a violation of said paragraph (d) of Article XX above quoted.
This letter, therefore, constitutes notice to you that the Government reserves unto itself, all its rights and privileges under said Contract not inconsistent herewith and hereby cancels and terminates same in its entirety, effective immediately.
*C. The Contingent Fee Clause
5. (a) Negotiations with the Government for the contract in suit were conducted on behalf of plaintiff by Colonel West-brook and his associate, Mr. Heinz Pulvermann. This fact *86 was known to Mr. Larson at the time of the signing of the contract.
(b) At the time of the signing of the contract Colonel Westbrook and Mr. Pulvermann were “* * * employed * * * to solicit or secure this Contract upon an agreement or undertaking for a commission, percentage * * * or contingent fee * * This fact was known to the Government officials who conducted the negotiations.[7] It was not known to Mr. Larson at the time of the cancellation.
(c) At the time of the signing of the contract and at the time of its cancellation Colonel Westbrook was employed by the Democratic National Committee as one of its salaried officials. This fact was known to one of the Government officials who conducted the negotiations.[8] It was not known to Mr. Larson.
(d) On October 28, 1952, news reporters brought to Mr. Larson’s attention the fact that Colonel Westbrook had a percentage contract with plaintiff, whereupon Mr. Larson remarked that if he had known of the arrangement, he would have assigned that fact as a further reason for the cancellation of the contract.
(e) On October 29,1952, Colonel Westbrook was dismissed from his position with the Democratic National Committee by the chairman of the committee.
HI. BACKGROUND
A. Personnel: Plaintiff[9]
6. (a) Lawrence Westbrook was born in 1889. At the age of 19 he withdrew from the University of Texas (after 2 *87 years’ attendance) and went to work for an electric company in Galveston. Two years later he was chief engineer of a large electric utility in Dallas. He moved from there to Amarillo to be chief engineer and vice president of another electric company. In 1913 he gave up this career to take over from his father, who was ill, the management of the family’s cotton and ranching interests.
(b) Westbrook’s military career began in 1917 with a direct commission as a first lieutenant in the Army Signal Corps. He returned from France in 1919 and was released from active service with the rank of major. He was again on active duty in the Army from 1942 to 1945, with the rank of colonel.
(c) Upon his release from the Army in 1919 he returned to the management of his family’s cotton interests. In 1927 he organized a countywide farm association to market its members’ cotton and other produce. In 1928 he was elected to the Texas legislature, where he served two terms (1929-1932) and was for a time chairman of the Agriculture Committee. Meanwhile, in 1930-1931, he was employed by the American Cotton Cooperative Association to organize and direct the Texas Cotton Cooperative Association.[10] During the first year of his directorship the Texas association enrolled 10,000 members and marketed 500,000 bales of cotton under a system of irrevocable sales contracts between member-producers and the association.
(d) In 1933 the Governor of Texas appointed Colonel Westbrook head of the Texas Relief Commission. He continued in relief work until sometime in 1936, serving as Assistant Administrator of the Federal Emergency Relief Administration (FERA) during 1934-1935,[11] and as Assistant Administrator of the Works Progress Administration (WPA) during 1935-1936.[12]
(e) From 1936 through 1939 Colonel Westbrook served as a consultant to rural cooperatives, developing plans for agricultural production and marketing and small-scale industrial *88 operations. During this period he served as Chairman of the National Advisory Committee of WPA, and for a few months was employed by the Senate Committee on Agriculture to direct an investigation of the marketing of cotton.
(f) During the two years (1940-1941) preceding his return to active duty in the Army, Colonel Westbrook was again in Federal civilian service as assistant to the Administrator of the Federal Works Administration.[13]
(g) While he was on active duty in the Army during World War II, from 1942 to 1945, Colonel Westbrook was responsible for United States military procurement in the South Pacific Area (1942-1943),[14] directed the coordination of procurement procedures for United States purchasing agencies in Brazil (1943), served as Executive Secretary of the War Department Materiel Demobilization Committee (1944), and was a member of the Special Planning Division of the War Department General Staff (1944-1945).
(h) Following his release from military duty, he undertook a 4-year engagement in the employ of a Parisian capitalist, serving as president of Trans-American Development Corporation,[15] American subsidiary of a French engineering and banking concern known as Société Européene d’Etudes et d’Entreprises. As this assignment drew to a close, he undertook a full-time position with the Department of Defense as executive director of the staff of the Department’s Defense Housing Commission.
(i) Within a few months the last-named full-time position was reduced to part time, whereupon Colonel Westbrook embarked upon free-lance endeavors under the name of “West-brook Associates.” The title was chosen as one flexible enough to include himself and any other persons with whom he might choose to collaborate in future business ventures. After 18 months of these free-lance endeavors, Colonel West-brook was in the process of closing his Washington office, *89 making ready to retire to his home in Hot Springs, Arkansas, when the opening came to enter the matter which is now in suit. He thereupon elected to continue with Westbrook Associates and devoted virtually full time to the instant matter during the next 6 months (July-December 1951).
(j) As of the beginning of 1952 Colonel Westbrook believed the negotiations for the contract in suit to be completed. While the contract had not been signed, its terms, he thought, had been agreed upon, and the final execution was only a formality. He further believed that, after the execution of a contract between the Government and plaintiff, a period of 6 months or more would be required for plaintiff to develop its operations to the point where further service would be required of him under his contract with plaintiff. Upon the basis of this estimate of his relationship with and obligation to plaintiff, he accepted the position of Assistant Chairman of the Democratic National Committee, tendered to him at that time,[16] and entered on his new duties on January 7,1952.[17]
(k) Colonel Westbrook’s employment by the Democratic National Committee was terminated on October 29, 1952, by the then chairman of the committee,[18] on the ground, that it was improper for a member of the committee staff to negotiate with the Government.
(l) Colonel Westbrook has not since engaged, or sought to engage, in remunerative employment.[19]
*90 7. (a) Heinz Pulvermann was born in Germany in 1895. He fled Nazi Germany in 1936; came to the United States in 1947; and was naturalized in 1950. His residence, at the time of the trial of this action, was at Bye, New York.
(b) Mr. Pulvermann had 1 year (1913-1914) at the University of Freiburg before serving 4 years (191A-1918) in the Armed Forces of Germany. After the end of World War I, he spent 1 year (1918-1919) at the University of Hamburg, another year or more (1919-1920) at the Universities of Munich and Berlin, and returned to the University of Hamburg (1922-1923) to receive the degree of bachelor of laws. His studies included economics as well as law.
(c) In 1923 Mr. Pulvermann found employment with two German lignite (“brown coal”) companies. Between 1923 and 1930 he worked his way successively through the cost control, finance, investment control, and development departments of the mining corporations. In 1931 he became head (general manager-president-chairman of the board) of both corporations. At that time the two companies employed approximately 6,000 persons, produced 9 million tons of lignite per year, and had a combined net worth of about 40 million marks. He continued in this position until 1936. Meanwhile, he was a member of the executive committee and the board of directors of the Central Germany and Eastern Germany lignite syndicates, industrywide marketing and sales organizations with a yearly sales volume (combined) of 30 to 50 million tons of lignite and 16 million tons of lignite brickettes.
(d) In 1936 Mr. Pulvermann left Germany to escape the Nazis. He had previously transferred to London stocks enough to control the two German lignite companies, and managed to retain the control into 1937. In 1939 he became associated with the French engineering and banking corporation heretofore mentioned,[20] to direct through it and for its owner a program of facilitating the movement of Jews from Germany to South America. After the outbreak of World War II (September 1939), he remained in France for a time at the invitation of the French Government. He then went to North Africa, where he was interned by the Vichy *91 French. After his liberation in 1943, he remained in Algeria through 1946.[21]
(e) In 1947 Mr. Pulvermann moved from North Africa to London, where he arranged an assignment as Western Hemisphere representative of an English construction-consulting firm specializing in prefabrication. He came to the United States a short time later, and has since been engaged in one form or another of salesmanship, promotion, and international brokerage.
8. (a) In 1948 Mr. Pulvermann rented office space in New York from the Trans-American Development Corporation, of which Colonel Westbrook was president. The meeting of the two men was arranged by a mutual associate of Trans-American’s parent company, Société Européene d’Etudes et d’Entreprises.
(b) The business association of Westbrook and Pulver-mann began in January 1950. Mr. Pulvermann had been requested by German organizations to recruit the services of a British or American housing expert to serve as a consultant to the Germans on the reconstruction of workers’ housing. He asked Colonel Westbrook to undertake the project. Colonel Westbrook agreed and invited Mr. Pulver-mann to join him as a partner in the project, with all compensation to be divided equally. Mr. Pulvermann agreed, and the project was undertaken and executed accordingly.[22]
(c) The relationship between Colonel Westbrook and Mr. Pulvermann in securing the contract in suit was as informal as their first association had been. They were partners, to share equally, but there was no agreement in writing between them.
9. (a) There was an agreement in writing between Colonel Westbrook and Mr. Pulvermann, on the one hand, and the plaintiff corporation, on the other.[23] This agreement represented, in essence, the working arrangement between the two Americans (Westbrook and Pulvermann) and the Portu *92 guese citizen who first formulated the mining plan, Dr. Celestino Soares.
(b) Dr. Soares began work on his mining plan in July 1950. Two months previously, in May 1950, he had been released from prison after 26 months’ confinement for having participated in an effort to overthrow the Salazar regime. Full amnesty was granted to him upon his release.
(c) Celestino Soares was born in Portugal in 1898. Upon graduation from the University of Lisbon in 1921, he joined the Portuguese Ministry of Foreign Affairs. During 1922 he served for a time as an attach© of the Legation of Portugal in Washington and later as Charge d’Affaires of the Portuguese consulate in Boston.
(d) In 1926 Dr. Soares was appointed Governor of Portalegre, a Province of Portugal. The position was short-lived. Upon the coming to power of the Salazar regime a few months later, he was dismissed from his post. He then published a newspaper, in which he had the temerity to oppose the regime. The newspaper was suppressed.
(e) During the 1930’s Dr. Soares engaged in various private business activities[24] and in time overcame his Government’s attitude that he was persona non grata. Following the publication by him, in Lisbon, in 1939, of a monograph entitled “California and the Portuguese,” for use in connection with the Golden Gate International Exposition, he returned to the United States as head of his country’s historical exhibition. In 1940 he represented the Portuguese railroads and harbors at the Portuguese pavilion at the World’s Fair in New York.
(f) Dr. Soares first entered the tungsten mining industry in 1940 or 1941 at the request of the British Government. With British financial assistance, he organized and became the manager of Companhia Portuguesa de Minas, a company which bought and throughout the war operated various tungsten and tin mines.[25] He sold his interest in the company early in 1945.[26]
*93 (g) During the period 1943-1946, Dr. Soares collaborated with United States intelligence officers stationed in Lisbon. For a few months during 1945, he was a general agent of the United States Purchasing Mission in Portugal.[27]
(h) The political activity described in subsection (b) of this finding took place in 1947. When the revolt failed, Dr. Soares was tried and convicted by a court-martial. His codefendants included 1 admiral, 3 generals, and 4 colonels. The amnesty which accompanied his release, as described by Dr. Soares, was a sort of reciprocal accommodation between him and his Government: an agreement by the regime that he would not be molested in his business and private affairs as long as he refrained from further political activity.[28]
10. (a) The written agreement between the plaintiff corporation and its American representatives, Colonel West-brook and Mr. Pulvermann, was submitted by Colonel West-brook to his counsel for review and advice as to its validity as a binding contract for the purposes stated therein. The lawyer to whom the agreement was so submitted was Mr. Thurman Hill,[29] who had been Colonel Westbrook’s legal adviser for 2 years, while serving as counsel to Trans-American Development Company. As Colonel Westbrook’s representative, Mr. Hill participated in the negotiations which preceded the execution of the contract in suit.[30]
(b) Mr. Hill began the practice of law in Washington in 1945, after 10 years’ employment in the Treasury Depart *94 ment. He had served as special assistant to the General Counsel of Treasury from January 1,1935, to April 22,1942, and as Chief Counsel of Treasury’s Procurement Division from April 22,1942, to August 1, 1944.[31]
B. Administrative Agencies [32]
11. (a) The functions of the Procurement Division of the Treasury Department were transferred to the General Services Administration (hereinafter referred to as GSA) upon the creation of that agency in 1949.[33]
(b) Among the personnel transferred from Treasury’s Procurement to GSA were two men who had been in Procurement during the years of Mr. Thurman Hill’s service with Treasury: Mr. A. J. Walsh and Captain Harry C. Maull, Jr.
(c) Among the procurement functions assigned to GSA were those initially vested in the Army and Navy Munitions Board by the Strategic and Critical Materials Stock Piling Act of 1946 for stockpiling purchases of strategic and critical materials.
12. (a) The Strategic and Critical Materials Stock Piling Act of 1946[34] contained the first postwar declaration by the Congress of United, States policy relating to the stockpiling of strategic and critical materials, as follows:
* * * the natural resources of the United States in certain strategic and critical materials being deficient or insufficiently developed to supply the industrial, military, and naval needs of the country for common defense, it is the policy of the Congress and the purpose and intent of this Act to provide for the acquisition and retention of stocks of these materials and to encourage the conservation and development of sources of these materials within the United States, and thereby decrease and prevent wherever possible a dangerous and costly *95 dependence of the United States upon foreign nations for supplies of these materials in times of national emergency.
(b) Section 2 (a) of the act authorized the Secretaries of War, Navy, and Interior, “acting jointly through the agency of the Army and Navy Munitions Board, * * * to determine, from time to time, which materials are strategic and critical under the provisions of this Act and to determine, from time to time, the quality and quantities of such materials which shall be stock piled under the provisions of this Act * *
13. (a) On April 3, 1948, the Economic Cooperation Administration was created “for the purpose of assisting certain foreign countries to achieve economic stability and independence through the promotion of increased agricultural and industrial productivity, monetary stability, and the growth of international trade.”[35]
(b) In the furtherance of its programs, the Economic Cooperation Administration (hereinafter referred to as ECA) established branch offices (usually known as “missions”) in all of the major capitals of Europe; and in other capitals throughout the Free World either a representative of ECA was attached to the American Embassy (or Legation) or someone employed by the Embassy (or Legation) was also assigned to ECA.
(c) The administration of the ECA programs, at home and abroad, posed many new problems in the field of procurement and offered many new opportunities for the acquisition by the United States of strategic and critical materials.
14. The hostilities in Korea[36] required large and rapid increases in procurement, at home and abroad. The renewed need for armaments accentuated the problem of strategic and critical materials. Larger needs expanded the opportunities for the use of and participation by ECA. The role and responsibilities of GSA in these endeavors were likewise enhanced.
*96 15. (a) On September 1,1950, the Administrator of GSA established within GSA a special branch designated as the Emergency Procurement Service (hereinafter referred to as EPS), and delegated to it the authority he had received from the Munitions Board to purchase, store, and dispose of strategic and critical materials.
(b) The Administrator of GSA (Mr. Jess Larson)[37] named as Commissioner of EPS, Mr. A. J. Walsh;[38] and Captain Harry C. Maull, Jr.,[39] became Director of the Purchase Division.
(c) Within the Purchase Division of EPS was an Ores Branch, the Assistant Chief of which was Mr. Leonard W. Mooney, a staff specialist in the procurement of tungsten ore.
16. On September 8, 1950 (one week after the creation of EPS), the President signed the Defense Production Act of 1950.[40] Following are some of its provisions:
Sec. 802. To expedite production and deliveries or services to aid in carrying out Government contracts for the procurement of materials or the performance of services for the national defense, the President may make provision for loans (including participations in, or guarantees of, loans) to private business enterprises * * * for the expansion of capacity, the development of technological processes, or the production of essential materials, including the exploration, development, and mim'rig of strategic and critical metals and minerals. Such loans may be made without regard to the limitations of existing law and on such terms and conditions as the President deems necessary, except that financial assistance may be extended only to the extent that it is not otherwise available on reasonable terms.
Sec. 303. (a) To assist in carrying out the objectives of this Act, the President may make provision (1) for purchases of or commitments to purchase metals, minerals, and other raw materials, including liquid fuels, for Government use or for resale; and (2) for the encouragement of exploration, development, and mining of critical and strategic minerals and metals: * * *
*97 (b) * * * purchases and commitments to purchase and sales * * * [under subsection (a)] may be made without regard to the limitations of existing law, for such quantities, and on such terms and conditions, including advance payments, and for such periods, as the President deems necessary, except that purchases or commitments to purchase involving higher than currently prevailing market prices or anticipated loss on resale shall not be made unless it is determined that supply of the materials could not be effectively increased at lower prices or on terms more favorable to the Government, or that such purchases are necessary to assure the availability to the United States of overseas supplies.
:ji ‡
Sec. 304. (a) For the purposes of sections 302 and 303, the President is hereby authorized to utilize such existing departments, agencies, officials, or corporations of the Government as he may deem appropriate, or to create new agencies (other than corporations).
(b) Any agency created under this section, and any department, agency, official, or corporation utilized pursuant to this section is authorized, subject to the approval of the President, to borrow from the Treasury of the United States, such sums of money as may be necessary to carry out its functions under sections 302 arid 303: Provided, That the total amount borrowed under the provisions of this section by all such borrowers shall not exceed an aggregate of $600,000,000 outstanding at any one time. * * *
(c) In addition to the sums authorized to be borrowed under subsection (b), there is hereby authorized to be appropriated to carry out the purposes of sections 302 and 303, such sums, not in excess of $1,400,000,000, as may be necessary therefor.
17. (a) On September 9, 1950, the President delegated to the Secretary of the Interior the authority contained in the Defense Production Act of 1950 relating to the “exploration, development, and mining of strategic and critical metals and minerals.” The Secretary thereupon created, within the Department of the Interior, a Defense Minerals Administration, to which he delegated his authority in the premises. Thereupon, DMA turned to GSA to serve as the contracting agency in procurement, and GSA referred the chores to EPS.
(b) During the remainder of 1950, EPS was charged with the responsibility of contracting for the procurement of *98 strategic and critical materials, subject to policy determinations by either the Munitions Board, under the Stock Piling Act of 1946, or the Defense Minerals Administration, under the Defense Production Act of 1950.
18. (a) On January 8, 1951, the President, by Executive order,[41] created the Defense Production Administration (sometimes hereinafter referred to as DPA) and delegated to it the authority with respect to metals and minerals which he derived from the Defense Production Act. The authority was to be exercised subject to the direction and control of the Director of the Office of Defense Mobilization.
(b) The foregoing action affected the responsibility for the determination of the policies controlling procurement by EPS, but not the administrative responsibility of that agency for the contracts of procurement.[42]
(c) On August 28, 1951, the President, by Executive order,[43] created the Defense Materials Procurement Agency (hereinafter referred to as DMPA), and transferred to it authority as follows:
Sec. 303. The Defense Materials Procurement Administrator is hereby authorized and directed to purchase and make commitments to purchase metals, minerals, and other materials, for Government use or resale, as authorized by and subject to the provisions of section 303 of the Defense Production Act of 1950, as amended * * *
Sec. 304. The Defense Materials Procurement Administrator is hereby authorized and directed to encourage the exploration, development, and mining of critical and strategic minerals and metals, as authorized by and subject to the provisions of section 303 of the Defense Production Act of 1950, as amended.
* * * * *
Sec. 307. The functions conferred upon the Defense Materials Procurement Administrator by sections 303 to 306, inclusive, of this Executive Order, shall be carried out in accordance with programs certified to the said Administrator by the Defense Production Administrator * * *
*99 (d) The foregoing action transferred to DMPA the responsibility for procurement contracting as well as for the determination of policies affecting procurement under the Defense Production Act of 1950. EPS was thus relieved of responsibility in the premises[44] in relation to the Defense Production Act of 1950, but retained its former responsibility under the Munitions Board and the Stock Piling Act of 1946.
19. (a) DMPA, the agency “by and through” which the United States acted in making the contract in suit, was created 8 weeks after the publication by the Preparedness Subcommittee of the Senate Armed Services Committee of a report entitled “Tungsten, 1951.” [45]
(b) At the time of the execution of the contract in suit (1) Mr. Larson was Administrator of GSA as well as of DMPA; ,(2) various staff functions of DMPA, such as fiscal, compliance, and personnel, were administered for it by the Comptroller, Compliance Division, and Office of Management of GSA; but (3) DMPA maintained a legal division of its own.[46]
(c) During the year 1952, both DMPA and EPS maintained offices and representatives abroad. From April 1952, General Thomas B. Wilson[47] was DMPA’s Director of Region III Headquarters for Europe, the Middle East, and Africa, with offices in London. EPS’ manager for Europe was Mr. George B. Guillotte. His office was also in London.
20. (a) After the creation of DMPA, the primary concern of EPS was the purchase of current supplies obtainable under the authority of the Stock Piling Act of 1946. The function of development, by encouraging increased production, passed to DMPA, operating under the Defense Production Act of 1950.
(b) Plaintiff’s representatives, Colonel Westbrook and Mr. Pulvermann, initiated discussions preliminary to contract negotiations just after the issuance of the report, “Tung *100 sten, 1951.” The discussions were begun through GSA, where plaintiff’s representatives were routed to EPS.
(c) Although DMPA was created in August 1951, negotiations for the contract in suit remained with EPS until May or June 1952, when they were shifted over to and completed by DMPA.
C. Tungsten: General
21. (a) Tungsten[48] is the hardest of metals with the highest melting point of any of them.[49] Its principal use is in the manufacture of tools for cutting metal, although the presence of tungsten in the filaments of electric lights is perhaps better known. Tungsten has its uses in electronic equipment, and tungsten salts are used in chemicals because of their resistance to acids. Militarily, tungsten is used in jet engines and as cores in high-velocity, armor-piercing projectiles. Atomic energy work also requires tungsten.
(b) The largest known reserves of tungsten are in China,, and, until 1950 at least, China was the largest producer of tungsten because of the high quality of its ores and the low production costs. Over a period of many years prior to 1950, China supplied 28 percent of the world total. The United States was second, supplying 13 percent, and Burma, third, with about 13 percent. They were followed by Bolivia, 0 percent; Portugal, 7.5 percent; and Korea, 6 percent.[50]
(c) Prior to 1950 the peacetime consumption of tungsten in the United States varied with the use of steel, ranging from 90 pounds of tungsten per 1,000 tons of steel, to 110 pounds of tungsten per 1,000 tons of steel, with the ratio of 100 pounds, to 1,000 tons representing a fair average. During both *101 World Wars this ratio doubled, 200 pounds of tungsten being required for each. 1,000 tons of steel. In quantity, the annual average consumption during the period 1935-1939 was 5.2 million pounds of tungsten. During World War II the annual average rose to 17.3 million pounds.
22. On July 1,1951, the Director of Defense Mobilization filed with the President his second quarterly report. Following are excerpts from it:
* * * A critical problem in relation to the types of steel needed is the shortage of alloying metals — needed particularly for the high-quality steel required in jet engines, tanks, and other modem weapons, and for machine tools and other essential purposes throughout industry. * * *
* * * Recognizing the vital need for distributing available supplies for the greatest benefit to the combined defense effort, the United States has taken a leading part in organizing, in Washington, the International Materials Conference. Altogether, 27 of the major producing and consuming nations are participating. * * * committees have been created, dealing * * * with * * * groups of commodities: * * * Molybdenum and tungsten * * *.
* * * Higher production of most basic materials requires capital development — new mines must be developed * * *. * * * the United States is working with producing nations to increase the availability of their supplies. Loans have been made for the exploration of mineral deposits in a number of Marshall plan countries and their dependencies — for example * * * tungsten in Portugal * * *. Two long-term contracts have been made covering present and expanded tungsten production from mines located in Peru and Argentina. The contract with the latter mine was accompanied by a loan.[51] * * *
* * * Through the guaranteed purchase program, the Government contracts to purchase specified quantities *102 of materials, particularly minerals, at an established floor price. Tungsten ores of a specified grade, for example, will be purchased at a floor price of $63 per unit. Such guaranteed purchases encourage private investment which otherwise would not take place. * * *
23. (a) On July 3, 1951, the Preparedness Subcommittee •of the Committee on Armed Services of the United States Senate released to the press excerpts from its 27th report of its investigation, and on July 5, 1951, filed with the parent committee the report entitled “Tungsten, 1951.”
(b) Following are excerpts from the report’s review of the •“Present Tungsten Situation,” in terms of the “Relation between Requirements and Supply” and the “Status of [the] National Stockpile”:
The United States is once more engaged in an effort to prepare for any eventuality, including all-out war. The preparedness program calls for a great acceleration in our industrial activity requiring a much larger supply of tungsten than was consumed in the years 1946 through [19]49.
The Defense Production Administration has advised the committee that “* * * tentative military and stockpile requirements plus overdue deliveries to the stockpile are in excess of total supply.” Unofficial estimates place our civilian requirements alone at 14,000,000 to 15,000,000 pounds a year.
The Bureau of Mines estimates domestic production in 1951 at 5,450,000 pounds and general imports at 7,000,000 pounds, resulting in an approximate deficit of 1,500,000 to 2,500,000 pounds for civilian requirements alone. This gives no consideration to the requirements of tungsten for the stockpile or for military purposes * * *. The Defense Production Administration sets the requirements of these items at a figure * * * greater than total expected supply in 1951.
*****
Faced with the above-described shortage of tungsten, we ask the next logical question, “What have we in our stockpile?” * * *
* * * * *
The bitter fact is that our stockpile is pathetically small. * * *
*103 (c) The committee report concluded that “* * * study of the actions of the Munitions Board in connection with the stockpiling of tungsten reveals a startling degree of shortsightedness and bungling * * This conclusion was dramatically foreshadowed in the opening sentences of the “Introduction” to the report:
On occasion the operations of some of the Federal agencies bear an unfortunate resemblance to a children’s game of blind man’s buff — with all the players blindfolded.
Two or more bureaus with separate but related functions will grope for each other in the dark. They will stumble over obstacles, paw at thin air, or just stand still in bewilderment. Usually, they get farther and farther apart as their search for each other becomes more frantic.
Finally, somebody is tagged as “it” and the blindfolds are removed for a few precious minutes of daylight. It is then discovered that what the players have tagged is the public welfare. When the agencies are defense agencies, “it” turns out to be the Nation’s security.
Such is the story of tungsten.
Here were two agencies — the Munitions Board and the Department of the Army. Each was the child of a parent organization — the Nation’s Defense Establishment. Each had an important defense responsibility involving a vital metal — tungsten. Each had the clear obligation to work together for the national security.
Yet, though both were housed in the same building, these two agencies, so far as tungsten problems were concerned, acted as though they had never been introduced. * * *
The Army had an important program — the development of armor-piercing shells — which required large amounts of tungsten. The Munitions Board had the responsibility of stockpiling the metal lest America’s supplies be suddenly cut off.
*****
The two agencies had merely to get together, decide how much was needed, and ask Congress for the appropriations.
And yet — for nearly 3 years no one — absolutely no one — informed the Munitions Board of the amount of tungsten required for the Army’s core program and the Board made no effort to find out about it. The two agencies seem to have been playing “blind man’s buff.”
*104 Today, the United States and the free world stand on. the verge of tungsten starvation. * * *
D. Tungsten in Portugal
24. (a) Substantial quantities of tungsten were mined ini Portugal during both of the World Wars. Otherwise, Portugal was one of the areas wherein the production of this-metal was submarginal. During the years immediately preceding 1950, Portuguese production of tungsten was desultory and of little consequence to either the world supply of the-metal or the national economy of Portugal.
(b) Several mineral ores[52] occur in a mountainous zone in the northern half of Portugal. Many of the ore deposits (including tungsten and tin) are located at or near the surface. Numerous outcroppings are visible. Most of the area is rather easily accessible.
(c) Mining, in the sense of digging for minerals, has been practiced in Portugal for centuries.[53] It began as a handwork industry and has continued to be essentially a pick-and-shovel operation. Mechanization has been slow and of limited extent.[54]
(d) Traditionally, handwork mining has been considered in Portugal as an occupation (or avocation) open to all, like fishing in the sea. Just as he who would tax a fisherman’s catch had first to find the fisherman and his catch, so did he who would either tax or assert an owner’s claim to the miner’s take have first to find the miner and his take. Like the inlets and coves of the seacoast, the folds and crevices of hidden valleys throughout the low eroded mountains of Portugal defied detection except by occasional chance.
25. (a) Tungsten did not become an important factor in Portuguese mining until World War I. Hostilities then enhanced the need for the metal, in the production of armaments and other implements of war. A fierce competition ensued, between Germany on one sidé, and England and France on the other. Price was usually the dominant factor in the competition. Prices, therefore, soared.
*105 (b)The urgent demands of the combatants for tungsten, hacked by cash on delivery, produced in the mountains of Portugal something akin to an American gold rush. Prospectors went into the hills in great numbers. Some staked out claims and organized the mining of them with hired labor. Others simply dug on their own for their own. While the war-born demand lasted, there was bounty for all. The nondescript miners of Portugal’s nondescript mines produced a short-lived generation of Portuguese nowoeaux riches.
26. (a) In 1930 the Salazar Government initiated an extensive revision of the mining laws. During the times material to this action, Portuguese law asserted controls over the mining, transport, sale, and export of ores and minerals, tungsten included.
(b) The foundation of Government control was the concept that all subsurface and mining rights were the property of the State. Every step in the development of mineral resources was thereby made subject to leave or license. Controls were asserted accordingly. Their supervision was entrusted to a General Mining Department which functioned through regional bureaus of mines.
(c) Exploration by private persons was invited, but a “concession”[55] would be granted only upon proof by the applicant of the discovery of an ore body of commercial value and upon condition that the Government approved the applicant’s development plans and considered his financial responsibility sufficient for the development task.
(d) Portuguese law forbade the sale or export of ores or minerals from sources other than legal concessions. In order for a concession to be legal it had to be under the supervision of a technical director, of Government-approved qualifications,[56] who became responsible to the Mining Department for compliance with the rules and regulations governing the exploitation of ore deposits.
(e) The lawful transport of ore required a permit {guia). Eor every lot of ore leaving the concession, the concessionaire *106 was required to prepare, in triplicate, a transport permit showing its nature, source, quality, quantity, route, and destination. One copy of the permit was to be filed with the Mining Department within 15 days. One copy remained in the concessionaire’s files, and one copy accompanied the ore in transit. Any ore found outside a concession without a transport permit was subject to confiscation.[57]
(f) The copy of the transport permit which accompanied the ore in transit was also destined ultimately for the Mining Department. If the ore went to a treatment plant or dealer, the recipient surrendered the permit to local representatives of the Mining Department and supplied a new permit when the ore went on. If the ore went directly to export warehouses, the exporter or warehouseman surrendered the permit to the customs authorities, who, in turn,, forwarded it to the Mining Department.
(g) The export of ores[58] required an export license, to be-issued by the Department of Foreign Commerce of the Ministry of Economy, subject to the prior approval of the Mining-Department. The latter department required (1) a separate-export license for each lot of ore or mineral and (2) information on each lot as to its quantity and assay reports (supported by the numbers of the applicable transport permits)[59]' and documentary proof of the sale of the ore or mineral.
(h) Taxes were also imposed on the yield of the mines- or on the privilege of engaging in the industry, payable in-one form or another and in greater or lesser amounts to the governments of the localities (municipality or parish or both) and the nation.[60]
27. (a) The foregoing requirements of the revised mining laws were, for the most part, in effect when World War *107 II began in 1939. By the time the war ended, the General Mining Department had certified for registration (as having-proven industrial value) some 800 concessions for the mining-of tungsten.[61]
(b) The wartime production did not induce extensive-mechanization. Very few mines had vertical shafts or were-equipped with heavy machinery. The bulk of the ores was-obtained by hand, assisted (if at all) by crude mechanical operations. The work of extraction, therefore, was limited to surface operations and horizontal galleries built into the-hillsides.[62]
(c) When the wartime demand (with its liberal price-support) was withdrawn,[63] the nonmechanized mines again became submarginal. By 1950, at least 600 of the 800 registered concessions were closed.
(d) During the period 1948-1950, one mine[64] accounted; for 55 percent of the total production of tungsten in Portugal. A second mine[65] accounted for another 10 percent of production. Another 15 percent of production was attributable to similarly equipped mines, while 20 percent of the-total output came from 100 (more or less) small producers. At the end of the period total production was running at the rate of 2,500 metric tons per year.[66]
28. (a) Portugal’s extensive revision of her mining laws; during the 1930’s set the stage for a division of interests between capital and labor which was more pronounced and better defined than any the mining industry of the nation-had theretofore known. Substance and meaning, in terms of capital and labor, were infused into this division by the World War II boom in the production of tungsten and other metals similarly mined. It took the “bust” following- *108 the war’s end, However, to indicate the relative strength of the economic equations that were inherent in the newly fostered division of interests.
(b) The capital interests, represented by the concessionaires, were severely shocked, if not seriously hurt, by the abrupt termination of demand for their products. In consequence, the postwar years found the smaller producers in particular in no mood to bestir themselves for the resumption of production without some assurance of greater stability. Their need was for price levels high enough and constant •enough to warrant the risk of venture capital.
(c) The labor interests were represented, of course, by the mining work force. Except for some of the employees of the few large industrialized mines, the members of this work force were never (before, during, or after World War II) miners by vocation as that occupation is understood in the United States. Under the conditions that prevailed in the Portuguese mines during World War II, there was some similarity between the Portuguese miners and American migrant workers. In terms of conditions in Portugal before and after the war, these people were simply Portuguese peasants.[67] When bust followed boom at the close of World War II, all semblance of steady employment and regular income ended for these quondam miners. The result for them was a toboggan slide into the status qua ante.
29. (a) Generations of Portuguese peasants have mined ■ores from the mountains just as they have taken fish from the sea. The standard operation consisted of an excursion of the peasant family into the mountains. The man (or men) would locate and loosen the ores, which would then be carried (sometimes by children, if the pieces were small ■enough) to a central assembly point where the washing could be done by women. The ores, thus reduced to concentrate ■as near as might be, would then be carried home, or marketed •on the way.
*109 The peasants who engage in this operation have come to' be known as pilhas.[68]
(b) Marketing was done through pickers and dealers. Virtually every community had one or more pickers who would accept the pilha’s ores and give him supplies or money in return. The ores accepted by the pickers were pyramided; until the work product of several pilhas or several excursions represented a sufficient accumulation to warrant shipment to a dealer.[69]
(c) The methods of mining and marketing described in the preceding subdivisions of this finding represent the standard pattern of the pilhas and the pilha system. It was-the standard pattern before World War II and after it. Following a short-lived improvement in the situation of the pilhas during World War II,[70] the standard pattern reflects the status quo ante to which they returned.
30. (a) Strict, literal enforcement of the revised mining, laws, under the conditions existing after World War II, would have destroyed the pilha system by eliminating the pickers.[71]
(b) At the times material to this action, both the industry (the owners of concessions) and the Government had made-accommodations to the realities of the situation, and ores mined by pilhas and sold to pickers were moving under guias-duly signed by the concessionaires. There was no indication that the laws would be so enforced as to destroy or even impede the traditional system of production and marketing.. *110 The fact remained, and was apparent to those who were fully informed,[72] that the Government could control the mining of tungsten as fully as it pleased whenever it might choose to do so.[73]
rv. NARRATIVE
A. To June 30,1951
31. (a) Dr. Soares was a participant in, as well as a witness of, the wartime boom and postwar bust in the mining of tungsten in Portugal. In 1950, when he began working on the plan which was later developed by and in the name of the plaintiff corporation, he was fully cognizant of (1) the reluctance of small producers to resume operations without some assurance of stability, (2) the twilight zone of legality in which the pilhas, pickers, and dealers were then operating, and (3) the rugged (even ragged) economy afforded the pilhas by their borderline operations.
(b) The basic element of Dr. Soares’ plan was organization. He believed that through careful organization of both production and marketing, sufficient savings could be effected to make a profitable venture of operations which otherwise had no favorable prospects. To this end it was his purpose ■to bring together under one management the control of substantial mineral resources. From the outset his attention was in the main centered on the ore veins (concessions) of the small producers and on the labor of the pilhas.[74] Through the proper coordination of these two he expected to develop an ■operation capable of competing with the established (mechanized) mines.[75]
*111 32. On February 27, 1951, GSA entered into a contract with Bensaude & Company, of Lisbon, whereby Bensaude was to serve as the sole agent of GSA (acting through EPS) in Portugal for the purchase of tungsten and 11 other items.[76] The selection of Bensaude & Company was made by General Wilson. The letter-contract was signed, in behalf of GSA, by Jess Larson, Administrator, and in behalf of Bensaude, by Antonio de Medeiros E Almeida, Managing Director.
33. During the spring of 1951 Dr. Soares obtained options to purchase either the assets of or the controlling stock in several companies which owned mines of tin or tungsten. He made an agreement with another company to provide it with equipment in return for a percentage of the mine’s production. His efforts to finance these undertakings were unsuccessful, and no payments were made on account of any of them, although the undertakings entailed potential commitments for payments in excess of 21,000 contos ($735,000).[77]
34. (a) Early in June 1951 Mr. Pulvermann visited Portugal to examine a manganese mine of which he had been told by an American lawyer, Mr. Anthony H. Manley, who was then living and practicing in Paris. Mr. Pulvermann had met Mr. Manley through Mr. Robert Bauer, onetime officer in the Austrian Army, whom Mr. Pulvermann had known casually many years earlier.[78] Mr. Pulvermann made the trip to Portugal at his own expense.
(b) Finding the manganese mine disappointing, Mr. Pulvermann took occasion to investigate the mining of tungsten, as to which he had recently done some reading.[79] His studies and observations led him to conclude, as had Dr. *112 Soares a year before, that if stable markets could be developed at proper prices, the mining of tungsten in Portugal would, be profitable. Upon inquiry as to native Portuguese engaged, in such an endeavor, he was directed to Dr. Soares as possibly the only one working along such lines.
35. (a) Mr. Pulvermann and Dr. Soares met in Lisbon on June 14,1951, and spent most of 3 days (June 14-15-16) discussing plans and possibilities. Their conversations were-interrupted by an urgent message to Mr. Pulvermann from Essen, Germany, concerning a matter in which he and Colonel Westbrook were interested. Mr. Pulvermann thereupon returned to Paris en route to Essen. Shortly after his arrival in Paris, he found his Essen client also there, which made it unnecessary for him to continue on to Essen.
(b) Upon his departure from Lisbon, Mr. Pulvermann' took with him the following memorandum signed by Dr.. Soares :
In the name of the Companhia Atlántica de Desenvol-vimento e Exploracao de Minas, at the present time under organization, I hereby give you, for 60 days: beginning June 16th, 1951 an option for the placement, in the U. S. A. or in Continental Europe, of a contract comprising the sale of :
a) — a lot of 1000 to 3000 tons of wolfram concentrates (wolframite or scheelite) with the chemical specifications and usual conditions of either contract B or C.
b) —a lot of 1000 to 3000 tons of tin-metal, with a purity of no less than 99,6% of tin.
Both lots to be delivered by the Company, in parcels,, during a period not exceeding two years, from the date of signing of the contract between the Company and the Buyer.
Price, payments and all the details of the delivery plan to be discussed, established and agreed in due time.
We should like to consider any contract for the selling of beryl, tantalite, ilmenite or mica; occasionally we should supply some molybdenum from Portugal, which does exist but is not under actual exploitation.
I am in the position to furnish you with all the information and particulars about the Company and its activities and connections in this Country.
*113 (c) In Paris Mr. Pulvermann reported to Messrs. Manley and Bauer concerning tbe manganese mine in Portugal, but made no comprehensive report to them of his investigation of tungsten or of his conversations with Dr. Soares. He did give Mr. Bauer a resume of his activities, and Mr. Bauer reported to Mr. Manley. Thereupon, Mr. Manley made some inquiries of the ECA representative in Paris (Mr. Collinet), and found evidence of marked interest in tungsten. Mr. Pul-vermann, upon learning of Mr. Manley’s activities, was much displeased,[80] and refused Mr. Manley’s invitation to see and talk with Mr. Collinet.
(d) Mr. Pulvermann went from Paris to London (en route to Washington) to talk with the ECA representative in London, Mr. Guillotte, to whom he had been given a card of introduction by Mr. Manley. Mr. Guillotte also expressed interest in Mr. Pulvermann’s report of the potential tungsten project in Portugal, and suggested that in Washington Mr. Pulvermann should see General Wilson and Mr. Walsh. While Mr. Pulvermann was in London he received a letter of introduction to General Wilson from Mr. Manley.
(e) Within less than 2 weeks of the time he left Lisbon, Mr. Pulvermann was in Washington with the purpose in mind of seeking a market for tungsten ore through agencies of the United States Government responsible for the procurement and stockpiling of strategic materials.
36. (a) In Washington Mr. Pulvermann reported in detail to Colonel Westbrook concerning the German matter in which they were jointly interested, but made no more than passing reference to his visit to Portugal. He did seek information from Colonel Westbrook as to the identity and positions of General Wilson and Mr. Walsh but Colonel Westbrook did not know either man.
(b) On June 29, 1951, Mr. Pulvermann talked with General Wilson, outlining to him the prospect of obtaining Portuguese tungsten through Dr. Soares’ Atlántica project. General Wilson said that he had been out of the country *114 for 2 months and was out of touch with the details of the tungsten program. He said that Mr. Pulvermann should see Mr. William Freeman, Assistant Commissioner of EPS. General Wilson did not mention to Mr. Pulvermann the contract of GSA with Bensaude & Company.
B. July 1 to September 30, 1951
37. (a) Mr. Pulvermann had his conference with Mr. Freeman on July 3.[81] After a brief discussion of the requisite specifications of tungsten ore and some probing of prices, Mr. Freeman said that an armistice was reported to be near in Korea,[82] wherefore EPS was not interested in a long-term contract for the purchase of tungsten.
(b) After his conference with Mr. Freeman, Mr. Pulver-mann spent the remainder of July 3 in conference with Colonel Westbrook. They were together when a radio news, broadcast reported the issuance by the Senate Preparedness Subcommittee of a report on tungsten which was severely critical of the procurement and stockpiling programs.[83]
(c) Mr. Pulvermann thereupon explained to Colonel West-brook in full detail (1) his arrangement with Dr. Soares and (2) his discussion with the Assistant Commissioner of EPS a few hours before. Both men considered the report of the Senate subcommittee, as reviewed by the newscast, to be contradictory of the attitude Mr. Pulvermann had encountered at EPS. They decided to seek further clarification through the office of the chairman of the Senate subcommittee.[84]
38. (a) On July 5, 1951, the office of the chairman of the subcommittee referred Colonel Westbrook to the director of the subcommittee staff, Mr. George Beedy. On July 6, Mr. Beedy met with Colonel Westbrook and Mr. Pulvermann, and referred them to Mr. Laurence P. Sherfy, counsel for the subcommittee. After full discussion Mr. Sherfy made an appointment for them to see GSA’s Assistant Administrator for Defense Coordination, Mr. Irving Gumbel, the. same day.
*115 (b) Mr. Gumbel suggested that Mr. Pulvermann must have misunderstood Mr. Freeman; that Mr. Freeman might have said only that a long-term contract with Portuguese suppliers was precluded by the arrangement with Bensaude & Company. When Mr. Pulvermann stated that he had never before heard of Bensaude, either in Portugal or the United States, Mr. Gumbel made inquiry of both General Wilson and Mr. Freeman and learned that neither had mentioned Bensaude to Mr. Pulvermann. Thereupon, Mr. Gumbel suggested that Colonel Westbrook and Mr. Pulver-mann ascertain whether or not Dr. Soares would be willing to deal through Bensaude.
(c) At a second conference with Mr. Gumbel, on July 12, 1951, Mr. Pulvermann reported that Dr. Soares was reluctant to deal with Bensaude because of Bensaude’s lack of experience with mines and minerals.[85] Mr. Gumbel then expressed the opinion that a contract could be negotiated in Washington, provided Dr. Soares’ company could furnish assurance of its ability to produce and deliver.[86] Mr. Pulvermann said that he would return to Portugal immediately to complete the measures preliminary to negotiation.
39. (a) With the way open for the negotiation of a contract, Colonel Westbrook and Mr. Pulvermann analyzed (1) the possibilities that were open to them as participants in Dr. Soares’ project and (2) the principles by which they should be guided in dealing with Dr. Soares and his company (or associates) ,[87]
(b) From the standpoint of compensation for their participation in the project they considered and rejected the possibilities of (1) a fixed fee for their services; (2) a stock *116 participation in the company to be formed; and (3) a syndicate to be organized by them to buy the tungsten from the ■Soares corporation for resale to the United States.[88] Their ■decision centered on a commission on sales. They further ■decided, on advice of counsel,[89] that their contract should describe them as sales agents and should give them exclusive ■sales rights on all products for a specified period of time.
40. On July 15, 1951, as Mr. Pulvermann was preparing to return to Europe, Colonel Westbrook expressed in writing (addressed to “Dear Heinz”) his views of the venture, as follows (in part) :
‡ $ $ $ $
1. Companhia Atlántica * * *. In his letter * * * of June 16,1951, Dr. * * * Soares stated that he was in position to furnish * * * full information about the Company and its activities and connections in Portugal. I suggest that you explain that you and I are now in position to enter into serious negotiations for sale of the products of the Company (especially wolframite) in the United States and Western Europe; and that we should like to obtain at this time all information available pertaining to the proposed Company, including:
a. The legal form of the Company. Will it be a holding company with powers and responsibilities delegated by its subsidiaries, or will it be a new company directly owning the assets of the existing affiliated companies to which it would issue its own stock? Or will it be a Central Sales Agency, similar to D. K. B. L.? Purchasers will want to have full assurance of the authority and the responsibility of actual owning and producing companies in connection with any contracts that might be negotiated. Fully confirmed documentary evidence of such authority and responsibility would no doubt be required by purchasers prior to entering into contracts.
b. Individual reports upon the standing and qualifications of the principal officers of the proposed Company. Since the Company will have been newly formed, it is *117 especially important that this information with respect to its responsible officers be supplied to prospective purchasers.
c. The attitude of the Portugese [sic] government toward the Company and toward the proposed method of operations and sales. In view of the fact that the governments of both producing and consuming countries have a vital interest in the products concerned (the U. S. government will be the sole purchaser for this country), and in view of the International Agreement entered into in Washington on July 8, to which the Portugese [sic] government subscribed, it may be assumed that the approval of the Portugese [sic] government would almost certainly be required for any sales contracts entered into by its Nationals. Thorough exploration of this aspect of the situation is a primary essential.
d. The date when the new Company will be formally organized, and able to enter into legal agreements. * * *
e. The date when actual shipments could commence under contracts, including estimated quantities within specified periods of time. * * *
f. Summary. It is indispensable to our program that we deal with a responsible business organization competent to carry out its obligations under any sales contracts that we might negotiate. Any contracts entered into by such organization must probably have the approval and sanction of the Portugese [sic] government.
2. Prices. The stipulation in the prospectus of Com-panhia Atlántica * * * that prices be established on the basis of the “best prices of the London market etc.” is neither realistic nor desirable from the standpoint of producers. * * *
A much more reasonable and desirable formula would be based upon actual costs of production and merchandising. * * *
3. Contract with Companhia Atlántica. Col. Wozen-craft recommends that you and I enter into this contract as a partnership. He suggests that we should be designated in the contract as “Sales Agents”. If possible the contract should give us exclusive sales rights to all products for a specified period of time — not less than two years.
The only obligation that we should assume under the contract would be to dispose of products at the best prices obtainable by us, but, since our interests would be served by maximum production, we would, without •obligation or compensation other than actual expenses *118 incurred, render the Companhia such services as might be of assistance in increasing production, including such matters as aid in securing equipment etc.
Our compensation should be based upon a flat percentage, say five percent, of an agreed-upon minimum price for each product plus a progressively increasing percentage of all sums received above the stated minimum. The contract should provide that we should be paid by direct assignment to us of the appropriate portion of proceeds received by the Companhia from purchasers. * * *[90]
* * * * *
41. (a) On July 19,1951, Mr. Pulvermann arrived in Lisbon and began a series of conferences with Dr. Soares to establish bases suitable for formal negotiations with the United States of a contract for the sale of tungsten.
(b) One of the needs upon which they agreed concerned the addition of prestige names to the list of incorporators. Within the next month Dr. Soares enlisted in the endeavor General J ose Filipe de Barros Rodrigues, Chief of Staff of the Portuguese Army,[91] who became chairman of Atlantica’s board of auditors,[92] and Major Carlos Augusto d’Arrochella Lobo, Director General of Unemployment in the Portuguese Ministry of Public Works,[93] who became chairman of At-lantica’s board of administrators.[94]
42. Shortly after Mr. Pulvermann’s return to Portugal from the United States, and before the end of July 1951, Colonel Westbrook, in Washington, retained the law firm *119 of Barnes and Hill to represent Mr. Pulvermann and himself in their relations with plaintiff and in their activities on its behalf.[95] The agreement provided that the law firm should receive as its fee 10 percent of the net proceeds received by Colonel Westbrook and Mr. Pulvermann from plaintiff. Within the law firm the responsibility for this representation was assumed by Mr. Hill.
43. On July 24, 1951, Colonel Westbrook addressed the following “confidential” memorandum to Senator Lyndon B. J ohnson:[96]
1. Last spring Heinz Pulvermann, who was associated with me in connection with my work as consultant to the Ruhr industries, was told by some of his friends in the German steel industry that one of the greatest obstacles to the expansion of the industry was the lack of Tungsten. They said that the best natural source of supply, outside Russian control, was in Portugal, but that the industry there was completely disorganized, and that they thought a substantial part of what was being produced was getting to Russia through Switzerland. They suggested to him that we ought to see what we could do about re-organizing the industry so as to increase the supply to non-Russian countries. Incidentally, Pulvermann had made quite a reputation developing and modernizing lignite mines in Germany, and at the outbreak of World War II he was head of the German Brown Coal industry.
2. After consulting with me and with informed people in Germany and France, Pulvermann went to Lisbon early last May with an introduction to Dr. Celestino Soares, a Portuguese industrialist recommended by Pul-vermann’s friends as being the key figure in the Portuguese Wolframite mining industry. With Dr. Soares he made a survey of the situation, and found that the industry was indeed disorganized, using antiquated rmrung equipment and methods, and that considerable production, especially from smaller mines, was probably being boot-legged into Russia. Under the leadership of Dr. Soares a number of the more important producers were brought together to discuss their problems. It was obvious that expenditures for improvement of production *120 were out of the question unless a dependable, market could be assured over a considerable period of time.
3. As a result of these discussions Pulvermann was given an option by Dr. Soares in behalf of the group of producers for from 1000 to 3000 tons of Wolframite and for from 1000 to 3000 tons of Tin to be delivered within two years, prices to be those prevailing on the London market at time of shipment. He was assured'' that if he could arrange for the financing of modern equipment on the basis of forward orders, quantities could be substantially increased, and that a new .basis for establishing prices might be arrived at. This arrangement was made on June 16, 1951.
4. On his way back to the United States to confer with me relative to the carrying out of this deal, Mr. Mandel, an American attorney living in Paris who was a friend of Pulvermann’s, told him that he (Mandel) had some contacts with people in the American Government who were charged with responsibility for the purchase of strategic materials, and gave him a letter of introduction to General Tom B. Wilson of the General Services Administration. After his arrival here Pulvermann reported to me, and I told him go to see Gen. Wilson and explain the situation to him. He came back and said that Wilson had said that he knew little about the matter and had referred him to a Mr. Freeman of GSA, who, he said, was responsible for procurement of this nature. Freeman told Pulvermann that GSA was not interested in making long-term commitments for the purchase of Wolframite, and that he sawT little chance of developing any business along the lines suggested by Pulver-mann.
Pulvermann returned to my apartment, and was in course of telling me of his talks with Wilson and Freeman when a radio news commentator gave an account of the investigation conducted by your Committee into the failure of U. S. authorities to acquire an adequate stockpile of Tungsten.
5. I immediately went to the ’phone and called your office. I was put in touch with Mr. Reedy who gave us an appointment for the following morning. We told our story to Reedy, who seemed to be favorably impressed, saying that he could not understand Mr. Freeman’s statement that GSA was not interested in making long-term commitments for Wolframite. He arranged for us to talk to Mr. Sherfy, your Committee Counsel. He said that he thought we should talk to some one else in GSA, and that he would discuss the matter with *121 Needy, whom we should call later on in the day. This we did, and Needy said that he would undertake to make an appointment for us to see Mr. Irving Gumbel, Asst. Administrator in charge of Defense Coordination.
6. We saw Mr. Gumbel that afternoon. He was most courteous, but said that he understood that GSA had a,n agent in Lisbon responsible for making all strategic material purchases for the U. S. on the Iberian Peninsula. He suggested that we should discuss our proposal with this agent. Pulvermann said that he knew about this agent, but said that he understood the agent had been able to acquire only a relatively small amount of Wolframite in Portugal, and that we had hoped that, in view of the large quantity of production possible under the proposed organization of producers, the IT. S. would be willing to deal directly. Mr. Gumbel said that he thought this idea had some merit, and left his office to go talk to Gen. Wilson about it. However, when he returned he said Wilson felt that the arrangements with the Lisbon agent were preclusive. I had the feeling, though, that Gumbel, himself was not entirely happy about the situation. Pulvermann and I left with the understanding that we should talk the matter over further, and would probably get in touch with Gumbel again.
7. This was on a Friday. On Sunday the International Strategic Materials Committee, which had been meeting for several months previously, announced that an agreement had been reached allocating the world supply of Tungsten (less that controlled by Nussia) to various Western nations, and prescribing maximum and minimum prices. Monday I called Gumbel and asked him what effect this international agreement would have upon our proposals. He said that he did not know — that details had not been worked out, but that it was possible that there might not be much place for private enterprise in the new set-up. I also called Needy, who said that in his opinion our proposals would not be affected. He said he didn’t believe the agreement was intended to cover long-term contracts, pointing out that allocations were on a quarterly basis. He suggested that it might be a good idea for us to have another talk with Gumbel.
8. Pulvermann and I went back to see Gumbel the following day. He said that after thinking the matter over thoroughly, he felt that, if he could get adequate assurances of production and delivery, a contract could be negotiated right there in his office. He was most cooperative and cordial, making an appointment for us *122 to talk to the Chief of the Strategic Materials Division of EGA relative to possible financing for mining equipment. We told him that under these circumstances Pul-vermann would return to Portugal at once to complete the legal organization of the mining companies, and to obtain authority to negotiate sales contracts. Gumbel said that General Services Administrator Larson and Gen. Wilson would probably be in Lisbon the latter part of this month, and that Pulvermann should talk to them there.
9. Pulvermann flew to Portugal last week. He telephoned me from Lisbon this morning that all arrangements for the consolidation of the producing companies had been satisfactorily made, and that the necessary legal documents would be executed this week. He said that present indications were that Wolframite production could be stepped up to 4000 tons, and that, provided a sales contract could be negotiated promptly, some actual shipments could be made in August.
10. He expressed considerable concern, however, that the Portuguese Government might use the occasion of Mr. Larson’s visit to open up Government-to-Government talks with the view of bargaining with the United States with respect to various other matters. He said he was convinced that under our set-up the Wolframite can be obtained at a fair price based on over-all production costs, and without any special concessions. He said he was afraid if extraneous matters were brought into the picture, the situation might become quite complicated and that extended delays might ensue, He suggested that I should endeavor to see Mr. Larson before he should leave the United States, and discuss this matter with him. I should appreciate it greatly if you would arrange an introduction for me to Mr. Larson.
44. (a) As indicated in the foregoing memorandum, the agreement announced on July 8, 1951, by the International Strategic Materials Committee for the allocation of the (Western) world’s supply of tungsten might have been made the basis for government-to-government contracts for the production of the metal. Such contracts might have precluded private enterprise contracts across international boundaries for the mining of tungsten. Neither contingency occurred.[97]
*123 (b) Colonel Westbrook’s purpose in writing the memorandum to Senator Johnson was to obtain an introduction to Mr. Larson under committee auspices in order that he might try to convince Mr. Larson that (in the words of Mr. Pulvermann’s cable of July 24) “* * * this matter should be left on private level * *
(c) Mr. Pulvermann’s “expressed * * * concern” that “the Portuguese Government might use the occasion of Mr. Larson’s visit to open up government-to-government talks with the view of bargaining with the United States with respect to various other matters * * was a reflection of concern felt by Dr. Soares, based on his knowledge of the Portuguese Government.[98] Neither Mr. Pulvermann nor Dr. Soares was concerned at the time over “government-to-government bargaining” as a policy of the United States.
45. (a) On July 27, 1951, Colonel Westbrook reported to Mr. Pulvermann that he (Westbrook) had met with Mr. Larson “yesterday for about half an hour” and that Mr. Larson had told him—
* * * that he [Larson] had a definite appointment with Salazar, and that his principal object in seeing him was to discuss the Tungsten situation. * * * that reports he [Larson] had received indicated that Dr. Soares’ group and his plans for consolidation of producing companies were not favorably regarded by the Portuguese Government * * * that, on the other hand, the present GSA agents were well regarded. * * *
* * * that GSA had now made long-term commitments for about % °f the total world supply of Tungsten, outside of Russian control, and that they were not greatly worried about their position. * * * that GSA was pleased with the operations of their agents in Lisbon, and * * * that the Portuguese Government was also pleased. * * *
(b) In the same letter Colonel Westbrook further reported to Mr. Pulvermann that he had “* * * discussed all this *124 with Reedy, who said that be did not understand Larson’s attitude — that Gumbel had full authority to proceed * * * and that he (Reedy) was going to look into the matter further. * * *”[99] On August 1, 1951, Colonel Westbrook made a further report to Mr. Pulvermann:
I had a long talk with Reedy this morning. He has been digging into the situation at GSA pretty thoroughly. He told me the following
GSA has had a number of tentative offers of wolfram-ite recently from Portugal, these offers being along the general lines of the “option” that you had from Dr. Soares. They have practically all indicated annual deliveries of up to 3000 tons. Obviously those who made the offers have expected to obtain their supplies from substantially the same sources as Dr. Soares. I gather that GSA and the State Department are somewhat skeptical of the entire situation.
One offer, however, was for 40 tons already loaded on a boat, and was accompanied by a letter from Dr. Salazar and one from the Ministry of Economics giving assurances of export licenses. This offer was tentatively accepted by GSA, but, for some reason, Larson himself turned it down.
GSA suspects that, instead of Portuguese wolframite being black-marketed into Russia, the Russians themselves may be using Portugal as an outlet for their surplus. This would probably not make much difference, however, if the wolframite could be bought on satisfactory terms.
If we can submit a firm proposal for a substantial quantity of Wolframite from Portugal, backed up by incontrovertible evidence of ability to deliver, such a proposal would receive appropriate consideration, notwithstanding any existing attitude to the contrary.
(c) Colonel Westbrook closed the foregoing letter as follows:
Summing up the situation, it seems to me, Heinz, that our decision as to whether to go ahead with this business depends altogether upon our conviction that we should be able to submit firm proposals from fully responsible people. * * *
*125 46. (a) In mid-August 1951, Mr. Larson and General Wilson made a 24-hour visit to Lisbon. Dr. Soares decided that the circumstances were not propitious for him to see Mr. Larson and he made no effort to do so.[1] Mr. Pulvermann, however, believed it advisable, in terms of his relation with Colonel Westbrook and of their relation to the Senate subcommittee, for him to talk with Mr. Larson and General Wilson.
(b) In the interest of time and of being helpful, Dr. Soares suggested that Mr. Pulvermann channel his request for an appointment through the office of Mr. Easton T. Kelsey, ECA representative at the American Embassy, with whom Dr. Soares had had some prior business. Mr. Pul-vermann did so.
(c) Mr. Pulvermann obtained an appointment with Mr. Kelsey by telephone on the basis of Washington contacts, without mentioning either Dr. Soares or Atlántica. When Mr. Pulvermann explained to Mr. Kelsey in the latter’s office that his mission was to see Mr. Larson in behalf of Atlántica, Mr. Kelsey’s cordiality vanished; and, by the time the interview ended, Mr. Pulvermann had abandoned his effort to get an appointment with Mr. Larson.
(d) Mr. Kelsey told Mr. Pulvermann (1) that Dr. Soares had approached him earlier in the year with a proposal for the development of mines formerly owned by Germans, which, although then in litigation, were not owned or controlled by Dr. Soares;[2] (2) that in his opinion, Dr. Soares *126 was merely a promoter and not particularly qualified to develop an industry; and (3) that according to a Portuguese report[3] which Mr. Kelsey had or had seen, Dr. Soares had been convicted of embezzlement of consular funds while serving in Providence, Rhode Island, and had served a term in jail for the offense.
47. (a) Mr. Kelsey’s derogatory report on Dr. Soares[4] made it imperative for Mr. Pulvermann and Colonel West-brook to satisfy themselves, as a preliminary to the development of “firm proposals” for submission to the American Government, that they were dealing with “fully responsible people,”[5] having Dr. Soares in mind particularly.
(b) Mr. Pulvermann and Colonel Westbrook did satisfy themselves that Dr. Soares was a man of upright character, and of good repute in his native country; and that he and his associates were “fully responsible people.”
48. (a) In the course of his investigations of Mr. Kelsey’s charges against Dr. Soares, Mr. Pulvermann obtained information which satisfied him (and later Colonel Westbrook) that Bensaude & Company was somehow responsible (1) for the attacks on Dr. Soares and (2) for some of the adversities by which Atlántica was thereafter beset.[6]
(b) Mr. Pulvermann and Colonel Westbrook further believed that Bensaude & Company had constant and ready access to responsible and highly placed officials of the American Government through General Wilson; that General Wilson considered Bensaude & Company entitled to exclusive representation of the United States for the purchase *127 of Portuguese tungsten; that General Wilson was unsympathetic toward the Atlántica project from the outset; and that as Atlántica persevered, General Wilson engaged in active obstruction of its progress.
49. (a) General Wilson had selected Bensaude & Company, as heretofore noted,[7] for appointment (in February 1951) as the exclusive agent of the United States for purchases in Portugal and its overseas territories.
(b) On the day following the visit of Mr. Larson and General Wilson to Lisbon, Portuguese newspapers reported the appointment of Mr. Almeida,[8] general manager of Ben-saude & Company, as the exclusive agent of the United States for purchases in Portugal.[9]
50. (a) The plaintiff company was incorporated on August 21, 1951. Its articles provided for an initial capitalization of 1 million escudos ($35,000), to be increased to 25 million escudos ($875,000) within 60 days.[10] The capitalization was based on subscriptions for shares, in hand or in prospect, solicited with the intention to use the capital funds to purchase the stock of producing companies which would thereafter be operated as subsidiaries under the direction of plaintiff’s management and technical staff.
(b) Mr. Pulvermann and Ur. Soares soon afterward reached agreement upon the terms of the contract for participation in plaintiff’s venture by Mr. Pulvermann and Colonel Westbrook. The contract was set forth in a letter dated *128 August 22, 1951,[11] from plaintiff to- Mr. Pulvermann and Colonel Westbrook, as follows (in substantial part):[12]
*****
I. Your activities in securing sales contracts for “ATLANTICA”.
You are herewith appointed exclusive sales agents of “Atlántica” for securing contracts for the sale of wolf-ramite, scheelite, tin-metal, molybdenum, tantalite, beryl, mica, manganese and blende (zinc-ore) for the territories of the United States, Germany and Switzerland.
Furthermore you are fully authorized to act as our agents in view to obtain a contract for the sale of wolf-ramite and tin-metal to France.
»[»
II. Commission.—
A commission on the price f. o. b. Portuguese port will be paid to you on all quantities of wolframite, tin-metal and other minerals or metals, sold by “Atlántica” or its affiliated companies or companies under the administration of or under contract with “Atlántica” (hereafter designated by A. C.) to the IT. S. Government or any of its agencies or to American private firms, as specified hereunder:
a) A commission of a flat 5% will be paid to you on all quantities, not exceeding 4800 tons of wolframite and 4500 tons of tin-metal, to be delivered under contracts which you are presently negotiating on our behalf with the U. S. Government.
b) The same commission of 5% will be paid to you on all other quantities produced by “Atlántica” or the A. C. to be delivered to the United States, including those quantities produced after securing credits for expansion facilities.
c) A commission of less than 5% will be paid to you on all quantities not produced by “Atlántica” or its A. C. and sold to the United States through their purchasing agent in this country or any similar agency acting as purchasing agent for the U. S. Government in this country, with the exception of those quantities, not *129 exceeding 4800 tons of wolframite and 4500 tons of tin-metal, delivered under the contracts referred to in paragraph (a).
This commission will be settled by special agreement in the spirit of friendly co-operation.
d) No commission will be paid to you on quantities delivered by any of the affiliated companies or companies under the administration of or under contract with “Atlántica”, produced under an agreement with ECA or any similar U. S. agency, concluded before such company entered into any relation with “Atlántica” as described in this paragraph.
*****
III. Financing.—
It is furthermore agreed that on all credits secured through your negotiations from any source, a commission will be paid to you of not less than 1%; a commission exceeding 1% has to be settled by special agreement.
IV. Your activities as industrial consultants.—
We also confirm to you our agreement of August 13, 1951, whereby Colonel Westbrook and you are retained as industrial consultants to “Atlántica” and its A. C.
a) It is understood that the remuneration due to you for your activities as industrial consultants, will be covered by the payments made to you under our commission agreement.
Travel expenses and out-of-pocket expenses related to activities as our industrial consultants requested by us, or such expenses specifically agreed to by us, will be refunded to you against your statements which the company will receive from you without undue delay.
b) It is understood that “Atlántica” and its A. C. will inform you immediately of all their negotiations, deals, contracts and other pertinent facts relating to your activities described in paragraph I, and will always furnish you with information related to their industrial commitments, financial obligations entered into and such-facts which you ought to know for your negotiations, in order to attain efficient co-operation and to avoid any misrepresentation or difficulties which might be caused by lack of information from our side.
*****
V. Duration.—
This agreement will be valid from today and end five years after the signature of the first contract with the American Government, or on December 31,1956.
*130 51. (a) On September 11, 1951, Colonel Westbrook forwarded to Mr. Pulvermann a copy of a letter be bad prepared for transmittal to Mr. Larson. Colonel Westbrook’s covering letter advised Mr. Pulvermann tbat be (Westbrook) and Mr. Reedy[13] expected Mr. Larson to reply that since Mr. Almeida had been appointed sole purchasing agent in Portugal, At-lántica should initiate negotiations through him.[14]
(b) Following is the text of Colonel Westbrook’s initial letter to Mr. Larson, dated September 13,1951:
1. Since early in June of this year Mr. Heinz Pulver-mann * * * and I have been assisting in the development of an organization of producers of wolframite and tin in Portugal. The purpose of this organization is to increase output of these two metals, especially of wolframite, by existing producers affiliated with the organization through taking the following measures on behalf of these producers:
a. The making of sales for future delivery of sufficient production at sufficient prices to justify the modernization and expansion of mining operations.
b. The employment of qualified technical personnel to advise producers with respect to the modernization and expansion of their operations.
c. The procurement of necessary equipment.
2. A Portuguese company for carrying out the above measures was organized on August 13, 1951 with an agreed-upon capital of 25,000,000 escudos. On August 21, 1951 this company was formally incorporated with a provisional capital of 1,000,000 escudos, the underwriters contracting to increase the capital within 60 days to the originally proposed 25,000,000 escudos.
a. The name of the company is: Companhia de De-senvolvimento e Exploracao de Minas, Lisbon.
b. The incorporators, directors, officers, bankers and affiliated companies are:
Directors (Administrators) :
(1) Dr. Celestino Soares, President, Lisboa
(2) Major Arrochela Lobo, (Commissioner General of Unemployment for Portugal), Lisboa
*131 (3) Dr. Texiera Queiroz, (President of Fomento Nacional de Industria, Portugal’s leading tin company) in charge of mining operations, Lisboa.
(4) Eng. Pedro Mouzinho, in charge of buildings, roads and machinery, Lisboa.
Board of Auditors:
(1) President, General Barros Rodriguez (Chief of Staff, Portuguese Army) Lisboa
(2) Secretary, Sr. Assis Camilo (businessman), Lisboa
(3) Inspector General, Sr. Xavier Pinto (Attorney), Lisboa
(4) Chief Engineer, Sr. Lopes da Silva (Chief Engineer the International Commission for Enemy Property), Lisboa
Banks:
(1) Banco Nacional Ultramarino, Lisboa
(2) Banco de Agriculture, Lisboa
Affiliated Companies:
(1) Alianca Minero Industrial, Lda, Celorico de Beira
(2) Fomento Nacional de Industria, Lisboa
i3) Minas da Barranco, Lda Yizeu
(4) Minas de Male Seco Arouca
(5) Portuguese & Spanish Tin Mining Co. Milar Formoso
(6) Sociedade Carbonifera da Lomba, Lda Oporto
(7) Sociedade das Minas de Cumhina, Lda Lisboa
(8) Sociedade das Minas do Gerez, Lda Gerez-Carris
(9) Sociedade de Minas do Amedo, Lda Carrazeda de Anciaes
(10) Sociedade Mineira Molesta, Lda Yizeu
(c) Mr. Pulvermann and I are retained as industrial consultants.
3. On August 13, 1951, I received a cable from the newly organized company authorizing me to continue the negotiations initiated by Mr. Pulvermann and me with the General Services Administration when he was here in July. I advised Mr. Pulvermann, who was and still is in Lisbon, by telephone that I wanted to wait until “Atlántica” was formally incorporated and until I had received replies to certain questions which I had asked relative to the incorporators and other matters were answered before again approaching representatives of the United States Government. As stated above, the Company was incorporated on August 21, and I have now received sufficient information with respect to the *132 matters inquired about to justify me in requesting the privilege of reopening the negotiations.
4. Upon the basis of a contract at prices sufficient to defray costs of modernization and expansion and to return a reasonable profit, “Atlántica” will enter into a firm commitment to deliver to the United States not less than 4800 short tons of wolframite within three years from date of signing of contract. Of this 4800 tons, At-lántica will agree to deliver 3000 tons within 24 months on the following schedule:
1st and 2d months; no specific quantity guaranteed, but probably about 50 short tons
3d, 4th and 5th months; not less than 100 short tons per month
6th, 7 th and 8th months; not less than 120 short tons per month
9th to 24th months; not less than 150 short tons per month
25th to 36th months; not less than 150 short tons per month
5. “Atlántica”, on the basis of a firm contract from the United States, will be able to make deliveries at the rates specified in paragraph (4) above without requiring credits other than those it can arrange for with Portuguese banks. If additional deliveries are desired, it will be necessary to obtain credits from ECA or some other United States source in order to finance the added expansion required. No accurate estimates of additional quantities possible under such conditions can be made without extensive investigation, but it is believed that such additional quantities would be quite substantial.
6. Before agreeing to our assignment as industrial consultants to “Atlántica”, Mr. Pulvermann and I made as complete an investigation of the situation as was possible through commercial and other sources available to us. We are convinced that “Atlántica” could and would effectively carry out such a contract as is indicated herein. We recognize, of course, that, prior to entering into a contract of this magnitude, you would make complete investigations of your own. We should be glad to make available to you such information as we have obtained, and to assist you in any way that we can to obtain such further information as you might require.
7. The matter of price is left open for specific negotiation dependent upon quantities desired and periods of delivery.
*133 8. “Atlántica” is now ready to proceed in tbis matter. Actual deliveries of wolframite can commence almost immediately after negotiation of the contract, and continue as indicated in paragraph (4). The privilege of an early conference in this matter is respectfully requested.
52. (a) As of the date of the foregoing letter (September 13, 1951) Dr. Soares had obtained commitments from the owners of mines and concessions which satisfied him and Mr. Pulvermann of Atlantica’s ability to carry out the terms offered by Colonel Westbrook, although all of the commitments were tentative (in the sense that no binding contracts had been made on account of them) and most of them were oral.
(b) Dr. Soares had negotiated agreements with the owners or managers of each of the affiliated companies whereby Atlántica, as soon as sufficient capital was available to it, could acquire either the physical properties or stock control, or, in any event, the companies’ mineral production.
(c) Dr. Soares’ main reliance for the financing of At-lántica rested on the agreement of Mr. Francisco Bastos de Assis Camilo, a wealthy Portuguese businessman, to invest in the company. Mr. Camilo had previously made a loan of 250,000 escudos ($8,750) to an associate who had invested the money in Atlántica. The associate had interested Mr. Camilo in the project. Mr. Camilo had met with Dr. Soares and his associates on one or two occasions and was intent upon making the agreed investment.[15]
53. On or about September 20, 1951, Mr. Camilo notified Atlántica that he would not invest in the company. His bank, he said, had refused to lend him money for the purpose, and the banker had advised him against making such an investment because of Dr. Soares’ “bad” reputation.[16]
*134 54. (a) On September 21,1951, acknowledgment was made of Colonel Westbrook’s letter of September 13 to Mr. Larson by the Emergency Procurement Service (EPS) of the General Services Administration (GSA) over the signature of A. J. Walsh, Commissioner, as follows (in part) :
* * * ❖ ❖
The offer contained in your letter is receiving attention and appropriate action has been taken to confirm the information contained therein.
Please be assured that your cooperation in offering this material to the Government is very much appreciated and you will be further advised as soon as this office is in possession of details necessary for the proper evaluation of the proposal.
(b) On the same day Commissioner Walsh forwarded copies of Colonel Westbrook’s letter to the “Acting Chief, Metals and Minerals Staff, Office of International Materials Policy, Department of State,” with the request that—
* * * the State Department forward a copy of the proposal to the Embassy in Lisbon in an effort to verify the information submitted by Mr. Westbrook, and to confirm that the affiliated companies listed are producers and have committed adequate tonnage to “Atlántica” to enable it to deliver to the United States Government the quantity stipulated in its offer.
(c) The State Department promptly forwarded to the American Embassy in London copies of the proposal and request, and the Embassy referred them to its ECA representative, Mr. Kelsey, for investigation.
55. On September 25, 1951, Colonel Westbrook wrote to Commissioner Walsh:
sf: # sjs * #
* * * it may be of interest for me to supplement my statements * * * to Mr. Larson with respect to investigations made by Mr. Pulvermann and me, since you have initiated inquiries of your own. From the beginning of our activities in the development of a producing and marketing organization for wolframite and *135 tin in Portugal, Mr. Pulvermann and I have insisted that the following requirements be met:
(a) That the principal officers of the organization be men of unquestioned standing and responsibility.
(b) That approval by the Portuguese Government of the organization and its operations be definitely assured.
(c) That the ability of the organization to carry out its contractual commitments be firmly established, and be subject to verification by prospective purchasers.
The principal figure with whom Mr. Pulvermann and I have dealt in Portugal is Dr. Celestino Soares, the President of the new company. When I discussed our plans with Mr. Larson just prior to his departure for Europe the latter part of July, he told me that information he had received relative to Dr. Soares was of such a nature as to cause him to doubt whether Dr. Soares and his associates could satisfactorily carry out commitments along the lines of our discussion. I asked Mr. Larson whether, in view of this information, he would advise that Mr. Pulvermann and I should discontinue our activities in the matter. He replied, in effect, that he did not want to overlook any bets that might result in increasing the availability of tungsten, and said that he would be glad to see Mr. Pulvermann and Dr. Soares when he reached Lisbon around the middle of August.
After this conference with Mr. Larson, I telephoned Mr. Pulvermann and emphasized the necessity of making the most thorough investigation possible of proposed top personnel of the new company, and especially with respect to Dr. Soares. Mr. Pulvermann said that investigations already made by him indicated that all the principal officers proposed were men of high caliber and recognized responsibility, and that this was unquestionably true of Dr. Soares. He agreed, however, to pursue his investigations further, and to keep me advised.
On the day of Mr. Larson’s arrival in Lisbon Mr. Pulvermann telephoned our Embassy for an appointment, and was referred to a Mr. Kelsey of ECA, * * *. After Mr. Pulvermann told Mr. Kelsey that he desired to discuss the Atlántica proposal with Mr. Larson, Mr. Kelsey said that Dr. Soares had approached him with an unreasonable proposal in connection with some mines formerly owned by German interests, and had made a quite unfavorable impression upon him. He further said that he had seen a Portuguese report to the effect that Dr. Soares, while acting as Consul for the Portuguese Government in Providence, Rhode Island, had em *136 bezzled consular funds, and had, upon his return to Portugal, been given a jail sentence for the offense. Mr. Pulvermann was so shocked by Mr. Kelsey’s statement that he abandoned the idea of seeing Mr. Larson, being determined to give up the entire undertaking if he should find that what Mr. Kelsey said was true.
Mr. Pulvermann went immediately to Dr. Soares and asked him for a complete statement of his services with the Portuguese Government and of his business career. I am attaching extracts from this statement * * *. Previous to this, * * * Dr. Soares had given Mr. Pul-vermann a statement from the Portuguese Government covering his entire service under the Ministry of Foreign affairs to date, completely refuting any such implications as those made by Mr. Kelsey.
You have advised me that you are now taking steps to confirm the information relative to Atlántica contained in my letter to Mr. Larson of September 13. In view of what appears to be the totally erroneous and irresponsible estimate of the situation entertained by one of our own officials in Lisbon, I take the liberty of suggesting that especial care be exercised in checking the reporte that will coiné to you. Mr. Pulvermann has expressed to me his conviction that certain interests in Portugal are strongly endeavoring to discredit the Atlántica organization, and to prevent its entering into negotiations with the United States Government. * * *
C. October 1 to December 81,1951
56. (a) On October 2,1951, Mr. Pulvermann, having been advised by Colonel Westbrook that an investigation of At-lántica' was being made, called at the Embassy.[17] A stormy session followed between Mr. Kelsey and Mr. Pulvermann. The commercial attache, Mr. Bartley Richards, took the matter over from Mr. Kelsey, and Mr. Pulvermann undertook to provide (and later did provide) Mr. Richards with detailed answers to the accusations made by Mr. Kelsey against Dr. Soares.
(b) On October 6,1951, Mr. Pulvermann reported to Colonel Westbrook. Obviously discouraged, Mr. Pulvermann’s review of events since June suggested the possibility of a *137 losing struggle against opposition contrived by the “administration” in Washington.[18]
(c) Colonel Westbrook replied on October 11,1951:
s}s *1» H*
* * * you summarize our activities * * * and indicate your disappointment that measures which I had taken over here had not been more effective. * * *
As a matter of fact, our position over here has been very strong from the beginning. Otherwise, your first visit to General Wilson and Mr. Freeman would have marked the end of the matter. Also, it must be obvious to you that, without the continuously manifested interest of Senator Johnson’s Committee, the schemes of Bensaude, Kelsey et al would have been successful. The full force of the Committee’s intervention in an investigative capacity could have been invoked at almost any time, but such action would have created bitterness and hard feeling, and would have most likely resulted in our never getting any business, even though our claims might have been completely substantiated. It has been necessary to exercise great care and diplomacy to maintain pleasant relations and, at the same time, to make clear the action we should take if left no other alternative.
As matters now stand, our relations with Walsh are excellent. The schemes of Bensaude, Kelsey et al have back-fired, and we are in a stronger position than we should have been in if these gentlemen had remained quiescent. Senator Johnson told me yesterday that he was very pleased with the outcome, and that he had issued instructions to Needy for his staff to give us any further assistance that we might need. Beedy, who has been constantly active in our behalf, and who has used excellent judgment in his contacts with Larson and Walsh, says he feels sure we shall get full cooperation all the way down the line.
* * * * *
57. (a) On October 9, 1951, Colonel Westbrook advised Mr. Pulvermann by transatlantic telephone that “the way is now clear and we are formally invited to submit proposals for definite quantities at definite prices for specific periods of time.”
*138 (b) At tbis time Colonel Westbrook was in regular, informal communication with the office of Commissioner Walsh (of EPS) through Mr. Hill.[19] Commissioner Walsh was referring the communications to the office of Captain Maull.[20] The preliminaries to the negotiations were thus in the hands of three former employees of the Procurement Division of the Treasury Department.
(c) On October 15, 1951, Mr. Pulvermann supplied Colonel Westbrook by telephone with the data that had been requested. Colonel Westbrook and Mr. Hill thereupon completed the details of a formal offer by Atlántica to the United States (through EPS) and submitted it at a conference with Captain Maull on October 16,1951.
(d) At the conference of October 16, 1951, Mr. Hill delivered to Captain Maull, in Colonel Westbrook’s presence, a copy of the contract between Atlántica and the Westbrook-Pulvermann partnership,[21] with a statement of its contents and the explanation that he (Hill) wanted the Government “to have full knowledge of all the terms and conditions of that employment agreement and the amount of compensation they were to receive.” [22]
58. (a) Following is the text of the offer submitted on October 16, 1951. It was contained in a letter addressed to Commissioner A. J. Walsh, EPS, signed for Atlántica by Lawrence Westbrook and Heinz Pulvermann “Exclusive Sales Agents for the United States.”
*139 1. * * * Atlántica * * * hereby offers to sell to the United States * * * Four Thousand Eight Hundred (4800) short tons of wolframite at a price of Sixty-Five Dollars ($65.00) per short ton unit, u. o. b. Portuguese sea ports.
2. Atlántica agrees to deliver the aforesaid 4800 tons of wolframite according to the following schedule:
a. During the first and second months after acceptance of this offer, no specified quantity guaranteed, but probably about 50 short tons.
b. During the third, fourth and fifth months after acceptance, not less than 120 short tons per month.
c. During the sixth, seventh and eight months after acceptance, not less than 120 short tons per month.
d. During the ninth month and up to and including the thirty-sixth month after acceptance, not less than 150 short tons per month.
Atlántica reserves the right to increase the quantities delivered in any of the months set forth in the foregoing schedule, provided that total deliveries shall not exceed 4800 short tons, and provided that over-deliveries in any given month may be applied against under-deliveries in any succeeding month.
3. Attachment I hereto indicates scheduled deliveries from various mines owned by, controlled by, or affiliated with Atlántica. The figures in column 1 * * * have been checked by * * * Mr. * * * Pulvermann, with the Bureau of Mines of the Portuguese Government. The figures in column 2 represent commitments from the mining companies listed. The figures in column 3 were derived from estimates made by the mining companies and checked by the engineering staff of Atlántica. A copy of this attachment has been furnished to Mr. Bartley Richards, Commercial Attache of the United States Embassy in Lisbon. Documentary evidence of ownership, control and validity of commitments can be supplied by Mr. Pulvermann * * *.
4. Mr. Pulvermann has filed with Mr. Richards, a complete statement of the organization of Atlántica, including names of directors and principal officers and names and locations of mines supplying wolframite. It is believed that Mr. Richards is now in a position to confirm the standing and responsibility of the organization and its personnel.
5. Atlántica respectfully invites attention to the fact that sporadic spot buying of wolframite in the Portuguese market at higher prices than those applying to its contract would seriously disrupt its relations with its *140 constituent and participating companies and make it difficult to carry out its commitments, and it is therefore requested that protection from such practices be provided.
6. Atlántica also requests that, in the event of increases in world prices, protection equivalent to that _ac-corded any other supplier of wolframite on a similar long-term contract be extended to it.
7. Atlántica requests that a force majeure clause be included in its contract.
8. Attachment 2 hereto is a copy of a letter confirming the designation of the undersigned and his associate, Mr. Pulvermann, as exclusive sales agents of Atlántica for wolframite and other metals in the United States, Germany and Switzerland, and retaining them as industrial consultants.
9. Attachment 3 is a copy of a cable dated October 16, 1951 from Atlántica authorizing the undersigned to submit the offer of wolframite to the United States Government as set forth herein.
(b) Following is the text of Attachment 1 annexed to the foregoing letter:
WOLFRAMITE ATTACHMENT 1
Scheduled Wolframite deliveries of Atlántica to the U. S. Government will be secured from the following mines:
All figures in metric tons per month:

*141 59. In the course of tbe conference of October 16, 1951, Colonel Westbrook explained to Captain Maull (1) the interest of Atlántica in protection from the possible effects of sporadic spot purchases (as suggested in paragraph 5 of the offer), (2) the availability of ores not produced by Atlántica or its affiliates, and (3) the desire of the company for an escalator clause (as expressed in paragraph 6 of the offer).
60. (a) On October IT, 1951, Colonel Westbrook reported to Atlántica by letter :
I am enclosing copy of formal offer of Wolframite submitted by me in your behalf to the Emergency Procurement Services of the United States Government on yesterday.
Hi % m H* H*
* * * Captain Maull would, of course, make no commitments, but he did make the following interesting comments:
(1) He was sure that our proposal would receive most careful consideration, and that we should have no difficulties on account of Mr. Almeida, since arrangements made with him had been substantially modified.
(2) He said that the United States had not entered into any long-term contracts at the maximum price of $65.00, since it was felt that prices should be reduced after more efficient production had been achieved.
(3) He did not believe that it would be possible to include a clause in our contract that would protect us from increased world prices, because such a provision would be unilateral — we could not expect to “have our cake and eat it too”, and that he felt that world prices would be more likely to go down than to go up.
(4) He said, however, that since the United States wanted to buy Wolframite in volume and be assured of getting it, he felt confident that agreements could be reached whereby producers would be afforded adequate profits and provided with sufficient protection against loss to justify expanded production.
Captain Maull’s attitude was most cordial and cooperative, and I have complete confidence that we can negotiate a contract which will fully meet your approval * * *.
H* * * # H<
(b) On October 20, 1951, Mr. Hill phoned Captain Maull and was referred by his office to Mr. Leonard W. Mooney, *142 staff specialist in the procurement of tungsten ore, serving as Assistant Chief, Ores Branch, Purchase Division, EPS. Mr. Mooney reported that the Embassy was not satisfied Atlántica could produce, and that EPS would make no commitment until the ability to produce was established.
(c) Colonel Westbrook thereupon telephoned Mr. Pulver-mann for further details and, on October 23,1951, wrote the following memorandum to Captain Maull on the subject of the “Ability of Atlántica to Deliver Wolframite According to Offer.”
* * * * *
1. Deference is made to Attachment 1 of my letter of Oct. 17 listing mines owned, controlled by or affiliated with Atlántica and from which Atlántica has received commitments. Attachment A hereto is a copy of a “Technical Deport” submitted by Eng. Eurico Lopes da Silva as to the productive capacity of each of these mines, and in which he gives it as his opinion that Atlántica can easily deliver on the scale established in its offer to the United States Government. Eng. da Silva is a recognized authority on Portuguese wolfram-ite mining operations. In addition to being Chief Engineer of Atlántica, he is Chief Engineer for the International Commission for Enemy Property in Portugal.
*****
Attention is invited to the fact that the aggregate estimated productive capacity of the mines reported upon by Eng. da Silva is more than 15% greater than the aggregate of scheduled deliveries contained in my letter of Oct. 17. Since writing this letter I have been advised by Mr. Pulvermann that negotiations are nearing completion with other mines producing additional quantities totalling about 25 tons per month.
2. In further explanation of the apparent discrepancy between existing production figures and potential productive capacity of the mines reported upon by Eng. da Silva, it is desired to point out that since 1944, when producers and dealers suffered disastrous losses due to cessation of Allied buying, the wolframite mining industry in Portugal has been sadly disorganized with production running from one third to one half of the country’s estimated capacity. In 1943 official production figures are understood to be 7500 tons. (Unofficial estimates are 10Ó00 tons). Yet, notwithstanding relatively high prices paid for sporadic spot purchases re *143 cently, exports for the first half of 1951 were only 1573 tons, of which only 250 went to the United States. Lack of a dependable market has caused production to be regarded as highly speculative, especially in view of the unhappy experiences suffered in 1944. Consequently, the mines generally have been operated only on a hand-to-mouth basis, with little or no expenditures for improvements and without regularly employed labor forces.
3. It is respectfully submitted that the officers and directors of Atlántica, who are people of high standing and responsibility in Portugal, would have nothing to gain and a great deal to lose, if Atlántica should fail to make deliveries in accordance with a contract with the United States Government. Under the terms of the offer submitted, such a contract could be abrogated by the United States immediately if deliveries should not be made as scheduled.
*****
(d) On October 23, 1951, Colonel Westbrook and Mr. Hill again met with Captain Maull and Mr. Mooney, and Atlantica’s offer was reviewed in detail. Thereafter (October 24) Colonel Westbrook reported to Atlántica:[23]
* * * With respect to the necessity of obtaining maximum assurances of Atlantica’s to deliver according to the contract schedule, Messrs. Maull and Mooney stated that under the law they were required to obligate funds to meet total payments applying to any contract that they might enter into. Thus, even though our contract might provide for abrogation because of failure to perform, a large sum of money might be tied up for a considerable length of time, and they naturally want to reduce the chance of this happening to the greatest degree feasible. No further word has been received from our Embassy in Lisbon. The writer considers it important that any additional information desired be furnished promptly, and that the Embassy be urged to send in a further report as soon as it is satisfied.
* * * In my opinion our major problem now is to convince responsible representatives of the United States Government that we are able to carry out our commit *144 ments. If it should be deemed desirable by you, I could make a quick trip to assist in. the assembling of needful information on this point and in presenting it to our Embassy.
61. (a) On October 27,1951, Colonel Westbrook wrote the following memorandum to Mr. Pulvermann:
* * * Mr. Hill and I * * * have come to the conclusion that my going to Portugal at this time might very well serve, not only to clarify any doubts with respect to Atlantica’s ability to carry out its commitments, but also to provide me with valuable information for use in the conductance of final negotiations with Emergency Procurement.
If I should go over, I should do the following before leaving:
a. Have another conference with Emergency Procurement with the view of obtaining further information as to their requirements and attitude.
b. Discuss the situation fully with Mr. Eeedy and Senator Johnson with the view of acquainting them with the existing status, ascertaining their thoughts relative to prices, procedures etc., and enlisting their further assistance.
c. Obtain introductions to responsible U. S. officials in Portugal.
In Portugal, I should:
a. Confer with you and Atlántica officials in order to give a first-hand report of the situation over here, and be brought up to date on the situation there.
b. Confer with U. S. officials to determine their attitude and to clarify their understanding of Atlántica.
c. Obtain first-hand information relative to mining conditions, production and handling costs, financial needs and other factors important in the carrying out of negotiations. * * *
Upon my return to this country, I should be in position [to] carry out our business with much more confidence and authority than at present. I believe that the time is now ripe for such a trip.
(b) In preparation for his visit to and work in Portugal, Colonel Westbrook requested Senator Fulbright, of Arkansas,[24] “to write * * * to our Ambassador in Lisbon * * * asking him to request his staff to give me appropriate assistance in carrying out my mission.”
*145 (c) Colonel Westbrook's request of the Senator was set forth in a letter addressed to "Dear Bill." Following is the opening paragraph of the letter:
I come to you as a humble constituent who seeks neither favor, loan nor special privilege from the Federal Government, but who asks your help in clarifying a situation which appears to be either stupidly absurd or grossly venal-possibly both. Part of the story is told in the attached copy of memorandum to my attorneys * * ~. I shall summarize it in this letter.
(d) Colonel Westbrook's memorandum to his attorneys (Messrs. Barnes and Hill), copy of which was attached to his letter to Senator Fulbright, was dated October 31, 19~1. Its purpose was to provide for the attorneys' files a narrative statement "to supplement the information already nished you with respect to * * * * * * * * the memorandum: Your own files will disclose the results of conferences held by Mr. Hill and the writer with Capt. Maull and Mr. Mooney of Emergency Procurement Services. Al- though Capt. Maull has been most courteous and has indicated that recent reports from our Embassy in Lisbon have not substantiated Mr. Kelsey's charges and statements, negotiations are still suspended. The re- sponsible officers of Atlantica, which has requested neither cash nor credit from the United States Govern- ment, are not able to understand why their proposal is not being considered. The ~`riter is not able to understand either, and, as you were advised this morning, it is his intention to fly fol lowing are the closing paragraphs of the memorandum:
Your own files will disclose the results of conferences held by Mr. Hill and the writer with Capt. Maull and Mr. Mooney of Emergency Procurement Services. Al though Capt. Maull has been most courteous and has indicated that recent reports from our Embassy in Lis bon have not substantiated Mr. Kelsey's charges and statements negotiations are still suspended. The re sponsible officers of Atlantica which has requested neither cash nor credit from the United States Govern ment are not able to understand why their proposal is not being considered.
The `riter is not able to understand either and as you were advised this morning it is his intention to fly *146 to Lisbon next week to try to find out what is behind all this nonsense.
(e) Following is the summarization by Colonel Westbrook in his letter to Senator Fulbright:
* * * * *
My partner, Heinz Pulvermann, and I, acting on behalf of a group of producing mines in Portugal, have offered to sell the United States Government a very important quantity of wolframite (tungsten ore) which is sorely needed in this country for National Defense. We have not asked the Government for payments or credit of any kind in advance of actual deliveries. We have furnished what would appear to be ample evidence of the responsibility and standing of our Portuguese principals. We have submitted a report from a recognized Portuguese engineer indicating that the productive capacity of the mines involved is much greater than the quantity of wolframite offered.
We first presented this matter to GSA early in July of this year, and have received nothing except a series of brush-offs since. We were advised by Commissioner Walsh of Emergency Procurement on September 13th that “appropriate action” had been taken to confirm the information submitted with our proposal, but, according to current advice from his office, sufficient confirmation of information has not yet been received to justify entering into negotiations. In view of the responsibility and standing of our Portuguese principals and of engineering reports of the productive capacity of the mines, it is impossible for me to credit this statement. Even if our offer were a “phony”, the negotiations would show it up.
My partner, who has been working on this matter in Portugal for the past four months, says that in his opinion all our trouble has been due to the activities of Ben-saude & Co., a Portuguese shipping concern which is the GSA agent for strategic materials on the Iberian Peninsula. According to my partner, Bensaude & Co., with the apparent cooperation of an official in the ECA Lisbon office, strongly opposes the direct forward sale of wolframite to the United States by producing mining companies, preferring to make spot purchases from dealers at speculative prices, and to utilize ECA credits for expansion of production rather than private credit, which is available upon the basis of forward sales at fixed prices. The fallacy of this policy is evidenced by the current restricted production and the failure of the United States to procure more than a small fraction of what is *147 produced — less than one-sixth of exports for the first half of this year.
ifc * * * *
62. (a) On November 8, 1951, Captain Maull wrote the following memorandum to the file:[25]
* * * Thurmond [sic] Hill * * * called this afternoon, concerning the offer submitted by Westbrook Associates * * * to furnish wolfram.
I informed Mr. Hill that this Service would consider offers to furnish wolfram where the material was actually available, but would not, at this particular time, consider a long term contract. I informed Mr. Hill that while the practice, in the past, has been to only purchase Spanish wolfram after it arrives in this country, this Service would consider offers where the material had been placed on board vessel and the name of the vessel furnished this Service.
(b) The policy reflected by the foregoing statement (abandonment of long-term contracts: continuation of spot purchases) related only to EPS and was the result, primarily, of adjustments made by the agency in the use of available appropriations.[26] These adjustments by EPS were often transient and temporary and did not affect the long-range policies of the United States for the procurement and stockpiling of tungsten.[27] These facts were fully known to and understood by Mr. Hill and Colonel Westbrook.
63. (a) Colonel Westbrook arrived in Lisbon on November 9, 1951.[28] One week later, in a memorandum to Atlántica, he “recommended that the following conditions be met prior to the resubmission of offer to sell wolframite to the United States * *
*148 * * * Cash capital or certified credit should be supplied sufficient to finance the acquisition and delivery of wolfram according to the terms of the contract. * * *
* * * The Co. [sic] must have a net worth in any event of not less than five million escudos as shown by a statement issued by a certified public accountant * * *. * * * The statement should, also list stockholders and their respective holdings.
* * * Contracts with participating companies should provide satisfactory evidence of validity of commitments of such companies to deliver an aggregate quantity of wolfram exceeding the amounts contracted to be sold to the U. S. by not less than 20%. * * *
* * * The control and management of the company must be satisfactory to representatives of IT. S.
(b) On November 17,1951, Colonel Westbrook forwarded a copy of the foregoing memorandum to Mr. Hill and reported that he and Mr. Pulvermann were “endeavoring * * * to develop a program which would, permit us to resubmit our offer to EPS with confidence that it would be well received.” The letter to Mr. Hill further advised:
* * * Dr. Soares * * * has indicated his willingness to withdraw from control of the company and, at the same time to make the contributions to it which I am convinced are essential for successful operation. I have discussed this matter with Mr. Eichards, who has been most cooperative and courteous, and he has expressed the opinion that the measures which I have suggested, if carried out, will remedy the previously existing defects. I have also discussed these matters with the Ambassador on two occasions at his insistence, and have been assured by him of his wholehearted cooperation.
* * * the directors of Atlántica * * * have advised me that they consider the conditions outlined to be reasonable and that in their opinion these conditions can be complied with. I shall not leave here until this has actually happened to my personal satisfaction, or I am convinced that the requirements cannot be met. I believe that they can be.
In my judgment, which I believe can be supported by adequate documentation, the Atlántica program offers the best, if not the only means for increasing the availabilities of wolfram in Portugal within the ceiling prices now established. * * * Mr. Eichards told me today that exports to the U. S., which he personally has to approve, were at ridiculously low levels.
*149 The major obstacle to be overcome is the obtaining of the basic cash capital investment in the company. As you will recall from Mr. Pulvermann’s reports it was considered up until the later part of September that this problem had been solved. Unquestionably, from my own investigations a commitment had been secured from a thoroughly financially responsible financier for enough cash to have adequately met requirements. It is claimed by the directors of Atlántica that the failure of this financier to carry out his commitments was due to rumors spread by those selfishly opposed to the Atlántica program. I have no basis for an opinion as to the motivations of those who circulated these rumors, but it appears very likely that, without the rumors, Atlántica would have been adequately supplied with capital. * * *
In presenting the enclosed list of requirements to the Board of Directors of Atlántica I have been guided by my own conception of the requirements that I myself would insist upon if I were the contracting officer for the U. S. Government. I have frankly told the Board of Directors that I would not resubmit the Atlántica proposal unless and until the conditions set forth were complied with.
I have about convinced Mr. Pulvermann that, in the event a suitable contract should be successfully negotiated, he should remain in Portugal for at least 8 months as advisor and supervisor of the mining operations. * * * If he should agree to remain here, there could be no greater assurance of the success of the program, and our personal interest would be fully protected.
‡ ‡
(c) On November 27, 1951, Mr. Hill replied to the foregoing letter:
Upon receipt of your informative letter, conferred with Captain Maull, and his reaction was that you were proceeding in the right direction. I gathered from his talk that if you, upon your return, could satisfy GSA that the personality obstacle had been removed and that delivery of tungstan [sic] under the schedule would be assured, then a contract would be forthcoming.
64. (a) Meanwhile, on November 24, 1951, Colonel West-brook submitted to Atlantica’s board of administrators a memorandum wherein he (1) reviewed the commercial situation relative to tungsten and (2) put forth specific sugges *150 tions relative to the contractual relationships between At-lántica and its affiliated companies.
(b) Colonel Westbrook’s review of the commercial situation relative to tungsten noted his findings and conclusions that current production of wolfram in Portugal was estimated to be only one-half to one-third of potential production; that the lag between actual and potential production could be attributed in large part to the lack of a dependable market; that the United States price for foreign wolfram had advanced from $22 to $85 per short-ton unit since the beginning of the Korean incident; that production in Portugal had nevertheless increased very little over what it had been in 1948-49, when United States prices ranged from $20 to $28 per short-ton unit; that under current market conditions the bulk of actual Portuguese production was supplied by a few well-established, well-equipped mines; that realization of potential production could come only from the expansion of a number of small (i. e., currently small) producing mines “which, because of the uncertainty of a future market cannot be expected to make the necessary investments for equipment and organization to substantially increase their production”; that the policy generally followed by the United States Government of making direct loans to individual producing companies to permit expansion of their operations was not practicable as applied to these small mining companies in Portugal; that if a dependable future market at or about the current ceiling price could be assured, these small companies would increase their production through their own resources and with local credit; that it would appear to be good policy to provide a dependable future market to the small companies, “which in the ag-régate represent the vast majority of unrealized potential production.” [29]
(c) Colonel Westbrook’s memorandum also summarized the negotiations with EPS as follows:
*****
*151 The Emergency Procurement Service * * * has indicated its willingness in principle to follow a policy in Portugal of providing a dependable future market for wolfram through the medium of a contract for future delivery of not less than specified quantities of wolfram within specified periods of time within a total period of three years. The writer, on behalf of Companhia Atlántica has submitted a proposal to the E. P. S. * * * providing for the sale to the U. S. Government of an aggregate quantity of 4.800 tons of wolfram at a price of $65. — per short ton unit, with deliveries to begin within two months after the signing of the contract at the rate of 100 tons per month and to increase up to a total of 150 tons per month until the aggregate of 4.800 tons might be delivered. The E. P. S. has indicated to the writer that it would favourably consider such a proposal at prices slightly under the $65. — per short ton unit, provided reasonable evidence could be submitted of the ability of Atlántica to perform its commitments if such a contract should be concluded. Attached hereto is copy of a memorandum addressed by the writer to At-lántica setting forth the writer’s estimate of minimum conditions that would be required to be met by E. P. S. for provision of necessary assurance of Atlantica’s ability to meet its commitments.
(d) The memorandum continued: “Assuming that the conditions with respect to requirements for minimum net worth and for opening credits as specified can be met, there remains the question of the contractual relationship between Atlántica and its affiliated or participating companies.” There followed a review of Colonel Westbrook’s understanding of the options and pledges then held by Atlántica and his reasons for believing them insufficient “to meet the minimum conditions required by EPS.”
(e) Colonel Westbrook then set forth his specific suggestions for resolving the contractual relationships between Atlántica and its affiliated or participating companies, as follows:
If the writer’s apprehensions with respect to the difficulties involved in arriving at acceptable contractual agreements between Atlántica and the affiliated and participating companies are well founded, it would appear to be unlikely that the problem presented could be resolved within any reasonable length of time, and that the opportunity now existing for the conclusion of a *152 satisfactory long term sales contract with the U. S. Government might be lost. The writer therefore suggests that consideration be given to an entirely different type of contractual relationship between Atlán-tica and its affiliated or participating companies. This conception is based largely upon marketing principles and procedures successfully utilized for many years in the U. S. by the great farm cooperatives. Under this conception Atlántica would become the exclusive sales agent for all of the affiliated or participating companies, — it might or might not own stock in these companies. In addition to serving as sales agent, Atlántica would also undertake to assist the affiliated or participating companies in securing financing, from either Portuguese or U. S. sources, necessary:
(1) to provide preliminary operating expenses with present equipment and
(2) when considered desirable, for equipment and other improvements for the expansion of production.
Contracts between Atlántica and the affiliated or participating companies would be uniform, and would provide for the following:
(a) the irrevocable sale of the complete production of each company to Atlántica for a period of 3 years from date of contract;
(b) the obligation of Atlántica to resell all wolfram delivered to it under the aforesaid contracts to the best advantage within its capabilities and to distribute the proceeds of such sales proportionally to quantities delivered among the companies concerned, less a specific spread to cover operating expenses and profit to At-lántica ;
(c) Atlántica to agree to extend credits to the companies for preliminary operations with existing facilities on the basis of estimated tonnage to be delivered by each of the companies, for specified periods of time at a specified rate of interest;
(d) Atlántica to agree to attempt the negotiations of long term credits for equipment and other improvements either in Portugal or in the U. S. in consideration of a specified commission,'
(e) contracts between Atlántica and the companies would become effective upon the signing of a sales contract between the U. S. Government and Atlántica for specified quantities to be delivered within specified periods at specified prices.
Under the concept as above outlined the following situations may be envisioned:
*153 (a) the shares of Atlántica would be owned by those contributing to its capital structure proportionally with the agreed upon value of the contributions;
(b) the companies would receive the full proportional benefits of the sales contract with the U. S. Government less the specific spread and would enjoy all the advantages of expert sales and financing services and other advantages obtainable only through consolidation, without sacrificing their independence as producing entities, making whatever profits they might obtain through their own hard work and ingenuity in production. By reason of the large aggregate quantity of wolfram controlled by their agent, Atlántica, they would be able to make strong and united representations with respect to taxes, market protection and other factors vital to their industry;
(c) the shareholders of Atlántica would earn a reasonable profit on a very large volume of business with little or no risk to their investment. It might well be expected that after the actual signing of the sale contract with the U. S. Government and the beginning of actual operations, additional mining companies would desire to enter into equivalent engagements with Atlántica;
(d) The Portuguese Government would benefit, not only from tax revenue derived from increased exports, but also from the increased volume of dollar credits distributed through Atlántica down to the companies and then to the employees of the companies;
(e) the U. S. Government would benefit from the acquisition of substantially increased quantities of wolfram from Portugal and also in the stabilization of the Portuguese market.
The writer is convinced from his personal knowledge of the attitude of responsible U. S. officials that the foregoing concept would be well regarded in the U. S. and that in the event of any conditions which might result in the material increase of world prices of wolfram, appropriate consideration would be given to the upward revision of the contract price in order to prevent undue hardship and insure the continued delivery of maximum quantities of wolfram. It goes without saying that the measure of such favourable consideration would be greater for a number of actual producers than it would be for speculative dealers.
The writer recognizes that some variations of the foregoing concept may be necessary for adap[ta]tion to the wolfram industry, but he believes that the parallels between the problems of U. S. producers of agricultural commodities and those of Portuguese producers of wolf *154 ram are sufficient to justify confidence that similar principles and procedures may be advantageously utilized.
65. (a) Atlántica accepted Colonel Westbrook’s suggestions for revamping its contractual relationships with its affiliated and participating companies, and immediately initiated negotiations with the producing companies for contracts of the kind outlined by Colonel Westbrook.
(b) Following is the text of the standard contract between Atlántica and the producing companies after the revision:
By the present we obligate ourselves to supply to atlántica, for the fulfillment of its contract with the U. S. Government, the wolframite of our own production as well as that which we acquire in our concessions or our mills under the following terms and conditions:
1. As for the wolframite of our own production, we obligate ourselves to deliver X tons according to the following delivery plan:
in the 1st, 2nd and 3rd month X tons
in the 4th, 5th and 6th month X tons
in the 7th up to the 34th month X tons
2. As for the wolframite acquired by us in our concessions or our mills, we obligate ourselves to deliver X tons in monthly lots of
X tons, during 12 months
3. If the contract of atlántica with the U. S. Government would be for longer periods than those referred to under numbers 1 and 2? we maintain the contracted obligation for the respective periods within the volume foreseen for the last month of these same periods.
4. We reserve ourselves the right to anticipate the deliveries stipulated in this contract which expires after total delivery of the quantities referred to under 1, 2 and 3.
5. We likewise reserve ourselves the right to eventually deliver within any month a quantity corresponding to only 80% of the quantities stipulated according to the delivery plan or the volume of the monthly purchases; we however, obligate ourselves to deliver such delayed quantities corresponding to up to 20%. within the subsequent months, so that the total quantities referred to in the present contract are delivered within the period referred to.
*155 6. The present contract enters into force after the signature of the contract between the TJ. S. Government and atlántica and deliveries wili be effected beginning at the end of the 2nd month to be counted from the date of the signature of the contract referred to.
7. As for the wolframite of our own production, atlanttca will pay us a price not inferior to Esc. 70.— per kg. on the basis of 65 units, ex our warehouse packed for export.
8. As for the wolframite acquired by purchases in our concessions or our mills atlántica will pay us the highest price which has been paid during the preceding week by the U. S. Government in the Portuguese market for quantities supplied under the terms of No. 2, with a deduction corresponding to the profit margin of atlántica and its general agents.
9. atlántica will assist our company by transferring to us the corresponding share of the (divisible) letters of credit which will be opened in its (Atlantica’s) favour in accordance with the rythm of our deliveries.
10. We shall establish with atlanttca a general operating plan in order to assure the contracted productions. In special cases atlántica will lend us convenient technical assistance.
11. We obligate ourselves to inform atlanttca of the manner how extraction and purchasing services are operating, facilitating for this purpose an inspection if atlanttca deem it convenient.
(c) Following are the companies that entered into standard contracts (as above-defined) with Atlántica, together with the total quantities of wolframite to be delivered under clauses 1 and 2, respectively:
Producer Production (in tons) Clause 1 Clause 2
Soeiedade Carbonífera da Lomba_ 268 . 120
Fomento Nacional de Industria_ 204 120
Metallum_ 257 60
Soeiedade Mineira do Amador_ 170 120
Alianca Minero Industrial[30]_ 170 120
Gomes & Saldanha_ 229 60
Sociedada Mineira Volesta_ 102 120
Helice_ 93 120
Minas do Barranco_ 170 24
Minas Pomar da Bainba_ 102 36
Centro Mineiro de S. Pedro do Sul_ 68 60
*156 Producer Production (m tons) Clause 1 Clause 2
Mineira de Coimbra [31]. _ 96
Minas do Yale Seco— 102 24
Totals 1930 1080
(d) Atlantica’s chief engineer was requested “to assess the capacity of the Companhia * * * for the fulfillment of planned deliveries to the TJ. S. Government * * *” on the basis of (1) nothing during the first two months; (2) 100 tons per month during the third, fourth, and fifth months; (3) 120 tons per month during the sixth, seventh, and eighth months; and (4) 150 tons per month from the ninth month onwards.[32] For this purpose he was given a list of 14 mines, 9 of which had made contracts with Atlántica.
(e) The chief engineer certified his opinion (1) that the mines were capable of production “at the moment * * * working on a small scale” of 43 tons per month;[33] (2) that production could be increased, with present machinery, to 112 tons per month;[34] (3) that production of 179 tons per month was possible.[35]
66. On December 19,1951, Colonel Westbrook (having returned to Washington 9 days earlier) made the following report to Captain Maull:
Within a few days I shall present to you a revised proposal for the sale of wolframite on behalf of * * * At-lántica * * *. Preliminary to this proposal I take the liberty of submitting to you for your consideration certain general information relative to the production and marketing of wolframite in Portugal which I obtained during my five weeks’ visit to that country. It is hoped that information will be of broad interest to you and, also, that it will be useful in evaluating our proposal when it is submitted.
1. Present and Potential Production. Current production of wolframite in Portugal is at the rate of ap *157 proximately 3600 tons per annum. * * * Potential production is undoubtedly in the neighborhood of 10000 tons. * * * The existing great lag between actual and potential production may be ascribed to two major factors, the first of these being the uncertainty of the future market and the second the Portuguese Government export tax of $19.51 per ton, almost one-third of the present ceiling price.
Of these two factors the absence of a dependable future market is unquestionably the most important. Current annual production is only about 20% greater than it was during the peace-time years of 1947-48, although prices for these years were in the range of only $28.00 to $30.00 per ton. According to the best informed opinion in Portugal, even quite substantial increases in spot prices over the current ceiling of $65.00 would have only a slight effect on production.
Examination of the situation reveals that nearly all the current production comes from a very few large producers whose production costs are low enough to permit them to operate profitably at near capacity under normal peace-time conditions. The smaller producers, from whom any substantial increase in production must come, can not produce at less than from $10.00 to $15.00 per ton over normal peace-time prices.
2. The Existing Situation. The following conclusions are based upon inspections of mining properties, conferences with their owners and consultations with Portuguese mining engineers, wolframite dealers, bankers and Government officials. I found them to be substantially agreed to by competent Portuguese authorities, as well as by our own Embassy.
a. Any important increase in wolframite production in Portugal must come from small mines which have a potential capacity of from two to fifteen tons per month, and which are definitely marginal under normal peacetime conditions.
b. In order for these small mines to expand their operations above present levels, they must invest in additional equipment and provide adequate assurances of continuous employment for the required labor force.
c. The existing policy of spot purchasing through normal dealer channels does not provide these small mines with the protection necessary to justify their making the expenditures for expansion referred to in (b) above. Although they admittedly could make a good profit selling at the ceiling of $65.00 which has been paid for most spot purchases during the current *158 year, they do not, of course, know how long such a price will prevail, and they do know that they would lose their investment if they had to sell at average peace-time prices. Consequently, production from these potential producers is now negligible, as is shown by current production figures. The proposed new international agreement would not help unless the guaranteed floor price should be somewhere in the neighborhood of the present spot price.
d. Not only does the existing policy of preferred prices for spot purchases fail to provide incentive to producers for increased production, but it is said by the producers themselves to seriously interfere with their present operations. They claim that competing dealers, although paying up to the maximum allowed under the established ceiling price, frequently give rival producers other inducements which make the actual price paid considerably greater than the ceiling. They say that this practice causes a constant shifting of pilaffs (piece workers) from one producer to another, thereby disrupting individual production schedules and preventing the orderly carrying out of operating plans. It is assumed that the dealers for their part are similarly compensated above the ceiling price by the private purchasers to whom they sell. * * * In addition to causing confusion among producers, this practice obviously would make the ceiling price established by international agreement of no value whatever.
e. The only feasible way to assure any material increase in the production of wolframite in Portugal is through guaranties to producers of a market for a sufficient part of their product for a sufficient length of time at a sufficient price to enable them to profitably make the investments necessary for expansion. To be effective such guaranties should be in the form of contracts with each producer. It is also essential that contracting producers be protected from the disruptive spot buying practices now being allegedly followed by speculative dealers who accumulate and hoard wolframite for the obvious purpose of disposing of it in tempting quantities at prices higher than established ceilings.
f. The United States, being by far the largest consumer of wolframite, and the United States Government being better able financially than any other country to undertake forward commitments for its purchase, is the logical agency to provide the guaranties referred to.
g: Since it would be manifestly impracticable for the United States Government to enter into individual con *159 tracts with large numbers of small producers in Portugal, it is desirable to have such contracts executed with a Portuguese company, organized for this purpose, which would be able to enter into a single contract with the United States Government for delivery of the aggregate quantities obtained from each of the producers concerned.
8. OorrvpamMa, Atlántica * * * as reorganized according to my recommendations, adequately fulfills the requirements for the Portuguese company referred to. This revised organization and operating plan have been fully discussed with Ambassador Mcveagh and his aides, and it is believed that he is prepared to indicate his approval of the new set-up.
67. (a) Colonel Westbrook and Mr. Pulvermann[36] prepared a “draft for discussion purposes” of a new offer to be submitted to EPS. Following is the text of the draft:
On behalf of * * * Atlántica * * * I submit you an offer to sell a total of 3220 short tons of Wolframite, basis 65% tungsten trioxide, according to the following terms and conditions:
1. 2620 short tons at a price of $65.00 per unit, to be delivered within a period of forty six months beginning two months after acceptance of proposal at not less than the following average rates per month:
a — 50 tons for the first 6 months,
b — 58 tons for the remaining 40 months;
Provided: c — That the delivery of the entire quantity of 2620 short tons may be completed at the prices and under the terms indicated at any time during the specified 46 month period.
d — That deliveries in any one month may be not more than 20% less than the average quantity specified, provided the deficiency is made up within the subsequent six months.
e — That payments shall be made from an irrevocable, divisible letter of credit, upon surrender of warehouse receipts from stipulated warehouses at Oporto or Lisbon, there being attached to such warehouse receipts certificates of analysis upon which final settlement for each lot will be calculated.
2. 600 short tons to be delivered within a period of twelve months beginning two months after acceptance of this proposal at not less than an average of 50 tons per month, at unit prices not less than the current ceiling *160 price established by the International Conference on Strategic Materials, or, in the event there should be no ceiling price currently established by the International Conference, not less than the maximum price being currently paid by the United States in Portugal;
Provided: a — That delivery of the entire quantity of 600 short tons may be completed at the prices and under the terms indicated at any time during the specified twelve months period.
b — That deliveries in any one month may be not more than 20% less than the average quantity specified, provided the deficiency is made up within the subsequent six months.
c — That payments shall be made in the same manner as prescribed under sub-paragraph (e) of paragraph (1) hereof.
3. In support of the asking price of $65.00 per short ton unit for the 2620 tons to be delivered over a 46 month period, I respectfully submit the following:
a — That the guaranty of this price for the partial production of the mining properties concerned is justified as an incentive for the owners of these properties to make the investments necessary to expand their operations. It has been proved by the experience of the past year that payment of the maximum ceiling price for spot purchases does not furnish such an incentive. * * *
b — The provision of this incentive would bring about an increase in production of not only the quantity contracted for sale by producers at the fixed price, but also of a large unspecified quantity which producers would sell in the open market at prevailing prices. The commitment by producers to deliver an additional 50 tons per month for 12 months at such prevailing prices may be taken as evidence of confidence in their ability to greatly expand their operations if provided with assurance of a dependable market for a sufficient part of this output to justify the expenditures for necessary improvements.
c — A substantial part of any profits made by producers under the fixed price sale would have to be used for the amortization of the improved facilities required. They would have to take their chances in the world market for additional profits. It should be borne in mind that, once these improved facilities should be provided, they would remain in being for a considerable length of time as a stand-by to meet any needs that might arise.
*161 4. It is understood that it is the normal practice of the Emergency Procurement Service to make payments for its purchases in foreign countries against ship documents with inspection certificates attached, rather than against warehouse receipts. This method of payment is entirely feasible in the case of spot purchases from dealers. However, in the case of long term purchases from sales agents representing numbers of small producers, each delivering small quantities currently, this method would work considerable hardship because of the necessity of financing the aggregate of these small deliveries while waiting for ship schedules. Since it is likely that such purchases may be destined for several different consuming countries this period of waiting might become quite extensive and burdensome.
It is understood that some private purchasers of Wolframite, follow the practice of making payments against warehouse receipts with inspection certificates attached. It is hoped that similar arrangements may be made in connection with the proposal submitted herein.
5. Attached hereto as Exhibit “A” is a formal certificate * * * to the effect that the photostatic copies of contracts between various listed producers and Atlán-tica, which are attached to the certificate, are “normal commercial contracts according to Portuguese practice and law”. Also included in this exhibit is an authenticated translation of the contracts concerned. These contracts form the basis for the offer on behalf of Atlántica submitted herein.
6. Attached as Exhibit “B” is a technical report of the productive capacity of all the mines listed except San Pedro. * * *
* ‡ ‡ $
As reorganized, Atlántica is purely a sales and technical service organization representing and serving the producers under contract with it. The spread between prices obtained by producers and those which would be paid by the United States, under this proposal, is limited to the amount required for overhead expenses, and its service charges, this amount being fully known to the producers and being recognized by them as reasonable and proper. The officers and directors are outstanding personalities in Portuguese business and official life. It is hoped that these factors will be taken into account by you in your consideration of this proposal.
*162 (b) On December 26, 1951, Colonel Westbrook and Mr. Pulvermann held a lengthly conference with Captain Maull, in the course of which they reviewed in detail the foregoing draft offer. Captain Maull said he was satisfied with all elements of the negotiation[37] except the price to be paid for the Portuguese tungsten. The conferees thereupon agreed to meet again after the conclusion of a January meeting of the Tungsten-Molybdenum committee of the International Materials Conference at which the producing and consuming countries were expected to establish an international ceiling price. Before the conference ended, Captain Maull said that once the price question was settled, a formal contract based on the draft offer could be prepared without further delay.
68. On December 29, 1951, Mr. Pulvermann forwarded to the president of Atlántica (1) a letter setting forth the requirements for a power of attorney to Colonel Westbrook to act for Atlántica in completing negotiations and signing a contract with EPS and (2) a proposed revision of the compensation agreement between Atlántica and its sales agents, Westbrook and Pulvermann. The proposed revision was deemed necessary in fairness to the company because of the changes made in the contractual relationships between At-lántica and the producing companies. It did not purport to alter the principle of compensation based upon a percentage of income.[38]
*163 D. January 1[39] to March 31,1952
69. On January 4, 1952, Atlantica’s board of administrators authorized Dr. Soares to fly to Washington and there to reach agreement with Colonel Westbrook and Mr. Pulver-mann on both the power of attorney and the compensation contract.
70. (a) At their January meeting the members of the International Materials Conference failed to agree on a ceiling price for tungsten.
(b) Thereafter, on January 16, 1952, a further conference was held on the Atlántica offer between Colonel West-brook,[40] Mr. Pulvermann, and Mr. Hill, for the company,[41] and Captain Maull for EPS. Using Atlantica’s draft offer of December 26 as the basis of discussion, they reviewed each of its terms.[42] At the close of the conference Captain Maull said that the essential terms of the Atlántica offer were acceptable, including price, quantity, duration, delivery, and *164 letter of credit. He requested' Mr. Hill to submit a formal offer incorporating the terms which had been orally agreed upon, and said that he would have a formal contract prepared within a week after the receipt of the formal offer.
71. On January 17, 1952, the formal offer was submitted to EPS in the following terms:
On behalf of * * * Atlántica * * * I submit you an offer to sell a total of 4080 short tons of Wolframite, basis 65% wo3, according to the following terms and conditions.
1. 3480 short tons to be delivered within a period of sixty (60) months beginning not later than two (2) months alter acceptance of proposal at not less than 58 short tons per month, at prices of:
$65.00 per short ton unit for the deliveries of the first 12 months
$63.00 per short ton unit for the deliveries of the following 24 months
$57.50 per short ton unit for the deliveries of the following 12 months
$55.00 per short ton unit for the deliveries of the following 12 months
Provided: a. That the delivery of the entire quantity of 3480 short tons may be completed at the prices and under the terms indicated at any time during the specified 60 month period.
b. That deliveries in any one month may be not more than 20% less than the average quantity specified, provided the deficiency is made up within the subsequent six months.
c. That payments shall be made from an irrevocable letter of credit, opened in Lisbon in favor of the seller, divisible and transferable at the legally authorized direction of seller, * * * Atlántica * * *.
We suggest that delivery conditions conform to what is known m the trade as “Hamburg Contract B”.
Payments should be made upon delivery of the mineral, f. o. b. Portuguese Harbors, as follows: 90% of provisional invoice on basis of 65%, wo3, net cash against documents on delivery f. o. b. ship, Portuguese Plarbors; balance to be paid on rendering of final invoice.
2. 600 short tons to be delivered within a period of twelve (12) months beginning two (2) months after acceptance of this proposal at not less than an average of 50 tons per month, at unit prices not less than the *165 current ceiling price established by the International Conference on Strategic Materials, or, in the event there should be no ceiling price currently established by the International Conference, not less than the maximum price being currently paid by the United States in Portugal;
Provided: a. That delivery of the entire quantity of 600 short tons may be completed at the prices and under the terms indicated at any time during the specified twelve months period.
b. That deliveries in any one month may be not more than 20% less than the average quantity specified, provided the deficiency is made up within the subsequent six months.
c. That payments shall be made in the same manner as prescribed under sub-paragraph (c) of paragraph (1) hereof.
3. Due to world-wide shortage of steel, which will make packaging in steel drums prohibitive, seller offers to pack said minerals in the usual and customary method now current which is by using usual double bags.
Seller agrees to conform to all pertinent terms and conditions usually found in the standard form of contracts for the purchase of tungsten by the Emergency Procurement Services.
72. (a) On January 29, 1952, Mr. Mooney[43] submitted to Captain Maull his analysis of and recommendation on At-lantica’s offer in the following terms:
Offer dated January 17, 1952 from subject Company to supply 4,080 tons wolframite over a five year period. *****
My Comment:
1. Quantity offered: Supplier’s original proposal dated October 17, 1951, offered 4,800 tons over 3 year period. Current offer is a total of 4,080 tons over a longer period of five years.
2. Producing Mines: From information supplied it appears that 4,080 tons will be supplied from the same mines that were to supply 4,800 over the shorter period. Embassy Lisbon reported it is not familiar with any of *166 the mining companies named with the exception of two which have exported small shipments of wolframite to the United States, one of the two being a coal mining company.
3. Company Atlántica is to act solely as a servicing organization on a contractual basis with a number of mines, and as payment will be made through open transferable and divisible letter of credit payable directly to the mining company, Company Atlántica would not need to do any financing and would merely receive a fee from the mining companies for its services.
4. Copies of contracts between Company Atlántica and the producing mines include the following provisions :
(a) Atlántica will pay not less than 70 Escudos per kg. (equal to $33.82 per short ton unit).
(b) For material purchased by the mining companies (not own production) will be resold by Atlántica at the price paid by United States in the preceding week to other Portuguese suppliers, less a stated fee to Atlántica.
(c) Atlántica will transfer to the mining company a corresponding share of the divisible letter of credit, established by the Government.
Conclusion: If the proposal of Atlántica is accepted the following will result :
(a) We will in effect establish Company Atlántica as a Portuguese Purchasing Agent of the Government. This will conflict with the present agreement between Bensaude and the Government.
(b) Atlántica is a Portuguese Company which will not apparently be required to furnish any financing as a Letter of Credit is to be established by the Government for direct payment to the producing mines or companies acquiring material for resale by Atlántica.
(c) It is questionable whether Atlántica can deliver the quantity offered as in some cases part of the quantity is to be produced in pick and shovel operations under concessions with the mining companies.
(d) The unit prices proposed by Atlántica are much in excess of prices being paid on other long term contracts from Portugal and without any guarantee of the quality to be produced or purchased from twelve or more different mining companies.
(e) I believe the offer should be rejected on the reasons:
1. It would establish two similar purchasing operations in Portugal.
*167 2. No acceptable evidence has been offered to show that the producing mines can and will produce the quantity offered.
3. The price is too high and no guarantee of quality is given.
(b) On February 1,1952, Mr. Hill dictated the following memorandum to his “tungstan [sic] file”:
Conferred with Captain Maull in reference to the delay over acceptance of offer of Atlántica to sell Tung-stan to the United States. I told Captain that I disliked very much to push this matter but that the mine owners in Portugal were becoming nervous over the delay and were anxious to know what was holding up the acceptance. I then inquired if there were any serious obstacles in the way of acceptance. Captain said there were no real serious objections but that Mr. Mooney who is Technical Advisor and Analyst had raised 4 questions:
(1) Whether there was sufficient appropriation to purchase Tungstan.
(2) The price was a little out of line.
(3) The ability of the seller to deliver, stating that in his opinion only one or two mines had the capacity to deliver.
(4) That since this was to be a long-term contract he thought that it should be routed through Bensaudi the official purchaser in Portugal for the U. S. A.
(1) & (2) Captain stated that he told Mooney that while the appropriation for stock pile tungstan was exhausted, that he had an appropriation to purchase tung-stan for use under Public Law 744 and as to price, while it might be a little out of line that it could be adjusted through negotiation. (3) That as to the ability to produce that was a matter for him, Captain Maull, to decide. (4) That as to purchasing through Bensaudi, that Ben-saudi had been a failure and that Emergency Procurement Agency could act independently in this matter and purchase through our Group. Captain Maull stated that Mooney had been ill with a serious cold and had not been able to be at Ms desk this morning but was quite sure he would be back on the job Monday; that he, Maull, was to have a complete report in his hands Monday afternoon and would advise me about it on Tuesday; that it might be necessary for us to come over and clear up some of the objections.
All of this I have related orally to Colonel Westbrook and Mr. Pulvermaim.
*168 (c) On February 14,1952, Captain Maull advised Colonel Westbrook and Mr. Hill tbat because of an unexpected change in procurement policy there was grave doubt that the Government would enter into the Atlántica agreement. He explained that because of the critical shortage of tungsten the Government had once again decided to use its available funds for spot-purchasing to meet current requirements instead of for long-term contracts. He also said the EPS would give further consideration to the Atlántica offer only if Atlántica would accept a reduction of approximately 15 percent in the prices previously agreed upon.
(d) Colonel Westbrook’s reaction to the foregoing advice was one of impatience. He discussed with Mr. Hill the advisability of severing his connection with the Democratic National Committee and endeavoring to induce Senator Johnson to reopen his subcommittee investigation for the airing of the entire Atlántica project and negotiations. Mr. Hill counseled against such action.[44]
73. (a) On February 15, 1952, Colonel Westbrook prepared the following draft of a letter to Captain Maull:
Reference is made to our conference yesterday afternoon relative to the proposal submitted by me on January 17th last on behalf of Companhia Atlántica etc. You stated that, notwithstanding your previous verbal acceptance of the essential elements of this proposal, a formal contract could not be entered into until certain difficulties created by unexpected changes in policy had been eliminated.
You explained that these policy changes involved questions of purchases for future delivery and also of price. _ You asked me to find out whether Companhia Atlántica would agree to revise the prices set forth in the proposal of January 17th from $65.00 for the first year, $63.00 for the second and third, $57.50 for the fourth and $55.00 for the fifth year, to $57.50 for the first year, $55.00 for the second and third, and $50.00 for the fourth and fifth years.
_ We have been informed by Atlántica that it is impossible for them to accept this revision. They state that producing companies could not conceivably be expected to obligate themselves to go to the heavy expense of providing facilities for expanded production and, at the *169 same time, be required to make the sacrifice of accepting lower prices than the prevailing market. The effect of this would be to penalize them for their initiative and enterprise. My own comment is that a policy which puts a premium on spot prices, as compared with prices offered for increased production requiring producers to make heavy expenditures for the necessary expansion of their facilities, defeats the basic purpose of the legislation enacted by Congress to increase the availability of the product. This is especially true of the Atlántica proposal of January 17th, which involves no loans, subsidies or grants on the part of the United States. The fact that, under this spot-price-premium policy, current Portuguese production is only about 3600 tons per annum (only slightly more than normal peace-time production) as against a potential production of 10,000 tons, is ample proof of the fallacy of such a policy. * * *
But above and beyond any consideration of policies, I must remind you that our proposal of January 17th was verbally accepted at that time on the essential points of price, quantity and time of delivery. We were told that a formal contract could be entered into as soon as technical details could be worked out, which you said would require not more than a week. I formally notified Atlántica of this verbal acceptance, and, on the basis of this assurance, the producing companies confidently entered upon their plans for expansion. Officials of Atlántica have expressed their astonishment and dismay that any changes in policy occurring subsequent to the verbal acceptance of their proposal should be permitted to abrogate the basic features agreed to. They have asked me for an explanation which I have been unable to supply.
In this connection, I invite your attention to the many months devoted by me and my associates to the development of an organization and program in Portugal for the production and merchandising of Wolframite, in accordance with requirements suggested by responsible officials of the United States Government. The expenditure of time and money involved has been of a very substantial nature, being commensurate with the recognized importance of the enterprise. On December 26th, shortly after my return from Portugal, you advised me that we had met all requirements satisfactorily. You were kind enough to congratulate me upon overcoming the very difficult problems encountered. I have reason to believe that our Embassy in Lisbon reported favorably upon our organization and plan of operations. On Jan *170 uary 17th the Commercial Attache of the Portuguese Embassy here, Dr. Antonio Lucena, who is also the Portuguese representative on the International Materials Conference, accompanied us on our visit to your office, and expressed the unqualified approval of the Portuguese Government.
I fully appreciate the fact, Captain Maull, that the changes in policy, which have brought about the existing deplorable situation, were not promulgated by you. In all our dealings with you we have been shown the most courteous and constructive cooperation. I sincerely hope, and as sincerely believe, that you will do everything possible to correct this most embarrassing and inexplicable state of affairs. The urgency of the matter is reflected in the bewilderment of our Portuguese associates who cannot understand why agreements arrived at in good faith between responsible people, even though verbal and informal, could be voided through conditions developing after such agreements have been made.
(b) At Colonel Westbrook’s request, Captain Maull read the draft. He suggested changing the words “verbal” and “verbally,” as applied to “acceptance” and “accepted,” to “tentative” and “tentatively.” Colonel Westbrook agreed to the revisions, and the letter as modified was prepared and mailed.
74. (a) On February 22, 1952, Colonel Westbrook wrote to Atlántica as follows:
Reference is made to * * * my letter of January 17, 1952, in which I submitted an offer * * * to the emergency procurement service * * * for the sale of approximately 4100 tons of wolframite.
At the time this offer was submitted the International Conference on Strategic Materials had been considering the establishment of long-term ceiling and floor prices on wolframite for more than two months. It is known that all the consuming countries had agreed upon a ceiling price of $60.00 per short ton unit, and a floor of $35.00 but these prices were not, and have not yet, been, agreed to by the producing countries.
Notwithstanding the commitment of the United States Government to not exceed a ceiling price of $60.00, we hoped that, by reason of the refusal of the producing companies to agree to this ceiling, we should be able to secure in your behalf the prices as set forth in the offer of January 17 * * *. We were advised at that time *171 by Captain * * * Maull * * * that he felt that the prices stipulated by us would be acceptable, and that he would so recommend.
However, on February 14 we were informed by Captain Maull that unexpected changes in procurement policy had made it impossible to obtain these prices and, also, that because the stock-pile goal for wolframite had already been achieved, there was grave doubt that the United States Government would enter into any further contracts for long-term purchases of this commodity.
I immediately entered a strong protest against this decision on the grounds that a tentative commitment had already been made to Atlántica with respect to its proposal of January 17. As a result of this protest, Captain Maull advised me on yesterday that he had been authorized to proceed with the negotiation of the contract in accordance with the terms set forth in my proposal of January 17, except that prices should be $57.00 for the first year, $55.00 for the second year and $50.00 for the third, fourth and fifth years respectively.
_ Since these prices are considerably below those previously discussed with you and would require that the contingent contracts between Atlántica and the producing properties be accordingly revised downward, I must request further instructions from you. Captain Maull has assured me that we may count absolutely on acceptance of these prices if we submit them firmly without delay. It is possible that some slight additions might be secured in the final negotiations, but, in order to be sure of negotiating the contract, I need authority to submit them as minima in your behalf. Also, in order to assure the U. S. Government of the ability of At-lántica to make deliveries at these prices, it is necessary that the contingent contracts between Atlántica and the producing companies be revised before I finally sign the contract on your behalf with the United States Government.
I give it to you as my opinion that the changes in policy herein referred to indicate the likelihood of an easing of the demand for wolframite, due to the practical cessation of hostilities in Korea, the imminent development of new weapons, and other related causes. I may be entirely mistaken in my appraisal, but I should not be surprised to see the price of wolframite decline still further, and long-term buying cease altogether.
In this connection, I know positively of one offer from a responsible dealer for a three year contract at the prices now offered to us. This offer was from a country *172 which has no export tax. I respectfully invite your attention to the fact that this tax, especially with the easing of demand, imposes a heavy handicap upon Portuguese producers in these negotiations.
Sir. Pulvermann and Dr. Soares will give you their personal views upon the urgency of immediate action with respect to this new offer of the United States Government. I shall keep the negotiations open as long as I can, but urge upon you the desirability of the least delay possible.
(b) Atlántica and its producing companies accepted the lower prices, and the contracts between them were modified as follows:
The wolframite of our production with the basis of 65 units shall be priced during the first three years at 60$00 (sixty escudos) per Kg. with the contents of 65% instead of 70$00; for the fourth and fifth years it shall be 50$00 per Kg. (fifty escudos per kilo) with the same contents.
(c) On February 26, 1952, Colonel Westbrook wrote to EPS as follows:
Pursuant to my telephone conversation of this date with Captain H. C. Maull, I hereby accept, on behalf of Companhia Atlántica * * *, the following modification of paragraph 1 of my offer to you of January 17, 1952 (copy of which is attached), to wit:
“1. 3480 short tons to be delivered within a period of 60 months beginning not later than two (2) months after acceptance of proposal at not less than 58 short tons per month at prices of:
$57.00 per short ton unit for the deliveries of the first 12 months.
$55.00 per short ton unit for the deliveries of the following 12 months.
$50.00 per short ton unit for the deliveries, of the following 36 months.”
Further, pursuant to our telephone conversation of this date, it is understood that the remaining terms and stipulations set forth in my letter to you of January 17, 1952, are mutually agreed to.
‡ ‡ ‡ ‡ if;
In my telephone conversation today with Captain Maull, I was informed that my proposal of January 17, 1952, as modified by the price changes stipulated herein, was acceptable to Emergency Procurement Service, and *173 that a formal contract based upon such modified proposal would be immediately prepared for appropriate signatures.
(d) On February 28, 1952, Captain Maull wrote to Colonel Westbrook:
This is to acknowledge receipt of your letter, dated February 26, 1952, relative to an offer of * * * Atlán-tica * * * to supply tungsten concentrate to the Government and to advise that it is quite evident that the information given you during a telephone conversation of February 26,1952 has resulted in a misunderstanding as to the acceptability of your proposal dated January 17, 1952.
This letter is to confirm information given you during the telephone conversation and to advise you of the terms and conditions under which your proposal of January 17, 1952 would receive consideration.
As the matter of price had been previously discussed and you were informed of the prices that the Government would consider, your telephone call of February 26, 1952 advised this Service of your principal’s agreement to prices which are those stated in your letter of the same date. Upon receiving advice of the revised prices, you were informed that the Government’s requirement for pricing had been met. However, you were also informed that other terms and conditions of your offer may not be acceptable.
In order that you may be apprised of the Government’s requirements as to terms and conditions, other than price, the following details are furnished.
1. Duration of Contract: The Government at this time prefers to limit term contracts to a three year period.
2. Quantity: The total quantity that can be delivered over a three year period is to be stated, with a minimum amount that will be delivered each calendar quarter. All quarterly deliveries need not be the same, but a minimum must be established.
3. Payment: In the event the Government did agree to establish a letter of credit, such letter of credit would permit payments only to the Contractor, and would, not be divisible or transferable. Payment to the beneficiary would not be made until material was loaded aboard the ocean carrier, and clean-on-board ocean bills of lading, analysis certificates, and other documents that are required surrendered to the bank making the provisional payment.
*174 4. Quality: The quality of the material to be delivered must be stated such as a guarantee that the material will meet the chemical and physical requirements of National Stockpile Specification P-57, dated June 14, 1950 (copy attached). If the material cannot be guaranteed to meet the specification requirements, a guarantee of quality must be given for constituents listed in the specification. The conditions of “Hamburg B” contract, are not acceptable to the Government and are not being used as a basis of purchase in any of the Government contracts.
Due to the fact that material to be supplied under the contract will, it is understood, be supplied from a number of mines, it will be necessary that individual lots be composited into a single lot of not less than 15 tons, before shipment, and such 15 ton lot weighed, sampled, and analyzed. The weighing and sampling shall be performed by competent operators such as the Superintendence Company and the chemical assay performed by a firm such as Kudi in Oporto, Benedict Kitto & Sons, in London, or Alfred H. Knight at Liverpool.
Upon receipt of a proposal prepared in accordance with the conditions stated above, this Service will be pleased to give it prompt consideration.
75. (a) On March 1,1952, Atlántica wrote to Mr. Pulver-mann as follows:
At your request, we beg to inform you that this Company has already absolutely secured 'assurance of the financing necessary to comply with the contract for supplying wo3 to the United States Government. This financing will be actually granted to the Company as soon as we have in our hands photostats of the contract and the irrevocable letter of credit.[45]
(b) On March 2, 1952, Colonel Westbrook cabled At-lántica :
Contract will be signed accordance instructions given Pulvermann as soon as formal documents can be prepared.[46]
*175 76. (a) On March 5, 1952, Colonel Westbrook wrote to EPS:
Reference is made to your letter of February 28,1952 * * * and to the personal conference held with Captain * * * Maull * * * on this date with respect to an offer for the sale of * * * Wolframite submitted by me on January 17,1952 on behalf of * * * Atlántica * * *
Upon the basis of my understanding of the terms and conditions set forth in this letter and of interpretations informally supplied by Captain Maull today, I am pleased to resubmit the proposal of * * * Atlántica * * * to sell to you a total of 3800 short tons of Wolf-ramite, basis 65% wo3, according to terms and conditions set forth below:
1. 3200 short tons within a period of thirty-six (36) months beginning not later than two (2) months after acceptance of proposal at prices based upon 65% wos of $57.00 per short ton unit for the first twelve months, $55.00 per short ton unit for the second twelve months and $50.00 per short ton unit for the third twelve months.
Deliveries to be made in lots of not less than 15 tons each according to * * * schedule:
‡ $ $ $ $
The right is reserved to deliver all or any part of the difference between the total for previous deliveries and the total amount of 3200 short tons at any time during the life of the contract.
Quality will be such as to meet the chemical and physical requirements of National Stockpile Specification P-57 as set forth in your letter of February 28,1952.
Provisional payments in the amount of 90% of provisional invoices should be made from irrevocable letter of credit opened in Lisbon in favor of * * * Atlántica * * * against clean-on-board ocean bills of lading with analysis certificates, weight certificates and other documents required to be surrendered to the bank before making such provisional payments. Balance of payments should be made in accordance with your standard practice for making final settlements.
Weighing, sampling and assaying will be performed by recognized operators located in Oporto or Lisbon and acceptable to you. Packaging will be in double bags as is now customary in Portugal.
2. 600 short tons to be delivered within a period of twelve (12) months beginning two (2) months after acceptance of this proposal at not less than an average *176 of 50 tons per month, at unit prices not less than the current ceiling price established by the International Conference on Strategic Materials, or, in the event there should be no ceiling price currently established by the International Conference, not less than the maximum price being currently paid by the United States in Portugal.
*****
(b) On March 10, 1952, Mr. Mooney wrote the following memorandum to “file”:[47]
This is to confirm a telephone conversation March 8th with Col. Westbrook regarding his offer dated March 5th.
1. The quantity to be offered is 2,640 minimum to 3,800 maximum over the three year period.
2. Part 2 of the offer is rescinded.
The object of the above is to avert the delivery of material at the same time at different prices, and further it will permit supplier to offer the extra 600 tons as each partial lot becomes available as “Spot” delivery at the prevailing market price. If for any reason a price better than the contract price cannot be obtained, then the supplier would at its option deliver the material to the Government at the contract price.
Col. Westbrook thought the above was an acceptable solution and agreed that we should consider his proposal accordingly. He further stated that for any reason his principals objected, he would let us know before contract terms were agreed upon.
77. (a) On March 13, 1952, Mr. A. J. Walsh, Commissioner of EPS, wrote to Mr. George B. Guillotte, EPS Manager for Europe, in London:
Accompanying this letter is our file on an offer made this Service by Westbrook Associates * * * in behalf of a Portuguese firm known as the Companhia Atlán-tica * * *
The purpose in forwarding the complete file to you is that you will have the complete record up to the present time.
It is desired that you make an investigation as may be necessary to determine if the proposal submitted to the Government is one that can be fulfilled. If, after *177 you complete your investigation, you find that the pro-gosal is one that is questionable to the extent that the rovemment should refrain from becoming a party to a contract, please be sure your decision is based on facts that can be substantiated, and your reason for the decision given us in detail.
You will note that the file contains cables from the Embassy at Lisbon, some of which appear critical of the individuals within the Portuguese Corporation.
Also contained in this file are photostats of agreements between various suppliers, some, it is claimed, are actually owners and operators of mining properties. As such agreements are in Portuguese we are unable to read them, and the certified statement by Carlos * * * da Silva who summarized the individual agreements in English, is ambiguous and questionable as to whether it does correctly express each agreement.
It is very important that the file remain intact and be returned with your reply, with proper safeguards for its transmittal.
It would be very much appreciated if you would take care of the matter discussed above as soon as possible.
Attached for your information is copy of letter dated March 6, 1952, from A. M. Almeida with a copy of our reply thereto, both are self-explanatory.
(b) Mr. Pulvermann returned to Lisbon (from Washington) on March 18,1952, and made a detailed report to a joint meeting of Atlantica’s boards of administrators and auditors. On March 24, 1952, the joint committees wrote to Colonel Westbrook:
í|í
On Monday * * * when we expected to receive the information that the Contract had been signed * * * we received instead * * * the surprising information, given by Mr. H. Pulvermann himself, that the contract would be signed only after our supplying capacity had been checked by Mr. Guillotte of the E. P. S., London. You told us by telephone that this was merely a final formality which mean [sic] a slight delay but that you took personal responsibility about the signing of the contract.
The joint Committees of this Company cannot refrain from expressing their dissatisfaction at this unexpected decision which, we are sure, also surprised you. As a matter of fact it would have been quite natural to check the supplying capacity of Atlántica, either during your visit with this purpose to Lisbon or after our letter of *178 the December 19th to Capt. H. S. Maull but it is very strange and quite ununderstable [sic] that during a series of conferences between our Representatives and the Representative of the E. P. S. one of which was attended by the Portuguese Commercial Attache to the Portuguese Embassy in Washington (who is also the Portuguese Delegate to the International Conference of Raw Materials) all details had been discussed without any doubts having been voiced and that only after the date for the signing of the contract having been announced, the need for checking should arise. This is by all counts untimely and the ensuing delays will be highly damaging to the interests of both countries and most particularly against the interests of the Atlántica Group. The prestige of the Members of the joint Committees — all persons of highest category — has suffered by these surprises and they are hardly disposed to tolerate a form of negotiations which they consider absolutely inconvenient and humiliating to their personal dignity, since, believing over and over again the promises of the Negotiator, they have undertaken commitments and in their turn made promises which finally cannot be fulfilled.
We never opposed and even desired a checking of the capacity of Atlántica and we were always ready to submit without reserve all the date [sic] required from us. But if the new investigator within a short term has not fulfilled his mission we cannot but protest through the competent channels against a delay, which is not only unjustifiable but also directly harmful.
* * * Besides this protest * * * it will be suggested to the Portuguese Government to take steps to regulate the Exportation of Strategic Materials to the United States.
* s{s * # #
We also hope that you will point out once again that Atlántica is ready to make all the necessary efforts to fulfill her plans without asking any help or anticipated payment from the U. S. Government, asking only the normal cover of a letter of credit.
Furthermore we ask you to point out the difference of treatment given to the exclusive buying agent of the E. P. S. in Lisbon who showed himself entirely incapable of using the credits opened in his favour and the treatment that is being given to the Atlántica after a series of offers which have been accepted but finally not confirmed.
*179 (c) On March. 27, 1952, Mr. Guillotte replied to Commissioner Walsh:
This is in reply to your letter of March 15, 1952, regarding an offer * * * by Westbrook Associates * * * in behalf of * * * Atlántica * * *
I am aware of most of the correspondence contained in your file, especially that emanating from Portugal and I also discussed this proposition with Heinz Pul-vermann about sis months ago in London, at which time I suggested he contact our Washington office for purposes of negotiating and completing, if warranted, the contract.
You state it is desired that I make an investigation as may be necessary to determine if the proposal submitted to the Government is one that can be fulfilled. In this regard I consider it necessary to have an independent engineer’s examination made of each and every property certified to be under the control of Atlántica in order to completely qualify any recommendations I might make.
The reasons for this are that nowhere in the literature, although I suggested to Pulvermann that it would be of great help if engineers’ reports could be had on these various properties in order that an evaluation might be made or that we could decide whether or not this proposition warranted sending an independent American Government or consulting engineer to verify such findings. This has not been done. Secondly, I have no record and neither does the Embassy, of the actual production from these mines and if they are producing I do not know to whom or under what conditions sales have been made, all of which Atlántica could supply if they so desired, in my opinion.
From the foregoing you can readily appreciate that I am in no position to pass judgment on the basis of fact. Plowever, the following comments might be in order and I hope will be of some help. The idea of a setup similar to the one claimed by Atlántica is good and would help stimulate production; however I believe the Government is warranted in having some firsthand knowledge regarding the potentialities of the properties concerned before tying up the large amount of money required to cover a purchase commitment up to 3800 tons of tungsten concentrates over a three-year period and I therefore ask you to obtain the information covering geological and engineering aspects of the properties, current production and shipments being made by the properties under consideration, as well as the milling *180 facilities available, from Westbrook and Associates or that you authorize me to request DMPA to furnish an engineer to make examinations. At the .moment all DMPA engineers are tied up on the continent or in Africa and no one is immediately available to undertake this job. Therefore as an alternative, I suggest that this office engage a professional engineer to undertake these examinations, which I can secure under a standard service type of contract.
# ‡ ij:
(d) On the next day (March 28) Mr. Guillotte again wrote to Commissioner Walsh:
v »!♦ H» V H»
In regard to my paragraph four of yesterday, and in view of the long time Westbrook Associates have had to set up this proposition, it seems to me that any of the various companies concerned associated with Atlántica, that Pulvermann himself or Mr. Jose Bacelar Bebiano could very easily have worked out comprehensive reports giving some indication as to the geology, mineralization, actual ore reserves, probable ore reserves, and potential ore reserves on these various properties as well as existing mill facilities and planned milling facilities with a brief resume of the actual production of each property not a “potential” actual production which can be substantiated provided any legitimate production is an actual fact.
The way this whole proposition has been presented looks to me like it might be another OMNI-Transact sort of proposition where all the so-called mines are goat pasture. However, this might be prejudicial on my part; that is why this report is submitted in two separate letters.
_ I am returning your file as I have sufficient information here * * * [I]t might be possible to get some sort of a performance guarantee from Westbrook Associates since they have been remiss in furnishing sufficient factual information on which to base an opinion.
The volume of this business is such that a cancellation clause would be in order if deliveries fell short at any time. I say this with reason because I believe in Spain, for example, there are a number of mines which we know something about which could produce fairly substantial quantities of tungsten on the basis of the prices offered by Westbrook Associates.
E. April 1 to June 30,1952
78. (a) Atlántica responded to the knowledge of Mr. Guil-lotte’s pending investigation by planning to dispatch Mr. *181 Pulvermann to London to talk with. Mr. Guillotte and to show him a report prepared for Atlántica by Portuguese engineers relative to the capacity of the affiliated companies to produce.
(b) The report was forwarded to Mr. Pulvermann by At-lántica with a covering letter dated April 7,1952, wherein At-lántica said:
We think we are sending Mr. Guillotte all the necessary technical data likely to allow him a perfect judgment of the ability of Companhia Atlántica to effect the deliveries to the EPS in accordance with the letter dated March 5th, 1952.
79. (a) Following are the “Contents” of the bound volume containing the report described in the preceding finding, as listed on the opening page thereof:
Eeport, by M. M. Engineers, Jose Bacellar Bebiano, Augusto Barata da Eocha, Eurico Guilherme Lopes da Silva, Fernando de Almeida Correia and Segis-mundo de Castello Branco
Appendix 1 List of Associate Mining Companies
Appendix 2 List of Mines
Appendix 3 List of Plants and their separating capacity Chart 4 Previous Top output — Official 1943 monthly figures
Chart 5 Average monthly antecipatid [sic] output
Map Showing the localisation of the Mines and Plants
Comment on the Development Plan of the Mining Industry in Portugal, envisaged by Companhia At-lántica * * * by Professor D. Luiz de Saldanha Oliveira e Sousa
(b) Following are the degrees and titles of the engineers as listed in the report:
Jose Bacellar Bebiano, G. B. E., M. E., A. E. S. M.; former Minister of Colonies; former Director of the Mining Services of Angola (Portuguese West Africa); Administrator of the Lisbon Harbour Authority; Member of the Portuguese Overseas Empire Council; Portuguese Ministry of Overseas Delegate to the Overseas Territorios Committee of the E. O. E. C.; President of the Missions for Geographic and Colonial Investigation; Technical Director of several mining companies; Administrator of the Board of Companhia Atlántica.
Augusto Barata da Eocha, M. C. E., U. P.; former Professor of the Sciences, Faculty Oporto University; *182 former Engineer of the Portuguese Board of Mines; Member of Mining Department of the Oporto Manufacturers Association; Technical Director of several mining companies.
Eurico Guilherme Lopes da Silva, M. E., U. P.; Engineer of the Portuguese Liquidation Office of Alien Property in Portuguese Territories; Technical Director of several mining companies; Chief Engineer of the Companhia Atlántica.
Fernando de Almeida Correia, M. E., 1.1. P.; Technical Director of several mining companies.
Segismundo de Castello Branco, M. E;, 1.1. L.; Technical Director of several mining companies.
(c) Following is the text of the 2-page report:[48]
We have been requested to inform on the ability of * * * Atlántica * * * to supply wolframite in the quantities specified in the offer submitted to the “Emergency Procurement Service” * * * in the * * * letter dated March 5th, 1952 * * *.
The safest way to determine the anticipated production of the group of mines which supply * * * Atlántica, would be:
a) estimate the reserves on sight and the possible reserves.
b) the exact knowledge of previous output.
No estimate of reserves has been made in the past, because there has been no reason to do so; it is possible to do it but such a job would involve a long study.[49] * * *
As to previous output, the existing figures do not deserve much credit. Taxes collected from some mines, those in proportion to the value of the ore produced, on the mine, are known; considering the values at different times, we can state, with regard to some mines, what their output was in average, in certain periods. With those figures we elaborated the attached Chart No. 4. * * *
The lack of this information is mainly due to the cir-cunstances [sic] in which the mining operation took place during the war and to which Professor Luiz Sal-danha made reference in his Comment * * *.
*183 This report was made with the following information on hand:
a) for the detailed figures of the various deposits we used the elements of the files of the official Board of Mines.
b) to the estimate of anticipated production we used the information given by the technical directors of the different mines, for they are the sole legal and professional qualified authorities to give it. * * *
With these figures we elaborated the attached Chart No. 5.
To conclude, we feel that Companhia Atlántica, gathering the producers listed on Appendix 1, attached, owners of the different deposits listed on Appendix No. 2, attached, and still the deliveries of the separating plants listed on Appendix 3, attached, can supply to the EPS * * * the quantities of Wolframite indicated in their offer dated March 5th, 1952.[50] * * *
(d) 'In Appendix 1 the authors of the report listed 29 producing companies as the owners of the 59 mines listed in Appendix 2, wherein the authors also inserted brief analyses of the several mines in terms of location, deposit, nature of work done, and method used in the extraction of ore.
(e) In Appendix 3 there were listed 12 separating plants, together with their locations, the number of separators (2 at each of 9 plants; 1 at each of 3), and their output capacity in kilograms per 8 hours of operation. Total capacity was listed as 16,200 kilograms.[51]
(f) In Chart 4 the authors tabulated the “previous top output (1943 official figures)” of 14 mines owned by 7 producing companies.[52] The total for the group was 30 tons.[53]
*184 (g) In Chart 5 the authors tabulated the “average monthly antecipated [sic] output” of 23 of the 29 producing companies. The total for the group was 93 tons.[54]
(h) The author of the “Comment on the Development Plan of the Mining Industry in Portugal, Envisaged by Companhia Atlántica * * D. Luiz de Saldanha Oliveira e Sousa, M. E., I. S. T., was professor of the Technical University of Lisbon and technical director of several mining companies.
(i) Following is the text of Professor Sousa’s comment:
1 — No doubt, one of the factors so far having made more difficult the development of the mining industry in Portugal, is the scattering of mines in the mineralized zones, coupled with the irregularity of their mineralization.
In fact, the existence of many small concessionaires, most of whom lacking sufficient capital to undertake an operation? and who maintain their mines with the very least equipment, bearing only in mind the sale, determines a rudimentary industry, with primitive methods as well as non economical, employing mostly miners recruited among rural populations, at the cost of above-human efforts, and with permanent danger for their lives.
These facts are principally bound to the tin and tungsten mines, these metals being more valued and more procured.
On the other hand, the preparation and equipping of a mine, requires the investment of large capitals, the *185 sake of which demands the guaranty of sufficient reserves to ensure the continuity of the operation.
When the reserves are sufficiently identified and the operation organized so as to guarantee the invested capital, due compensation, solid entreprises become possible with long life. Such is the case of “Panasqueira”, one of the largest tungsten operations in the world, at the present.
2 — -It is not possible, now, among us, to obtain reliable figures on previous mining output, because it is well known;
a) during the last war it was not possible to organize a statistics service, nor was it published the Official Bulletin of Mines, where such figures normally appear. That gap was the result of the exceptional regime then in force, due to the confusion the mining industry went through, and also the need to maintain a certain reserve on mining activities.
b) deliberately, many producers did not record their real outputs to evade taxation.
c) foreign buyers did their purchases without caring to know the origin of the ores they were buying.
When in 194Y the official services got back to normality, the market instability, the uncertainty of the international situation, and the restrictions imposed by some countries set the path for the irregularity and unsteadiness of mining operations.
Under the circumstances, the figures we could get and which were estimated on a normal regime of work cannot represent the production capacity of our deposits, if they were to operate at regular swing.
3 — The only safe way of figuring the production capacity of a deposit is estimating its reserves. However m many deposits in Portugal the investigation is so poor and the operation has so rudimentarily been made, without basic technical know-how, that it is difficult to estimate reserves on sight. The possible reserves basing ourselves in considerations of geological order, can up to a certain extent be determined, but it is then necessary to examine the soil, study the development plan and see what has already been made. The technical director of a mine is the one better qualified to judge its potentiality.
This lack of figures of reserves of a concession, can up to a certain point be relieved by the bigger number of corresponding concessions to a certain center of operation, as is the case of alluvials in which we broaden *186 the area of operation, and tlie case of veins in which we increase the total volume of same.
4 — Having been informed of the offer of “Companhia Atlántica de Desenvolvimiento e Exploracao de Minas” to the United States Government, with a plan of deliveries of 3.800 Tons of Wolframite, supplied by 26 associate companies, holding 57 wolframite mines and 10 separators, it appears to me that such a plan is perfectly practicable, considering the general knowledge of the regions where the mines are located, together with the information I gathered on the main concessions and separators, included in this company.
5 — The equipment of the mines and separators, necessary to produce the volume of ore offered, with the concentration such as set, is one operation calling for large investments of capital and therefore it is only possible if a reward is assured, by the guaranty of a market for the ore obtained.
The initiative of * * * Atlántica * * * is, no doubt, an important factor towards the progress of the national mining industry, and its plan is by all means possible, be it given the guaranty of a market for the ore produced, thus allowing it to organize the intensive operation of the mines embodied in this company.
80. (a) On April 8, 1952, by cable from Washington to London, Commissioner Walsh directed Mr. Guillotte to “arrange for prompt examination of properties by DMPA engineer or by competent independent service which you will hire locally.”
(b) On April 10,1952, Mr. Guillotte, in London, talked by telephone with associates in the Paris office of EPS concerning arrangements for someone to make the investigation of the Atlántica properties. Following are excerpts from the transcript of the conversation:
Mr. Guillotte: The point is there’s a lot of political pressure back of this thing — I’ll like to get somebody * * * who know their way around — but it will take more than 3 or 4 days. * * * I would prefer in this instance if at all possible not to have to hire an outside consultant engineer because this thing stinks politically. * * * I’m
* * * anxious to get a DMPA engineer to do it. * * * We’re worrying about Portugal — that’s why it’s so hard because the Chief of the Staff of the Portuguese army is one of the directors — and then there’s a couple of Portuguese ministers that are in this deal. I’ve either *187 got to justify or kill the thing. * * * The thing just doesn’t look good. * * * The thing looks lousy. * * * [T]hese boys talk big, they’ve got some bigwigs back of them — nobody’s guaranteed — if they guaranteed to put up money * * * I’d tell them to give them a contract. It involves 3800 tons of material which is just about ten million U. S. bucks and I don’t want to immobilize it without some real justification. * * * I don’t know whether they can deliver 10 tons per month or 100 tons per month. Nobody else knows that. They have never guaranteed to put up anything. What they have in effect is a hunting license to look around the Portuguese market with, so I don’t know what to do about it. * * *
(c) On April 16,1952, Mr. Guillotte advised Commissioner Walsh that arrangements had been completed for the examination to be made by Mr. Lynton, a DMPA engineer, commencing on Saturday, April 19, and that Mr. Pulvermann would accompany Mr. Lynton.
(d) On April 18,1952, Captain Maull said in a memorandum to the file:
I received a telephone call from Mr. * * * Larson * * * stating that a Mr. Barnes, Barnes and Hill, was in his office concerning a tungsten offer submitted by Colonel Westbrook.
I informed Mr. Larson that the case had been submitted to Mr. Guillotte, London office, for a complete report.
Mr. Larson requested that I immediately get out a cablegram to Mr. Guillotte requesting that the survey be made and a report submitted at the earliest possible moment.
I called Mr. Larson, within the hour, and informed him that I had just received a copy of an incoming telegram, * * * reading as follows:
“Arrangements completed for examination Westbrook by Lynton. * * *”
Mr. Larson requested that I watch this case very closely and let him know when the final report has been received from Mr. Guillotte.
81. (a) On Saturday, April 19, 1952, Mr. Lynton arrived in Lisbon, conferred with Mr. Pulvermann, met with responsible officers of Atlántica, and approved plans for an inspection trip to begin on the following Monday.
(b) On April 21,1952, Mr. Pulvermann reported to Colo *188 nel Westbrook on Mr. Lynton’s arrival in Lisbon, and interpolated in his report the following:
I suppose you are aware of the change in the general setup of Mr. Larson’s outfit. As far as I understand there will be under the control of the State Department a new European Group for Economic Development set up in London (the original plan to locate it in Paris has evidently been changed). This group will be directed by General Thomas B. Wilson with Guillotte as regional director of purchases. I am somewhat concerned about Wilson’s position who will arrive tomorrow, Tuesday, in London and have a talk with Guillotte. I have already heard about these changes when I was in Paris and I guess that Manley will also have a talk with Wilson and tell him how much he regrets his attitude in the whole matter.
(c) On April 27, 1952, Mr. Pulvermann forwarded to Colonel Westbrook his report of the inspection by Mr. Lyn-ton during the period April 21-26. Following are excerpts from that report:
* * * Mr. Lynton thought that the plan for the outlay of the Cales mines should rather be changed in order to secure a higher production. * * * [I]t was evident that this mine * * * would not produce in reasonable time the 5 tons referred to in chart No. 5. The deficiency could easily be made good by Engenheiro Correias’ separator, which as a British mining engineer, confirmed, could easily deliver some 5-10 tons per month of concentrates, based on the production of pilhas working on the adjoining concessions.
Mr. Lynton was also very conservative with respect to the development of the mines Folgar and Pomar which Engenheiro Barata da Rocha, the former consultant engineer of the Allied Commission described to us as an excellent chance. On the other side Lynton was very much surprised by 2 mines which had declared their willingness to work with Atlántica in the very last days. * * * Lynton was also impressed by the relations between Atlántica and the mine owners in so many districts of Portugal.
The most interesting interview * * * was that with Engenheiro Sá Fernandes, Director of the Northern Bureau of Mines, at his private home in Chaves. En-genheiro Sá Fernandes — -his son, the geologist Dr. Sá Fernandes, accompanied Lynton on this trip as an expert of Portuguese Tungsten Geology — is the admin *189 istrative chief of nearly 80% of the Portuguese tungsten mining. He * * * told us that the Ministry of Commerce and Industry had just sent him a letter asking for an official report on Atlantica’s setup in the Northern district and the chances of developing Atlántica into a nucleus for coordinating the operations of the small Portuguese mines. Mr. Sá Fernandes said that he would allow Atlántica to have a copy of a part of his reply referring to possible production which I then should communicate to Mr. Lynton.
* * * Mr. Lynton was very much surprised by Mr. Sá Fernandes’ unequivocal statement about the great interest the Portuguese Government takes in the development of Atlántica and that it was fully informed on all developments in the negotiations for the contract between this company and the American Government. * * *
* * * Lynton also changed his attitude towards Soares. * * *
(d) On April 27, 1952, Mr. Lynton asked Atlántica for the following information “* * * needed to establish the reliability of the Company to carry out its part of the contract.”
1. Exact name of Company. Exact address of main office.
2. History of Company — dates, etc. When organized? 1951 activities.
3. Location and address of its field offices, such as Oporto, Viseu, etc.
4. List of officers or directors and their position, such as president, vice-president, director, etc. and attorney representing company.
5. Authorized capital and paid in capital.
6. Number of stock shares issued.
7. Brief statement on purposes and aims of company.
8. Can the company give assurance to EPS that the Portuguese Government has or will grant them export licenses for wolfram concentrates in the amounts to be purchased during the 3 year period of the contract?
9. If the Portuguese Government have agreed to grant Atlántica export licenses — is this in the form of a written guarantee or only verbal ?
10.The Company’s recent financial statement.
* * % * ❖
(e) Following are excerpts from Atlantica’s reply to the foregoing request:
*190 * * * History of Company * * *
Hr. Celestino Soares initiated this Organization with the Portuguese miners which today form the Atlántica group, in July 1950. At that time, he tried to secure ECA aid, and in that connection he formally addressed the Portuguese Mission of that Agency on the 22nd of February, 7th of March and 17th of April 1951. After a small recess, negotiations were resumed directly in Washington by the American Representatives of the Company, Messrs. Colonel Lawrence Westbrook and Heinz Pulvermann, in July 1951. Hue to the warm welcome given by Washington to the “Bevelopment Plan” supplied by the Company, this was officially organized on the 11th of August 1951. The Company was Incorporated on the 21st of the same month and year with the cash capital of Escudos 1,000,000 and authorization to raise it to Escudos 25,000,000. At that time, the Company intended to take over some mining firms. Meanwhile, and in order to both overcome some difficulties which were encountered, and to best implement the aims of the Company, the structure of the Corporation was deeply altered upon recommendations of Colonel Lawrence Westbrook himself. The Company then started coordinating the activities of the various associate mining and separating firms. This change made possible a firm offer to the United States Government. Colonel Westbrook’s plan was outlined in a memorandum given to Atlántica on the 11th Hecember 1951, and a letter addressed to Captain H. S. Maull of the EPS on the 19th Hecember of the same year, by Colonel Lawrence Westbrook.
Although Colonel Lawrence Westbrook considered the cash capital of the Company (Escudos 1,000,000), to be sufficient, this was raised to Escudos 5,000,000 on the 7th of February 1952. So far, the activities of Atlántica have primarily consisted in the coordination of the works of the various mining and separating firms forming its group, and effecting technical studies and carrying out the necessary negotiations with the Authorities and Portuguese Banks involved in the execution of its Plan.
* * * List of officers * *
BOARD or administrators: Chairman: Major Carlos Augusto d’Arrochella Lobo. Engineer José Bacelar Bebiano. Hr. José de Azevedo Cabral. Sergio Barbosa Mendes, Hr. Joao Gonsalves.
board or auditors: President: General of the Army José Filipe de Barros Rodrigues. Reporter: Major *191 Joao José de Figueiredo Gaspar. Secretary: Dr. Francisco Xavier da Mota Viveiros Pinto.
GENERAL direction: General-Director (Coordinator): Dr. Celestino Soares. Production Director: Dr. Manuel Teixeira de Queiroz. Deputy General Director: Dr. Francisco Bruno de Miranda. Assistant: Dr. Orlando Augusto d’Arrochella Lobo.
technical staee: Engineering Consultants: Au-gusto Barata da Bocha, M. & C. E. Prof. Luiz de Saldanha Oliveira e Sousa, M. E. Armando Fer-nandes, Mach. & Elect. Eng. (Porto). Chief Engineer: Eurico Guilherme Lopes da Silva. M. E. Engineers: Fernando de Almeida Correia, M. E. (Vila Beal). Segismundo de Castelo Branco, M. E. (Lisboa). Chief of Geological Services: Dr. Luiz A. T. Sá Fernandes. Chief of Analysis Services: Dr. Fernando Sampai o e Castro. Laboratoire a Porto Civil Engineering: Julio de Nobrega Bangel de Lima, C. E.
‡ ‡ $ #
Industrial Consultants and Representatives of the Company in Washington: Colonel Lawrence Westbrook. Mr. Heinz Pulvermann.
* * * Authorized capital and paid capital. * * * Authorized capital: Escudos 25,000,000. Cash capital: Escudos 5,000,000. * * *
* * * Statement on purposes and aims * * *
The Company aims the operation of mining concessions and the business of mining activities, coordination of the activities of the greatest number of Portuguese miners, who are operating mines, the deposits of which warrant the Development Plan. * * *
Can the Company give assurance to EPS that the Portuguese Government has or will grant them export licenses for wolfram concentrates in the amounts to be purchased on specific prices as outlined in the offer of Atlántica to EPS of March 5th (3 years price).
Yes.
If the Portuguese Government have agreed to grant Atlántica export licenses — is this in the form of a written guarantee or only verbal ?
The Portuguese Government has, at different times given word guarantee that export licenses for the quantities referred to in the offer of Companhia Atlántica, would be given. At this moment negotiations are being concluded so that such guarantee is given formally and in written form.
*192 82. (a) On April 25, 1952, the Chief Counsel, Contracts Division, DMPA, prepared and forwarded to DMPA’s General Counsel a confidential memorandum concerning the Atlántica proposal. The memorandum took the form of a review and summarization of the files of the Purchase Division, EPS.
(b) The memorandum referred to three items in the file which are not in evidence in this case and have not been noted heretofore, as follows:
* * * By cable dated October 4, 1951, the American Embassy in Lisbon * * * gave an unfavorable report on the character and responsibility of Dr. Soares. * * *
* * * On October 23, 1951, the American Embassy at Lisbon cabled EPS a further report on the unfavorable character and reputation of Dr. Soares * * *.
By cable dated December 31,1951, the American Embassy at Lisbon reported that Atlántica had been completely reorganized, that Dr. Soares no longer had any official position with the company but was retained for liaison work with the producing companies and concluded with the following statement:
“If the Emergency Procurement Service considers it important to be assured before signing the contract that the mining companies with which the Companhia Atlántica has contracts will be able to supply the amounts indicated, it would be best to have a mining engineer to look at the properties. It is possible that Mr. Lynton of the OSB might be available for that purpose. If that consideration is not of major importance, it does not appear that they would be running any serious risks by signing a contract.”
83. On May 1, 1952, Mr. Pulvermann made a confidential report to Colonel Westbrook. Excerpts follow:
* * * [Y]ou should know that Atlántica, discouraged by the constant change of conditions imposed by EPS has tried to establish direct contacts with London. In the meantime General Wilson has taken over London. I suppose that he knows that he cannot get around At-lántica anymore without running into serious trouble after the complete failure of the Almeida appointment. But on the other hand he deeply resents our activities and that we have the background information on the Almeida deal and his European interests. His idea evidently is that if his friends could not make any money here, why should we ?
*193 On the other hand there is a growing resentment on the side of the Atlántica administrators against us because we did get them into entanglements and commitments and that despite all our promises we could not conclude the deal. But what really counts is the fact that the amount of our commission is a much heavier burden to everyone who was promised to get a share from Atlantica’s earnings after the contract price was considerably reduced. There is therefore, a danger that Atlántica tries to eliminate or considerably reduce our commission by simply changing the basic conditions on the Portuguese side, if this deal is not closed by us within a very short time. '
# # Jfi ‡
There is no doubt that since I returned to Lisbon on March 20th, with the surprising news that an investigation had to be made instead of a contract signed the attitude of the administrators towards us has very much changed. * * *
* * * [W]hat Bebiano told Lynton is right, that the Atlántica of today has great possibilities with the Portuguese Government and Soares has been deeply hurt by the request accepted by us that he ought to give up control of and a leading position in a company which he brought into existence.
$ ‡ $ H* $
84. Within 10 days after completing his tour of inspection of Atlantica’s affiliates, Mr. Lynton filed a report. Following are excerpts from it:
* * * Atlántica * * * was incorporated in August 1951 for the purpose of making individual contracts for the purchase of wolfram concentrates from a large number of small mines and licensed operators on various concessions. After gathering the concentrates from these many small operators, Atlántica would treat these concentrates in various electro-separating plants under contract to them.
Atlántica have under contract 14 small operators and 13 pending contracts with others. Atlántica claims they can deliver an aggregate production of 500 tons of wo3 concentrates in the first 12 months beginning September 1,1952, 800 tons the second 12 months, and 1400 tons the third 12 months for a total of 2700 metric tons in a 3-year period, that is, by August 31,1955.
Atlántica desires a purchase contract from EPS for three years. * * * The three year contract enables At- *194 lantica to contract for the production of these small operators who are then assured of a sale of their production and enables them to make definite plans for that period. The three year purchase contract is the basis of all commitments and operations. It will enable Atlántica to borrow necessary funds from Portuguese banks to finance small operators in the purchase of necessary equipment. The operators receiving such financial assistance will be obligated to contract all their production to Atlántica.
Of the 27 mining companies, either under contract or pending, the writer examined eight of the more important ones during the week of April 22, 1952, to obtain the probable minimum and maximum production during the period of the contract. The production of the other 19 companies is problematical. Atlántica made an estimate on the production of these 19 properties, which the writer discounted by 50%.
The results of the survey indicate that Atlántica can possibly meet a production of 500 metric tons in the first year, 800 in the second year, and 1400 in the third. This is on the basis of the present contracts, signed and pending, but Atlántica points out that additional operators have expressed a desire for an Atlántica contract as soon as the EPS purchase contract is signed. Such additional contracts might increase the available tonnage or assure the fulfilment of the figures quoted.
In addition to the 2700 metric tons for which At-lántica requests a contract, they are anxious to receive a commitment from EPS that it will purchase at spot price up to 225 short tons every six months of excess production which will be through deliveries of 40-55% wos concentrates to separating plants under contract to Atlántica. The separating plants will receive this material for processing to 65% wo3 and over from licensed leasers, known locally as “pilhas”.
It is recommended that EPS make a purchase contract with Atlántica for an annual tonnage of wo3 concentrates, as outlined above, for a period of three years at the prices quoted by Atlántica. It would be advisable to insert a clause in the contract, canceling all future purchases if Atlántica do not meet their quarterly quota of production, based on the annual tonnage contracted for.
No definite recommendation can be made for pilhas concentrates through separating plants as no firm quantities can be quoted. However, if EPS is in the market for this excess production 'at the time commitment is to *195 be made, EPS should have first refusal on this excess tonnage over the annual quantity contracted for delivery by Atlántica.
$ ‡ sg* $ $
The Company aims to supervise the operations of the mines and concessions under contract to Atlántica. Mines and concessions will be furnished the necessary material by Atlántica to increase their production and place the better concessions on a small operating basis. It is very doubtful if all the concessions under contract or under pending contract can be financed by Atlántica. Failing this, the concession owners will allow authorized “pilhas”, that is, leasers to work the claims on a manual basis and sell their 40 to 55% washed concentrates to Atlántica for further treatment in the nearest electromagnetic separator plant. Atlántica expects these concessions to become a good source of their coordinated production in addition to those mines whose present operations can be increased.
The concession owners and mine operators are willing to enter into a three-year contract with Atlántica for the sale of their concentrates at a price lower than At-lánticas re-sale price to EPS. Their willingness to do this is based on the time element of three years which will enable these operators to figure on steady sales for that period. Being recipients of equipment furnished by Atlántica and therefore under firm contract to them, all of their production must be made available to Atlántica.
Actually Atlántica at this date has 14 signed contracts and some 13 contracts pending or under negotiations. The unsigned contracts are waiting for the signing of the EPS purchase contract with Atlántica. These contractors are apparently hesitant to sign unless the EPS purchase of the concentrates over a period of three years is assured.
<]• ' H» í» 'I*
Price to be paid to the contractors of the operating companies by Atlántica was not disclosed but will be sufficiently less than that received from EPS so that At-lántica can make a fair profit on its handling of the tonnage, its resale and amortization of its equipment.
So far, the activities of Atlántica have primarily consisted of coordinating the operations of the various mine operators and the electro-magnetic separating plants forming its group. The consulting engineers have been carrying on technical studies on the properties and the *196 Atlántica directors, the necessary negotiations with the Portuguese authorities and banks necessary to the execution of its plan.
$ # ‡ *
The field trip of six days covered only the more important mining companies which were actually producing tungsten. Of the eight companies examined, only three were actually under contract to Atlántica, the fourth contract mine not examined, but the operators of the other five stated they were willing to sign the contract if Atlántica obtained an EPS contract which would assure them of a steady price and outlet for their concentrates for three years. In addition to the mines, several of the electro-magnetic separating plants were visited so that their present operating condition could be verified.
:Js * * * *
The * * * 12 plants are well scattered over northern Portugal so that operators under contract to Atlántica can bring their ore for final concentration in the magnetic separators at a low cost to them. The capacity of these plants exceeds the production from mines under contract and their main purpose, therefore, will be to purchase and treat manually washed concentrates by authorized leasers (“pilhas”), which concentrates in turn will be purchased by Atlántica. The Atlántica company estimates that production of wo3 concentrates channeled into these plants by “pilhas” will amount to 600 short tons annually. This appears somewhat optimistic as “pilhas” production is very variable, and Atlántica has revised this figure to 450 short tons during the first year of the contract.
Atlantica’s estimate of production during the three-year life of the purchase contract and the writer’s revised figures are summarized as follows:

3-Year Production

Atlántica Lynton (Metric (Metric tons) tons)

8 Mines Examined_ 1, 583 1, 345
19 Other Properties_ 2,293 1,083
Total- 3,876 2,428
In view of the discrepancy between these two final figures, Atlántica reduced their estimate for three years from these 27 properties to 2,900 metric tons. After considerable discussion with Mr. Heinz Pulvermann in *197 Paris, it was decided to set a final figure of 2,700 metric tons for three years. Atlántica would be obligated to deliver in three years 2,700 metric tons of wo3 concentrates on the following annual basis and price:

Period, Metric Price tons STU

1st 12 Months. 500 $57.00
2nd 12 Months. 800 $55.00
3rd 12 Months. 1,400 $50.00
Total_ 2, 700
Failure to deliver the annual amount of concentrates would subject Atlántica to cancellation of their contract by EPS.
In addition to the first 12 months’ fixed production of 500 metric tons, Atlántica desired to add 600 short tons of “pilhas” production, which they later reduced to 450 short tons, as there was considerable doubt that they could obtain such a tonnage from the separating plants under contract.
The tonnage of 450 short tons from “pilhas” during the first 12 months is in addition to the 500 metric tons. Atlántica requests EPS to commit itself to purchase up to 225 tons every six months. EPS would notify Atlántica at the beginning of each six months the quantity of excess wo3 concentrates they would purchase up to 225 tons at spot prices. EPS would not be committed beyond a six-month period, but Atlántica would prefer a commitment to purchase this “pilhas” production in excess of the mines production at spot prices over the three-year period of their purchase contract. Such a commitment by EPS on excess production would enable Atlántica to give a guarantee to the separating plants a sale for the concentrates obtained from authorized leases, known as “pilhas”.
Such “pilhas” production is a moot question. It is difficult to arrive at even a general estimate of their possible production. Atlántica claims that as soon as they have a commitment from EPS to purchase up to 225 short tons, the “pilhas” will go to work and deliver 40 to 55% wo3 concentrates to the separating plants. It cannot be foreseen by EPS what their requirements would be every six months, so it seems somewhat hazardous for them to commit themselves for that period and considerably more so for three years. It seems as if the only solution would be for Atlántica to organize the pilhas production on their own account and when they have a minimum of 15 tons for sale, to give EPS the first *198 refusal at tbe prevalent spot purchase price. If EPS should refuse, then Atlántica would have the liberty to sell to any buyer.
In view of the world tungsten situation and increased world-wide production of the mineral, it is difficult to see how EPS could make such a commitment every six months and much less so for three years when there does not exist delivery of firm quantities except the figure of “up to 225 tons every six months”.
After an examination of the main properties pf At-lántica and discussions with their key personnel in Lisbon and Paris it is concluded that:
1. Atlántica should be able to deliver 2,700 metric tons of wo3 concentrates during a 3-year period, divided into 3-12 months’ period of 500, 800 and 1,400 metric tons respectively at corresponding prices of $57, $55 and $50 per short ton unit.
2. The company has prominent financial and political Portuguese men within its organization.
8. It has paid-in capital of 5,000,000 escudos and plans to raise an additional 25,000,000 escudos to purchase equipment for the mines under contract and increase their production.
4. Atlantica’s plan to coordinate and. channel the production from many small producers into one holding company, under a three-year contract for the sale of concentrates to EPS, seems workable and feasible.
5. There is little doubt that Atlántica can obtain an undetermined quantity of “pilhas” concentrates. As to a firm quantity, Atlantica’s willingness to reduce their 600 short ton figure for the first 12 months to 450 short tons seems to indicate that they had some doubts as to the larger figure.
85. (a) On May 9, 1952, the following message was dispatched to Commissioner Walsh in the name of General Wilson:
A. A reasonable production estimate of Atlántica properties is reported to be 500 metric tons for the first year; 800 MT for the second year; and 1,400 MT for the third year. The price per MT would be $57. — $55.— $50. for the respective years. Atlántica has requested the right to accelerate deliveries at the relative prices and claims it has the ability to deliver as scheduled. The completion on this contract occurs on the delivery of 2,700 metric tons or August 31,1955 whichever occurs first.
*199 B. Atlántica reduced that portion of its offer of March 5, 1952 for additional deliveries from 600 to 450 short tons, and requests that EPS agree to purchase up to 225 tons each 6 months from specific suppliers using At-lantica’s leased separation plants. Purchase of additional excess quantities each 6 months will be at the option of EPS on notice to Atlántica. Purchase commitment by EPS is desired by Atlántica to cover a three year excess production at a spot price. This commitment will permit Atlántica to guarantee sale of separation plant excess productions.
C. Portuguese Government, according to Atlántica, has verbally guaranteed that export licenses will be granted. No Government loan to Atlántica is involved. Lynton feels that the company is well organized and has the political and financial backing. Atlántica claims to have 25 million escudos authorized, of which 5 million has been paid for equipment to be used in the mines under contract. The company is agreeable to cancel the undelivered balance in the event it fails to make scheduled annual minimum deliveries.
D. Wilson recommends “A” above be considered in completing negotiations with Westbrook in Washington. He cautioned that excess production referred to in “B” is based on possible speculation to acquire such excess.
(b) On May 15, 1952, Commissioner Walsh of EPS directed to the Deputy Administrator, DMPA, a memorandum wherein the history of the negotiations was briefly reviewed as the basis for the following conclusion:
‡ $ $ $ $
Under date of May 9, 1952, General Wilson advised by cable that the engineering reports showed that the Atlántica properties can reasonably be expected to produce 500 metric tons at $57.00 per short ton unit the first year; 800 metric tons at $55.00 per short ton unit the second year; and 1,400 metric tons at $50.00 per short ton the third year.
General Wilson recommended that consideration be given to a contract for this quantity but recommended against the purchase of additional tonnages on the belief that there were some elements of a “hunting license’’ in this offer of additional quantities.
In view of the above, it would appear that there now exists a practical basis for a contract with Atlántica, and if DMPA feels that this quantity of wolfram is *200 needed in connection with defense efforts, it is felt that steps should be taken to make provisions for such a contract by providing the necessary authority and funds from Defense Production Administration to cover such a contract.
The funds required for this contract are estimated to be * * * $17,177,660.
Pending further advice from you, no action will be taken on the company’s offer by EPS.
86. (a) On May 17, 1952, Atlántica wrote to Mr. Pulver-mann, then in Washington:
* * * [S]ix contracts of financing of Tungsten mines in Portugal, by the Mutual Security Agency, MSA, former EGA, were cleared by the Portuguese Government * * *
* * * [F]or these six contracts the Portuguese Government, agreed only that the loans were to be paid in wolfram, at the rate of 15% of the mine’s output, at 57 dollars per short ton unit CIF New York, but the EPS had no option to buy any wolfram afterwards unless the contract is first submitted to the Portuguese Government. This means that the miners are free to sell 85% of their output, to countries to which the Government grants export licenses at the time of the sales. A cable * * * from London informs that England is buying at 61 dollars CIF London * * *. The trend is for prices to go up. * * *
(b) On May 27, 1952, Mr. Kelsey, in Lisbon as an International Trade Economist with MSA,[55] wrote to Mr. Lynton, DMPA engineer, in London, to advise him of the status of negotiations of loans for mining developments in Portugal.
(c) The “clearances” by the Portuguese Government of MSA contracts for financing tungsten mines in Portugal, mentioned by Atlántica in its letter to Mr. Pulvermann, and the negotiations by MSA of loans for mining developments in Portugal, of which Mr. Kelsey advised Mr. Lynton, were all related to a situation which had developed as a result of commitments to private interests in Portugal made by MSA with *201 out first obtaining the approval of the Portuguese Government.[56]
(d) At or about the same time, MSA found itself in possession of more deutschemarks than it had immediate use for, and initiated an effort to induce the Government of Portugal to accept the German currency in lieu of dollars in the establishment of counterpart funds in Portugal.
(e) Discussions between representatives of the Governments of Portugal and the United States concerning matters described in this finding precipitated a review by the Portuguese Government of the activities of American interests in the Portuguese tungsten market, including the negotiations between Atlántica and EPS.[57]
87. (a) Beginning about the first of June 1952, Colonel Westbrook and Mr. Pulvermann began efforts to negotiate a contract with DMPA in lieu of EPS.[58] Through the office of the General Counsel of GSA[59] they were put in touch with Mr. Charles E. Stott,[60] Director, Foreign Expansion Division, and Colonel John A. Church, his assistant, as appropriate representatives of DMPA.
(b) On June 4, 1952, Colonel Church wrote to an official of EPS:
I am enclosing a copy of a memorandum I sent to Charlie Stott on purchases of Spanish and Portuguese *202 tungsten. The memorandum is based upon two memo-randa from Mr. Walsh to Mr. Young of May 9 and May 26, respectively, of which you no doubt have copies. I have found a working out of the various factors in this problem rather complicated, particularly in view.of General Wilson’s recommendation that the Atlántica tonnage be held to 2,700 metric tons. In several conversations with Mr. Mooney, I found that he had figured on the current offer from Atlántica in which they give a range of tonnage from 2,640 to 3,800 short tons. I felt that in view of General Wilson’s recommendation that [if] we stick to the 2,700 tons which they seem able to produce, we should base our calculations on this latter tonnage.
However, Mr. Mooney called my attention to the fact that the offer included some 600 tons of material now awaiting shipment, and I adopted his view that this 600 tons should be included, bringing the total up to 3,300 metric tons.
!]: * * * *
(c) Excerpts follow from the memorandum which Colonel Church enclosed in his letter to Mr. Stott:
Mr. Walsh’s memo of May 15 dealt with offers of tungsten concentrates (through Colonel Westbrook) by Companhia Atlántica of Lisbon, which began at a level of 4,800 ST at $65 per unit, and were progressively reduced as to tonnage and price down to quantities ranging from 2,640 to 3,800 ST, and prices ranging from $50 to $57. Engineering examination of the company’s properties showed that they can reasonably be expected to produce 500 MT of concentrates at $57 per ST unit in the first year, 800 MT at $55 in the second, and 1,400 MT at $50 in the third, a total of 2,700 MT. General Wilson advised against contracting for any larger quantities, on the ground that for anything more than these 2,700 tons, the contract would have some aspects of a hunting license. However, in its offer the Company mentioned an extra 600 tons probably available in the first year, from small scattered accumulations.
In his memo of May 26, listing the funds estimated as needed to take care of various offers under consideration, Mr. Walsh placed the Atlántica tonnage at 2,700, but showed a cost for this item of over $17 million, which on analysis proved to be the cost of a considerably larger tonnage. Mr. Mooney of EPS, who worked up the data, corroborates this statement. In view of the advice of General Wilson, the cost has been recalculated below *203 on the 2,700-ton limit, plus the extra 600 tons mentioned above, which would bring the first year’s tonnage to 1,100 MT.
* * * * *
88. (a) On June 10, 1952, Mr. Pulvermann, writing from Eye, New York, advised Dr. Soares (in Lisbon) of the developments of the preceding week:
* * * * *
* * * Wednesday, June 4th, Colonel Westbrook and I heard that the appropriation of funds might delay the contract longer than we had been told * * *. In view of this changed situation, Col. Westbrook and I asked for an interview with the responsible men of Defense Materials Procurement Agency; the interview was arranged for June 5th. We were received by Charles Stott, Director for Foreign Expansion Division of Defense Materials Production Agency, who introduced us to the responsible man in charge of the tungsten (and other materials) program, Colonel John A. Church.
Col. Church is now handling all contracts for expansion of production facilities, i. e., such contracts as we are asking for, viz. long-term contracts at specific prices for several years as well as contracts with credits granted by the Export-Import Bank reimbursable in minerals produced under such loans. Or, as I understand it, he coordinates the task of directing contracts based on credits for expansion facilities and supervising E. P. S. or D. M. P. A. long-term purchases.
Col. Church told us that he had just taken over his new assignment and that he would be glad to learn more about our deal. Thereupon Col. Westbrook answered that he would tell him what had happened in the past. And he gave him a report about our negotiations with the government authorities and about the development of Atlántica which lasted about one hour, ending with his request to speed up the question of the appropriation of money by all possible means. Col. Church was very much impressed when Col. Westbrook had ended his story and promised to do his very best to get the appropriation as soon as possible.
After the interview we went to see Maxwell Elliott, General Counsel of General Service Administration — ■ also in charge of D. M. P. A.’s contracts — an old friend of Col. Westbrook’s, who made an excellent impression on. me. Here again Col. Westbrook and I stressed the point that after the acceptance of the basic elements of the contract by Emergency Procurement Service upon *204 the report received from Wilson’s organization the appropriation of money should be speeded up. Col. West-brook asked to get a letter from E. P. S. or D. M. P. A. to the effect that the elements of our offer had been accepted and that a contract would be given to us as soon as the money would be available. * * *
# #
* * * [Y]ou suggested that we should try to get through Maxwell Elliott the terms of the contract, or the wording of the type of contract which will be given to Atlántica when the question of appropriating the monies will be settled. You had in mind that we could herewith avoid any further delay caused by the discussion of legal details. I do not know whether that can be done, because the whole setup and the relative authority of the different agencies: DMPA-GSA-EPS is evidently still subject to changes. However, I shall ask Col. Westbrook to discuss the matter with Maxwell Elliott and ask him to communicate to us the terms of a contract such as he expects will be given to Atlántica. ‡ ‡ ‡ ‡ ‡
(b) On June 10, 1952, Captain Maull wrote to Colonel Westbrook:
Reference is made to your offer of March 5, 1952, in behalf of Companhia Atlántica * * *, as modified informally by you by telephone on March 10, 1952, to sell and deliver to the United States * * * over a three year period, from a minimum of 2640 short tons to a maximum of 3800 short tons of wolframite tungsten of Portuguese origin.
The terms and price specified in the above offer are satisfactory to this Administration and constitute a basis on which a contract between the parties may be negotiated. Accordingly, a request has been made of the Defense Materials Procurement Agency to obtain and make available to the General Services Administration sufficient funds under the Defense Production Act of 1950, as amended, to cover the cost of the above proposed, contract. Upon such funds becoming available, this Administration will then proceed to negotiate a contract with you on the basis of the aforesaid offer.
It is to be clearly understood that this letter in no manner constitutes a contract or commitment between the above company and the United States * * *, acting by and through the General Services Administration, nor does it impose any obligation on the part of the Govern *205 ment with, respect to the above offer pending the negotiation and execution of a formal contract.
(c) On June 11, 1952, Colonel Westbrook forwarded to Dr. Soares a copy of Captain Maull’s letter, together with a copy of the form of purchase contract used by EPS in the acquisition of critical materials.[61] In his letter Colonel Westbrook said:
With respect to the availability of funds, I have had a number of conferences with Colonel John Church who has full responsibility in the Defense Materials Procurement Agency in connection with such matters. He tells me that there is no doubt whatever about the availability of the funds, but that it is necessary to make the allocation cover other contracts in addition to our own, and that some details in connection with these other contracts have not yet been fully worked out.
* * * I am enclosing a copy of the form of purchase contract usually used by the Emergency Procurement Service * * *. I am advised by Captain Maull that our contract will be substantially on the order of this typical form, but because of the fact that our contract will be somewhat different from those normally utilized, there will be certain modifications which will have to be prepared by attorneys for EPS in conjunction with our attorneys.
I am fully confident that we shall have no more difficulties in connection with this transaction and hope that within a very few days I shall be able to send you the completed contract for your consideration prior to signature by me as attorney in fact. Also, I am glad to say that I feel sure we shall be able to work satisfactorily with any future difficulties with respect to spot purchases.
* * * * ❖
89. (a) On June 11,1952, General Barros Rodrigues wrote to Colonel Westbrook:
This letter, though dealing of business matters, has an absolutely private character and is addressed to a comrade to whom it is requested to reply as a comrade.
The subject, as you can well imagine, is the contract of Atlántica with the United States Government and the negotiations pertaining to it, which have been held for *206 such a long time, full of complications and accidents some of which well unexpected and unbelievable.
On March 24th I signed, together with the other members of the Board of Administrators and of Auditors, a long letter to which, so far, you have not yet replied directly.
Several times has the completion of the contract been announced as “immediate”, but in the last moment, for one reason or the other, such completion has been systematically postponed, leaving us puzzled for failure of understanding in full the real causes and consequently without knowing how to line up our procedure, nor how to render our Government the information which has been asked from us. A short time ago, meeting with the Minister of Economy I confess, I was very embarrassed for ignoring what is going on, and you will realize how intolerable this is.
Over a month ago, the favourable information of Mr. Lynton, regarding the plan and offer of Atlántica, was forwarded to the EPS from Paris, by Mr. Guillotte. Be-cently Mr. Pulvermann sent the company a letter, dated May 80th in which he announced the completion of the contract within the next week or 10 days. Saturday last, however, over the telephone he said that, after all, there would still be a delay of one or two weeks in the appropriation of funds. Another delay very difficult to explain, if we recollect that already in March, 13th, Mr. Pulvermann cabled to us that the contract would be ready next Monday (March, 11).
That is why I ask you to advise me, personally, of the present stage of the negotiations with the greatest precision and detail. The Portuguese Government wants to know, with the utmost accuracy the terms of the contract and we are in no position to render this information, because the whole correspondence we have from Mr. Pulvermann is not precise and is sometimes rather contradictory.
# ❖ iji #
(b) On June 18,1952, Colonel Westbrook replied to General Bodrigues:
‡ ‡ ‡ $ H:
I can well understand the confusion and frequent disappointments of you and your associates during the course of the long negotiations in connection with our efforts to conclude a contract with the United States Government to assure it a vitally important supply of sorely needed tungsten under unusually favorable terms *207 and conditions. Until recently circumstances, which must certainly appear to be completely inexplicable to you, have prevented the consummation of this vastly important and mutually beneficial transaction between actual producers of Tungsten in your Country and our government.
Now, however, as you will note from Captain Maull’s letter and from my letter to Dr. Soares, the inexplicable obstacles have been removed. The contract will be executed as soon as certain formalities in connection with the allocation of the approximately 17 million dollars involved are disposed of. Unfortunately, compliance with these formalities will require still more time, possibly as much as two weeks. However, I have received assurances from the most highly responsible sources, which greatly deplore the delays hitherto encountered, that the contract will be executed as set forth in Captain Maull’s letter as soon as is procedurally possible. *****
(c) On June 18,1952, Colonel Westbrook forwarded copies of the two letters described in the preceding subdivisions of this finding to Colonel Church “just as a matter of information.” [62]
90. On June 16,1952, Mr. Kelsey, then in London, wrote to Mr. Guillotte, in Paris:
‡ ‡ $
* * * "\Yhen I was traveling in North Portugal last November our then Comptroller, Donald Delvin, was in the north on an end-use inspection and two or three times stopped at places where Mr. Pulvermann had been. A number of Portuguese asked Mr. Delvin about Pulvermann and claimed that the latter was holding himself out to be President Truman’s special representative authorized to purchase and contract for wolfram concentrates. Delvin was so disturbed about Pulver-mann’s allegations that as I recall he wrote a memo for the Embassy Security Officer suggesting an investigation. I can confirm this on my return to Lisbon.
Reliable sources of rumor in Lisbon indicate that the Companhia Atlántica is apt to fold up any day. The reason given is that although some of the members have good names, none of them has had any experience in the mineral field and even with an EPS contract such *208 an inexperienced group would be unable to finance its deals with, sub-contractors. Let me underline that this is rumor only.
# * ❖ # ❖
91. (a) On June 24, 1982, Mr. Stott directed a memorandum to Mr. Sol Elson, an attorney in the office of the General Counsel of DMPA, from which the following are excerpts:
Mr. Young, together with Mr. Walsh of EPS, is pressing for immediate action on a series of tungsten purchases in accordance with offers received by EPS and on file in the office of Capt. Maull, the Director of their Purchase Division. EPS has committed all of the funds set aside for tungsten during the current year, and the purchases will have to be made with DPA funds under borrowing authority now being applied for by DMPA.
There is one offer in the hands of EPS which, by arrangement with Mr. Walsh, we are negotiating and for which we are responsible for the drafting of a contract. This is with Companhia Atlántica * * * and covers a minimum of 2,700 metric (2,976 short) tons and a maximum of 3,800 short tons of tungsten wolframite concentrates over a period of 36 months. These 36 months begin 2 months after signature of contract and therefore do not conform to calendar years.
The application for borrowing authority is now in the hands of DPA and we are promised quick action. Accordingly, I called the contractor’s American representative, Col. Lawrence Westbrook, and suggested that the contract should be drafted, as a measure of saving time, but with the proviso that it could not be signed until the borrowing authority was assured. I am accordingly requesting you to proceed with the draft.
(b) Mr. Stott’s memorandum listed many of the details that were to be covered in the contract and enclosed sample contracts from the files of EPS.
(c) At the end of the memorandum Mr. Stott appended this note:
Subsequent to the negotiations stated above, Com-panhia Atlántica through Col. Westbrook, offered spot purchases of tungsten outside of the contract at the rate *209 of 200 metric tons every six months on a flat price basis. Mr. Church talked to EPS and was assured that the $57 per short ton unit was in fact the present price for spot purchases. This was passed on to Col. Westbrook who was agreeable to including the spot purchase offering into the 36 months contract. EPS will not spot purchase in competition.
The contract should be written to stipulate that the seller should be authorized to overship 200 metric tons at any 6-months period, to be purchased under the base price of that 12-months period.
F. July 1 to September 30,1952[63]
92. Following are excerpts from the Sixth Quarterly Ke-port to the President by the Director of Defense Mobilization, on July 1,1952:
$ $ $ ‡ $
To acquire needed supplies of tungsten, $18.6 million has been allocated to buy foreign tungsten at a guaranteed price over a 5-year period for resale to domestic consumers. As a consequence, imports of tungsten have been rising sharply in recent months.
To encourage domestic sources, $14 million has been allocated for purchase of 47.5 million pounds of tungsten at a maximum price of $63 a ton from domestic producers. As a result of this action, it is expected that domestic production will rise 30 percent above 1950.
93. (a) On July 7,1952, Mr. Elson[64] forwarded to Colonel Brenn,[65] for information and comment, “a draft copy of the proposed purchase contract between DMPA and Atlán-tica.” [66]
*210 (b) In due time Colonel Brenn returned tbe draft with tbe following comment:
Reviewed and from all appearances meets tbe understanding witb Atlántica representatives and contains tbe salient points we desire.
94. On July 9, 1952, Mr. Larson, as Administrator of DMPA, wrote to Mr. Henry H. Fowler, Administrator of DPA:
Your letter of June 10, 1952, in regard to tungsten points out that the stockpile objective for tungsten is only partially complete and further states: “If additional tungsten can be procured now or in tbe near future to complete tbe stockpile as expeditiously as possible, such procurement should, of course, go forward under authority of Public Law 320, 79th Congress, assisted as necessary by activities under the Defense Production Act, as amended.”
This Agency has made tentative negotiations on three offers of tungsten for near-term contract purchase. It appears at this time that the quantities involved will, be within the scope of the DMPA tungsten program which is currently in preparation and will be forwarded to you shortly. In any case, acquisition of the tungsten being offered this Agency is justified on the grounds of accelerating the completion of the stockpile objective in line with your letter of June 10, 1952. Since the full stockpile objective is covered by existing contracts, it is proposed that the pending offers of tungsten be financed under authority of the Defense Production Act with resale to industry or to stockpile, in the event of defaults in delivery in stockpile contracts. Leases, if any, would be absorbed under Section 304 (b) of the Defense Production Act.'
The table below indicates the quantity of material being offered together with the tentative prices. *****
It is requested that the financing of the above program be provided by the issuance of a new certificate * * *.
*****
The DMPA has considered the proposed procurement of foreign tungsten under the above offers and has determined that it is necessary to secure to the United States the availability of overseas supplies, that the procurement of tungsten cannot be increased more economically *211 in terms of funds, and is in the interest of national defense. Therefore, it is recommended that you certify the above described program is necessary in the interest of national defense and will assist in carrying out the purposes of the Defense Production Act of 1950, as amended. *****
95. (a) There is in evidence a copy[67] of a draft of the contract which was prepared by Mr. Elson at or about the time he made his first distribution of copies.[68] This copy is hereinafter referred to as Draft A.
(b) Following are the premises of Draft A:
whekeas, The Government is desirous of fostering the production of and procuring quantities of tungsten (wolframite) concentrates particularly from new sources of production and;
whereas, the Contractor intends to merge and consolidate with other small producers of tungsten in Portugal in order to facilitate and increase the production of tungsten of these small producers, and;
whereas, the Government recognizes that the Contractor is unable to give a firm estimate or rate of future production from these mines until they have opened up and a considerable tonnage of material therefrom mined and milled by the Contractor.
now, therefore, in consideration of the mutual promises herein contained, the parties hereto agree as follows:
(c) The scope and purpose of the contract were defined by Draft A as follows:
(a) In furtherance of the purpose set forth above and in consideration of the Contractor proceeding forthwith to open up its mines in Portugal and provide additional milling facilities, the Government agrees to purchase from the Contractor at the prices hereinafter stipulated and in accordance with the terms and conditions hereinafter stated, tungsten concentrates from the Contractor’s mine up to a total quantity of_short tons (of 2,000 pounds) of tungsten concentrates (wo8).
*212 (b) The Contractor agrees to sell at the prices hereinafter stipulated and in accordance with the terms and conditions hereinafter stated certain quantities of tungsten concentrates conforming to GSA material purchase specifications P-57, derived from the Contractor’s facilities in Portugal.
(d)Following are the provisions of Draft A relating to quantity:
The Contractor agrees to deliver to and the Government agrees to purchase a minimum of 2640 short tons of 2000 pounds each of tungsten concentrates meeting specifications as hereinafter stated. The Contractor may deliver to and the Government will purchase a maximum of 3800 tons of tungsten concentrates meeting the aforestated specifications.
The Contractor agrees to make delivery of the tungsten concentrates in accordance with the following schedule of deliveries:

Minimum Over run Total

1st Year_ 500 400 900
2nd Year_ 800 400 1200
3rd Year_ 1400 400 1800
It is agreed that this schedule shall be on a semiannual basis, and that the maximum tonnages (over run over the minimum scheduled deliveries) shall be achieved by the delivery of additional concentrates of tungsten at the rate of 200 short tons during each of the semi-annual delivery dates.
(e) Draft A further provided that the contract “shall be for a period of three * * * years commencing sixty * * * days from date of execution * * and that the prices should be $57 per short ton unit during the first 12 months of the contract, $55 during the second 12 months, and $50 during the third 12-month period. All prices “are f. o. b. Portuguese port,” and “include all duties, taxes, and other levies imposed by any authority other than the United States * *
(f) Another provision of Draft A recited that “in consideration of the undertaking of the Government under this contract, the Contractor hereby grants to the Government an option to purchase the Contractor’s entire production or any part thereof of tungsten (wolframite) meeting the specifications * * The option was to continue in existence for a *213 period of 5 years “from the date of the expiration of this contract.”
(g) Article 14 of Draft A provided that, except for force majeure as therein defined, “in the event the Contractor refuses or fails to make delivery of the material conforming to the specifications within the time specified or any extension thereof, or to perform faithfully any conditions of the contract, the Government without prejudice to other rights resulting from breach of contract conditions, may, by written notice, terminate the right of the Contractor to proceed with the contract.”
(h) Following is the text of Draft A’s provision relating to contingent fees:
The Contractor warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained, by the Contractor for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage, or contingent fee.
(i) The default clause of Draft A, insofar as material here, provided as follows:
Notwithstanding any other provision of this contract, the Government may, by notice in writing to the Contractor, cancel this contract or any part thereof at any time, without payment of damages or penalty of any kind for such cancellation, in the event (a) a receiver, liquidator or trustee is appointed for Contractor or its property, or Contractor makes an assignment for the benefit of creditors, * * * (b) of the liquidation or dissolution of Contractor, whether voluntary or involuntary, (c) of default by Contractor in the performance of any of the terms, conditions or covenants of this contract or any amendment or supplement thereto, (d) of the determination by the Government that the Contractor obtained this contract for the purpose of speculation.
96. (a) Several of the articles of Draft A were provisions that had been standardized by repeated use in procurement *214 contracts, and were selected for nse in this instance because of some statutory mandate or simply because the draftsman deemed them pertinent and appropriate to the situation at hand. Mr. Elson referred to these standardized provisions as “boiler-plate”. Among the boiler-plate provisions in Draft A were (1) portions of article 14, relating to force majeure; (2) article 16, relating to contingent fees; (3) article 17, relating to interest of Member of Congress; (4) article 18, relating to assignment; and (5) article 19, relating to default.
(b) In the course of negotiations a question was raised by Atlántica as to the meaning of a phrase in the force majeure provision. Otherwise, none of the boiler-plate provisions was discussed during negotiations, in relation either to drafts or to the contract in final form.
97. (a) On July 11,1952, Colonel Westbrook and Mr. Hill met with Colonel Brenn and Mr. Elson for a discussion of Draft A (or another draft closely related to it). Colonel Westbrook and Mr. Hill suggested, in effect, that neither the premises nor the statement of the scope and purpose of the contract was quite accurate in terms of Atlantica’s development plan, and Mr. Elson agreed to revise the provisions in accordance with their suggestions.[69] The negotiators also went over other provisions of the contract relating to quantities, times of delivery, inspection, and payment.
(b) Following the negotiation session described in the preceding paragraph Mr. Elson prepared a revised draft of the contract to conform to the agreements reached by the negotiators, and forwarded a copy (or copies) to Mr. Hill and Colonel Westbrook. It is not established that a copy of this revised draft, herein denominated for identification as Draft B, is in evidence.
(c) On July 12, 1952, Colonel Westbrook forwarded to Mr. Pulvermann a copy of Draft B with the following advice:
*215 ‡ % # ❖ #
This contract is completely de novo. It will be the first one of its kind that the United States has ever entered into. That is one of the reasons so much time was required to prepare it.
* * * You will note that maximum quantities to be accepted during each of the three one year periods have been established. This was contrary to our original conception. We had asked the privilege of accelerating deliveries without limitation, except within the total quantity involved. We were told by Mr. Elson (our 'attorneys agreeing), that it was not possible for the government to give us this privilege because of the fact that it was necessary to set aside a specific sum of money for each period. Under the liberal overrun allowed us the aggregate amount set aside is approximately $21,000,000. If we had been given the privilege of accelerating deliveries according to our original conception, it would have been necessary to increase this allocation more than 10%. If we are able to make more deliveries than the maximum shown within any given period, I do not anticipate that there would be any difficulty in negotiating a supplemental contract.
*****
With respect to funds, you should understand that the overall allocation for the purchase of tungsten from all sources has not yet been made to DMPA. This overall allocation may be delayed for another two or three weeks, and so DMPA made a special case in connection with our contract calling for the diversion of funds already set up for the purchase of other commodities. I am told that all necessary executive approval has been secured in this special case, and that only the completion of the required paper work remains to be done. This is expected momentarily. In any event, there is no question whatever as to the availability of funds for our contract after the overall tungsten allocation has been approved, and there is no question whatsoever that this overall allocation will itself be made shortly. Otherwise DMPA would be out of the tungsten business.
In my opinion there is no doubt of any kind remaining with respect to this contract.
*****
(d) Mr. Pulvermann handed the draft contract to Dr. Soares, who had it translated into Portuguese. After the *216 two men discussed it, Mr. Pulvermann forwarded it to the offices of Atlántica on July 21,1952. Later,[70] he reported to Colonel Westbrook detailed comment on the draft from himself, Dr. Soares, and the boards of administrators and auditors of Atlántica.
98. Following are excerpts from Mr. Pulvermann’s report to Colonel Westbrook of his and Atlantica’s comment on Draft B:
*****
I have been told that the Board was favourably impressed by the draft on contract. There was, according to Soares, a general feeling that with the exception of two clauses, (see below II and III), it was a satisfactory document.
Apart from these two clauses Atlántica wishes to have several minor items changed. Let me first refer to these minor changes, which I think are very reasonable.
1. — Article IY, 1st paragraph: “This contract shall be for a period of three years commencing (60) days from date of execution thereof.”
Instead of 60 days say 120 days. If it should be necessary to compromise on this issue, 90 days would do it.
Colonel Westbrook and I have repeatedly insisted that, after so many delays, Atlántica should be given a fair chance to negotiate the financing of the contract with responsible men of the Portuguese Government and Portuguese banks. It was understood that this would be particularly difficult in August and September when nearly all important people are away from Lisbon. Both Colonel Church and Brenn have agreed to the 120 days period.
2. — Article VI, 1st paragraph: “is only referring to wolframite * * *
It is deliberately excluding scheelite * * *.
During the Linton investigation, it was always believed to be an established policy * * * that scheelite would be accepted as well as wolframite. * * *
According to my records, the question of scheelite was discussed with Colonel Brenn on June 24th. Brenn came out saying that, even if the contract only referred to wolframite, scheelite quantities would also be accepted under the contract. I also remember that I nevertheless asked Colonel Brenn that this right of Atlántica should be specifically mentioned in the contract.
*217 I do not understand why this difficulty has suddenly arisen * * *.
However, in order to avoid any further delays, At-lántica agrees to deliver the quantities under this contract in wolframite exclusively. * * *
3. — Article VII, 2nd. paragraph: “The government will establish irrevocable commercial Letters of Credit opened in favour of the contractor in the Banco Nacio-nal Ultramarino of Lisbon/Portugal, or in such other Portuguese or United States bank as may be named by the contractor and is acceptable to the D. M. P. E.”
The wording of the draft may have been conceived under the idea that the government opens the Letter of Credit in the United States and in an American bank, the name of which had to be inserted in the blank of paragraph a., 2nd line.
May I remind you that in our offer of January 17th as well as in that of March 5th, accepted in principle by E. P. S., we had requested that a Letter of Credit be opened in Lisbon in favour of Atlántica.
sjí ❖ # ❖
II. The Semi Annual Schedule of Deliveries, and the Maximum Yearly Quantities.
As far as I remember there had never been any question of anything else than annual deliveries prior to February 28th, 1952, when E. P. S. suddenly requested that Atlantica’s deliveries of Tungsten should be scheduled on a quarterly basis. In view of this difficult condition I re-established in the first days of March, a scheme for Atlántica deliveries under the conception of quarterly maxima and minima. This scheme, after approval by Atlántica, served as a basis for our new offer of March 5th, which provided for increasing quarterly maxima and minima, and reserved the unrestricted right of anticipation of deliveries.
However, this new scheme was not further discussed as on March 17th the government came out with a request for an overall investigation into the Atlántica setup.
This investigation dealt with Atlantica’s ability to deliver at great length. A solution of this problem was condensed in Mr. Linton’s figures which recommended yearly purchases from Atlántica at the ratio of 550-880-1540 short tons, plus another quantity of 220 short tons to be negotiated every six months between the parties. This scheme was confirmed in General Wilson’s cable of May 9th from Paris to Washington.
*218 I should like to stress the point that in the so-called Linton report the 8 months schedule of deliveries was deliberately eliminated and replaced by periods of 12 months, because it was recognised that to grant At-lántica delivery periods of 12 months would greatly facilitate the Company’s task of overcoming the unfor-seeable difficulties of the first year. The whole problem was then looked upon from a sound engineering and industrial viewpoint, which prevailed over budgetary and accountants’ scruples. I can hardly assume that Linton, Guillotte, Wilson, Maull, Church and Brenn, should all have overlooked the necessity of “setting aside specific sums of money for each period of six months,” or the allegedly overwhelming difficulties precluding the anticipation of deliveries, which was recognised by everybody as a sound incentive for the producing companies.
In view of the objections raised by the lawyers of D. M. P. A., I suggest that you re-discuss this problem from a practical angle.
With regard to the annual schedule of deliveries. It should first be tried to get rid of this semi annual schedule altogether and return to the yearly schedule for the duration of the contract. If this is not possible, the yearly schedule should at least ~be preserved for the first yean'. Linton agreed in Lisbon with the Atlántica Administrators that the Company should be given the chance of a full year for its obligation to deliver the quantity of 550 tons. It makes a very bad impression that during these negotiations chances promised to the Company — not to mention prices or duration — should repeatedly be revoked.
s}i :Jí ^ sfc
Moreover, something has to be done with, respect to the yearly over-run of 440 tons, which according to the draft, has to be halved into two equal semi annual parts — * * *. This over-run should by all means be counted on a yearly basis. * * *
# % * * *
III. The Option Clause.
Article XIII was to everybody here a great surprise.
This clause had neither been discussed with us nor with Atlántica ever before, nor had it ever been mentioned. Moreover, Atlántica received by letter from E. P. S., dated June 10th, the assurance that “the terms and price specified in our offer of March 5th constitute the basis on which the contract between the parties may *219 be negotiated.” No one can deny that the_ sudden introduction of the option clause is to be considered a basic cmd very important change of the terms heretofore agreed between the parties.
In my report of July 4th to Lawrence Westbrook, I informed you that the basic letter from E. P. S., had been submitted to the Portuguese Minister of Economy. Unnecessary to say that it has also been communicated to the producing companies who have been waiting so long for the completion of our negotiations; this makes matters even more complicated.
When the new option clause was discussed over here, I realized perfectly that we were confronted with the same problem which came up when E. P. S. cut the price down to $57-$55-$50 per Tungsten unit. At that time we decided in Washington that this price-cut could not be accepted by Atlántica, unless the producing companies had previously agreed to a correspondingly lower price in their contracts with Atlántica. The same procedure had to be followed now. * * *
On the other side, we have to face the fact that the patience of the producing companies is nearly exhausted, their willingness to get along with new conditions is now at the breaking point. I therefore felt that it would be inopportune for the Atlántica administration to take the risk of having the option clause debated by the producing companies.
You will certainly remember that Atlántica has already twice been compelled to change their contracts with the producing companies. First, with respect to the reduced prices and, secondly, when E. P. S., came out with the statement that “the Government at this time prefers to limit term contracts to a 3 year period” (Letter of February 28th, 1952). * * *
Therefore, I dare say that any attempt to get the new option clause accepted by the producing companies at the present moment, would dangerously jeopardize the very existence of Atlántica. Moreover, that clause would make it much more difficult to obtain the adherence of new producers, not yet included in the At-lántica set-up.
Notwithstanding these difficulties., Atlántica is willing, in order to give proof of its sincere intention, to co-operate with our Government in the fairest possible way, to grant the Government an option in a somewhat different form. This form tries to avoid the great danger which Atlántica would run into if it were presented with a refusal from any larger group of producing companies.
The modified form of an option goes back to the *220 original conception of the 5 year contract. We believe that this approach would enable Atlántica to have the option clause accepted by the producing companies.
iji % ifc %
IV. Force Majewre.
Atlántica would much appreciate receiving an opinion from our attorneys on the force majeure clause.
V. This letter to you is written in accordance with the decisions of the Board of Atlántica, and is to be regarded as their reply to the draft of contract.
99. (a) On July 31,1952, Colonel Westbrook, Mr. Hill, and one of Mr. Hill’s partners, Mr. Swanick, again met with representatives of DMPA[71] and discussed with them the substance of the matters questioned by Atlántica, as indicated in the preceding finding.
(b) At this conference the DMPA officials agreed to several of the modifications proposed by Atlántica, and in particular agreed to modify the option clause to permit plaintiff to offer its ore to the United States without obligation to sell to the United States at the price offered, provided it would not sell elsewhere at a lower price.
(c) Following is an excerpt from a memorandum to the file prepared on August 1, 1952, by Mr. Swanick, relative to the July 31 conference:
* * * Colonel Church stated execution of the final contract would be delayed until a decision on the contract duration had been reached. While it is true all discussions and the proposed draft itself had provided for a three year period for deliveries, it has been suggested by the Munitions Board that tungsten purchases be made prior to July 1st 1954. If this point is adhered to, Atlántica would be unable to enter into the contract. Colonel Church stated he had written a blistering memorandum against any change in the three year period and that he was hopeful the Munitions Board would withdraw from its position. He suggested that we take no steps until he further advised us as to the outcome *221 of the negotiations between D. M. P. A. and the Munitions Board.
100. (a) On August 19,1952, DPA replied to the letter addressed to it on July 9, by the Administrator of DMPA:[72]
Reference is made to your letter * * * dated July 9, 1952, and to the Defense Materials Procurement Agency document, dated July 3,1952, entitled:
RESOURCES EXPANSION PROGRAM TUNGSTEN
(Superseding DMA Program on Tungsten dated March 6, 1951)
Studies just completed warrant modification of the existing tungsten program certificate * * *
Pursuant to the provisions of Executive Order Number 10161, as amended by Executive Order Number 10281,1 certify that the program of expansion proposed by you and cited above is essential to national defense. *****
In accordance with an agreement between DMPA, BuBud and DPA borrowing authority equal to the estimated net cost only is being provided. Accordingly, you are authorized to borrow $51,418,000 from the Treasury of the United States under the borrowing authority contained in Section 304 of the Defense Production Act, as amended, and allocated to you by the Administrator, Defense Production Administration.
*****
Within the broad framework of the program and within the aggregate borrowing authority certified, DMPA may exercise reasonable latitude in adjusting specific parts of the program provided that by such adjustments the individual limitations comprising the financial requirements of the above tabulation are not exceeded. However, purchases should be limited to contracts for delivery not later than June 30,1955.
* * * * *
(b) Until the authority recited in the foregoing letter was received by it, DMPA was not in position to contract with Atlántica.
101. (a) On August 26,1952, Colonel Westbrook forwarded to Mr. Pulvermann the “* * * form of contract which *222 DMPA is now ready and willing to execute,” with his recommendation that Atlántica authorize him to sign the contract “at once in its present form.”[73]
(b) There is in evidence a draft[74] of the contract which was prepared after the shortening of the term to June 30, 1955, and which is in all material respects identical with the contract as signed except for the absence in the draft (Draft C) of the concluding (cancellation) clause contained in the contract as signed. The draft forwarded as described in the preceding paragraph could not have differed in material respects from Draft C.
(c) Draft C contained boiler-plate provisions relating to default and to contingent fees that are identical with the provisions relating to those topics in Draft A and in the contract as signed.
102. (a) On August 27,1952, Commissioner Walsh of EPS received the following message:
A reliable though unofficial source reported the issuance of Portuguese export licenses will not be guaranteed for the export of tungsten by Atlántica under a DMPA contract. This decision it is understood resulted from a full Portuguese Cabinet meeting. Portuguese Government desires to handle exports on an individual basis to maintain its control over exports. Portuguese Government has been assured that American loan funds will not be made available to Atlántica until after the exchange of German marks for escudos has been resolved. It is suggested in view of the above that any contract should contain a cancellation clause to protect the Government’s interest.
(b) At some earlier time (exact date not specified) At-lántica had applied to the Portuguese Minister of Economy with a request “* * * as guarantee of its export capacity, that it be granted a permit to export to the United States * * * three thousand eight hundred tons of wolframite to *223 be delivered in minimum lots of fifteen tons * * *” over a period of 36 months.
(c) In response to the foregoing request the Minister of Economy had (on July 29,1952) issued the following order:
The Council of Ministers for Foreign Trade having considered the additional information furnished by the Directorate General of Mines, and other factors bearing on the case, and due to there being no duly approved and sufficient program for the development of the mines in order to insure that the exports will be made through a production increase of the company and not through purchases in the market to the detriment of the Government’s trade policy, particularly in regard to the protection of scarce raw materials, resolved in its meeting of today to deny the application * * *.
103. (a) Atlántica agreed to the contract in substantially the form contained in Draft C, and authorized Colonel West-brook to proceed accordingly. This was on August 29,1952.
(b) On September 4, 1952, Colonel Westbrook was notified of DMPA’s insistence upon a cancellation clause as protection against inability by Atlántica to obtain export licenses from the Portuguese Government. After phoning Lisbon, Colonel Westbrook agreed to the insertion in the contract of the following provision:
Notwithstanding any other provision hereof, this Contract shall automatically terminate upon the existence of any condition or conditions preventing the performance of any of the obligations hereunder, arising from an act or failure to act of the Government of Portugal. Such acts include, but are not limited to, the failure of that Government to authorize exports required by this Contract, and its failure to issue an export license necessary for the performance of the obligations hereunder.
(c) On September 5, 1952, Colonel Westbrook signed the contract for Atlántica as its attorney in fact, and at the same time delivered to DMPA the following letter:
Reference is made to your contract $DMP-20 which I have just signed on behalf of Companhia Atlán-tica * * *
This contract, as I signed it, provides for the delivery of the quantities of wolframite set forth therein within *224 certain specified delivery periods, the last oí which ends June 30, 1955.
According to our understanding * * * this contract was to run for a period of three years, beginning not later than 60 days (later mutually agreed upon as 120 days) from date of execution.
* * * [Wjhen the formal official authorization to DMPA for the execution of the contract was received, the limitation of duration to June 30,1955, was set forth therein. We were informed by Messrs. Brenn and Elson that, in order to obtain a new authorization extending the duration of the contract, it would be necessary to re-submit the entire proposal to Defense Production Administration and possibly the Munitions Board. They could give no assurances as to the length of time required to secure action by these agencies. They did state, however, * * * that they felt that upon proper presentation of the facts of the case, either an agreement to amend the contract to conform with the original conception of its duration could be obtained, or that some other means could be found and agreed upon which would permit Companhia Atlántica * * * to utilize the duration period as originally understood.
$ $ ‡ ‡
This letter is in no wise intended as a reservation or condition applying to the contract. Its purpose is merely to call your attention to the situation with respect to the duration of the contract, and to advise you that I shall request your consideration of the amendment stated as soon as I have received a full report from Companhia Atlántica * * *.
*1»
(d) Colonel Brenn appended to the foregoing letter a note stating that the “contents of this letter are true” and prepared a reply (which was signed by Mr. Stott) assuring Colonel Westbrook—
* * * that after the contract has been in operation for a period not exceeding twenty four months consideration will be given to the amendment as requested * * *.
(e) Immediately after Colonel Westbrook signed the contract, Mr. Elson routed copies of the signed document through channels to the Administrator’s office.
104. On September 11, 1952, the contract was signed by Mr. Larson, as Administrator of DMPA.
*225 105. On September 11,1952, Atlántica wrote two letters to Mr. Pulvermann, wlio was then leaving Lisbon for the United States.[75] One letter confirmed the authorizations given by the company in connection with the final draft of the contract. The other presented in detail the problems confronting the company as a result of the shortening of the period of performance.[76]
106. On September 15, 1952, Atlántica entered into contracts of employment with 28 persons at monthly salaries ranging from 1,000 escudos ($35) to 7,500 escudos ($262.50).[77]
107. (a) On September 16, Í&52, General Wilson sent the following message to Commissioner Walsh:
Today informed by telephone that Westbrook claims a contract for $17,000,000 worth of tungsten has been signed by GSA. Mission (MSA) has been notified by the Portuguese Government that if Westbrook’s claim is true, it will not permit conversion of additional deutschemarks to escudos above the fifty percent agreed to. U. S. Government should reaffirm that Atlántica will not benefit from the fifty percent exchange. It is apparent to Mission (MSA) that any negotiations to obtain additional deutschemarks transferred to escudos is now impossible. Advice from the Portuguese Government states categorically that it does not want contract with Atlántica and that shipments under such a contract may not be permitted. If a contract has been signed what is the basis.
(b) On September 19,1952, the following reply “for Wilson from Stott and Walsh” was made to the foregoing message:
We have received your telegram of September 16 and are mailing you a letter containing full data concerning the negotiation and execution of a contract with At-lántica. This will assist you in determining what action should be taken with the Portuguese Government.
*226 (c) The letter of advice to General Wilson was prepared on September 19,1952, by Colonel Brenn, and was signed by Mr. Stott. Following are excerpts from the letter:
$ ‡ $
After the receipt of the approval of funds, by agreement with EPS, negotiations with Col. Westbrook were reopened. During the early conversations with Col. Westbrook, Atlantica’s status with regard to the Portuguese Government was informally discussed. Col. West-brook^ informally advised members of my staff that the “political feeling” regarding Mr. Celestino Soares had been overcome and that there would be no difficulty in Atlantica’s obtaining export licenses from the Portuguese Government.
❖ # * * *
Early in the “reopened negotiations” Col. Westbrook offered spot purchases of tungsten outside of the contract at the rate of 200 metric tons every 6 months on a flat price basis. We were told by EPS that the $57 per short ton unit was in fact the present price for spot purchases. The contract was therefore written stipulating that the seller be authorized to over-ship 200 metric tons at any 6-month period, to be purchased under the base price of that scheduled delivery period.
Under the date of August 27,1952 cable No. 1111 for Walsh, EPS from Wiley, DMPA placed us on notice that the Portuguese Government decided in full cabinet meeting not to give Atlántica a guarantee of export licenses for the United States in the event this company should get DMPA purchase contract. Our purchase contract with Atlántica was ready for signature by Col. Westbrook when this message arrived. He was immediately notified by telephone that it would be necessary for us to insert a cancellation clause to protect the United States Government in the event that the Government of Portugal failed to authorize exports required by this contract. * * *
$ $ $ ‡ $
In the execution of this contract we have taken extreme caution to protect the United States Government to the maximum because of the various factors regarding Atlántica which have been called to our attention. * * *
I am appreciative of your concern because the Portuguese Government is using this contract as a “wedge” to abrogate their “agreement” to convert deutche-marks *227 to escudos. Perhaps we should have called the whole deal off at the time we received Wiley’s cable, but since this information was noted to be “unofficial but from reliable sources” we stopped the execution of the contract until the cancellation clause was agreed upon. Col. Westbrook was so confident that the Portuguese Government would permit export that he did not offer any objection. His attitude, in fact, was reassuring, so we went ahead with the execution of the agreement.
I have had informal advice from a member of the Munitions Board that Defense believes tungsten will continue to play the important role in their operation that it has in the past, and that there is no present indication of a reduction in their requirements. It is also true that we need the tonnage represented by the Atlán-tica contract. However, I think we should weigh our need for this tungsten with the actual possibility of delivery ; also the effect of this contract on the acquisition of other strategic items involving the Portuguese Government. * * *
$ $ $ $ *
108. (a) On September 30,1952, a Lisbon business firm engaged in selling machinery addressed to Atlántica a letter confirming “the agreement reached through our negotiations opened last April by which our firm undertook to supply your Company with equipment for your mines * * and requesting Atlántica to sign “the duplicate and the triplicate of this letter as a declaration of your agreement.” One of the copies was signed by Dr. Soares, under the word “Con-cordamos” and the name of Atlántica.
(b) Excerpts from the letter follow:
it ^
In accordance with the Installation Plan handed to us, we undertake to supply 70% of the entire value of the machinery and tools outlined in that plan * * *; your Company grants us an option on the remaining 30%.
# $ * $ *
The total amount of the contract is estimated at ca. 50 million Escudos.
Í! i» !j! $
The conditions of payment are to be the following:
a) When placing your order, the Company shall open a letter of credit amounting to 25% of the total order.
*228 b) The payment is to be made in eight equal instal-ments, the first of which being on the date of the presentation to the Bank of the shipping documents; the other instalments will follow three, six, nine, twelve, fifteen, eighteen and twenty one months after.
❖ ijs íN ifc
The financial movement of this contract shall be handled through Banco Nacional Ultramarino, Lisbon * * *.
It is expected that the firm order be in our possession during the 30 days following the opening of the letters of credit which the USGov. is bound to open according to the terms of the contract signed with your Company in Washington on the 11th inst.
We undertake to supply you within 30 days with the list of the manufacturers of the machinery required, catalogues and basic prices * * *.
* * * We feel sure that the conditions settled between us represent an important financial help for the fulfilment of your contract of the 11th inst., and we thank you for the preference given to us for the supplying of this equipment and we assure you we shall make all efforts in the execution of this arrangement, doing everything in our power and in the power of the manufacturers we represent to supply your Company in the easiest and quickest way possible.
$ $ $ # $
109. (a) The arrangement outlined in the foregoing letter contemplated an obligation on the part of Atlántica to purchase machinery and equipment to an extent that might have reached $1,750,000 (50 million escudos). Under the agreement Atlántica was not obligated to make any purchases until the letter of credit in its favor had been opened by the United States under the DMPA contract. Purchases might then be made in any amount less than the contemplated total.
(b) The “Installation Plan” to which the letter referred was identified in the evidence in this case as a document submitted to Atlántica in July 1952 by its engineers under the heading:
Equipment Plan for the development of the Wolframite Mines of the Atlántica Group (Affiliated Companies) showing the names of the Mines, their localisation (District, Municipality, and Parish), date of each Concession, previous production (1948/51) type of equipment required, foreseen production for each six months *229 period during the years 58/55. According to this Plan, the total of the foreseen production for the three years beginning Jan. 53 is 5,029.5 Met. Tons (equivalent to 5,532 short tons).
(c) Following is the opening statement of the Equipment Plan:
To plan the mechanization of this group of mines we had to adopt, at least for the first year of work, a standardization of equipment due to lack of a systematic study of their deposits.
However, in view of the morpho-geologic characteristics, the preparation and prospection work already done, and to previous productions we divided these mines according to their immediate production possibilities in three groups as indicated in the attached list, with different types of equipment.
For mines of the first group, to receive “Type Al Equipment”, and in which the possibility of immediate stoping [sic] has been recognized we intend to adopt a “Type Mill” to run 8 tons of ore-body per hour, with a plant to recover middlings and an electro-magnetic separator, as well as the necessary mining equipment, to feed the mill.
For mines of the first group belonging to the same deposit as others to be equipped with “Type Al Equipment” and therefore to be operated together, “Type A2 Equipment” has been selected, with less drilling material and without mill.
For mines of the second group, to be mechanized with “Type B Equipment”, a “Type Mill” has been selected to run 2 tons of ore-body per hour, and the equipment necessary for the mine operations.
For mines of the third group — “Type C Equipment” — we have only considered the necessary tools for hand operation and a few meters of rail and a few cars for hauling.
On the mechanized mines — two first group — two different power plants have been planned for the production of electric and pneumatic power so as to avoid the complete paralization of the mine in case of damage in on [sic] of them.
For mines in which mining is limited to shafts, we foresee a second electric group as a reserve to run the whinch [sic] and water pump, normally powered by the main power plant.
*230 As regards to drilling material, the figuring of special drills and steel bars has been based on a six month of consecutive work period.
Apart from the planned equipment for the various groups of mines, under the heading “Storeroom” sufficient reserve material has been anticipated.
It is obvious that the development of the work leading to a better knowledge of the deposits will bring modifications in the types of equipment adopted, according to the specific needs of each mine.
And therefore, we can now anticipate that on the mines of the first group the capacity of their installations will be increased, the same way the installations of the present second and third groups will be equipped with sufficient material, to become as well mechanized as those of the immediately above group.
110. On September 30, 1952, Atlantica’s Director and Assistant Director of Technical Services [78] submitted to the company a “Summary Study of the Tungsten Reserves of the Atlántica Group, with Charts showing fundamental data and statistics.” Their conclusion was that “the estimated total recoverable reserves of the companies affiliated with At-lántica are * * * Wolframite, 86.000 Metric Tons. * * *.”
111. At the end of September 1952, Mr. Pulvermann, then at his home in Rye, New York, received a letter from Mr. Bauer,[79] in Paris, wherein Mr. Bauer insisted that Mr. Pul-vermann should come to an arrangement with Mr. Manley and himself concerning Atlántica if he, Mr. Pulvermann, would avoid catastrophe.[80]
*231 G. October 1 to December 31,1952
112. On October 6, 1952, one of the officers of Atlántica wrote to Mr. Pulvermann (then in Washington):
* * * * *
* * * [W]e can start piling up in our own storehouses 200 to 300 tons of wo? from now until the end of the year. These goods to be shipped as soon as the tax question is solved. Meanwhile the DMPA Delegates would have all facilities to check in our own storehouses the goods piled up awaiting for the opportunity to be shipped.
All this provided that the system of irrevocable letters of credit as described in Art. VIII of contract is in full swing.
Part of that tonnage is of our own production and part is available now\ to be bought.
We feel sure that both you and Col. Westbrook as well as the DMPA are well aware of the fact that piling up stocks to be shipped at a convenient date may only begin when letters of credit are available. You are also no doubt aware that the condition that enable us to buy now part of the tonnage specified above may change overnight. This to point out the bare fact that we cannot begin’any buying or mining operations before a letter of credit is duly established. As a matter of fact contract DMP-20 has no value at all before Art. VIII is in operation.
% ^ # # #
113. On October 7,1952, Mr. Pulvermann and Mr. Swanick, for Atlántica, met with Colonel Brenn and Mr. Elson, of DMPA, concerning the opening of the letter of credit. The DMPA representatives took the position that Atlántica should first satisfy them with an assurance from the Portuguese Government that export licenses would be granted throughout the duration of the contract, or at least throughout the period of the letter of credit.[81] Within the next day or two Mr. Pulvermann returned to Portugal to try to obtain satisfactory assurances.
114. On October 9, 1952, General Wilson, in London, replied to a letter he had received from the office of Mr. Stott *232 forwarding to London conformed copies of the Atlántica contract:[82]
* ^ * * *
Your letter contemplates that we may enter into some negotiations with the Portuguese Government concerning this contract. We assume that you have reference to Article XXIV of the contract which provides for termination in the event that the Portuguese Government fails to issue export licenses for the shipment of material under it or by some other act or omission preventing the performance of the contract.
Since it is not our responsibility to obtain export licenses under this contract, we believe it would be unwise to approach the Portuguese Government on this subject. We feel that this should be left to the contractor.
As you know, we have dispatched an Engineer and an Attorney to Portugal to complete negotiations on the seven tin-tungsten and tungsten contracts which have been under consideration for some time past. This action was made possible when the Portuguese Government consented to permit the exchange of Deutsche Marks for Escudos in an amount equal to 70% of the original estimated requirements for these seven projects. * * *
115. (a) On October 17,1952, Colonel Brenn prepared and Mr. Stott signed a memorandum addressed to the Deputy Comptroller for DMPA:
Under Article VIII (a) cited contract, “The Government will establish irrevocable commercial letters of credit * * * in United States currency in amounts in the aggregate adequate to pay all sums due during the respective periods hereunder as such sums become due against which provisional and final drawings may be made upon presentation of sight drafts accompanied by the documents * * *.
There appears to be some question * * * of the Portuguese Government granting export licenses for the tungsten concentrates involved in the Companhia At-lántica contract.
It is therefore requested that no irrevocable letters of credit be established until notified by this office.
*233 (b) Meanwhile, Atlántica had discussed the matter of export licenses with the Portuguese Minister of Economy. He had said that if Atlántica needed a statement from the Government, the matter would have to be decided by the Governmental Committee for External Commerce, a cabinet committee composed of six members. The administrators of Atlántica had been advised by him to explain the principal features of the contract to the members of the committee prior to its next meeting.
116. Following is the text of a telegram sent from Philadelphia and received by General Wilson in London on October 18, 1952:
We offer firm answer by October twenty first 100 metric tons Portuguese Wolframite minimum 65-0/6 W03 maximum 1.5-0/0 Tin maximum 0.25-0/0 Arsenic shipment on first available vessel after acceptance by you at dollars 55.70 STU CANDE New York Stop Terms 90-0/0 payable against shipping documents similar our previous GSA contracts. (Signed) Pennsalt.
117. On October 20, 1952, Mr. Pulvermann answered the telephone in his hotel room in Lisbon and heard (1) a voice saying: “This is the New York Plerald Tribune — Paris speaking”, then (2) the voice of Mr. Bauer.[83] The call came from Paris. Mr. Bauer remonstrated with Mr. Pulvermann for not coming to Paris and urged Mr. Pulvermann to assist in arranging for Mr. Bauer to visit Lisbon. Mr. Pulver-mann made some inquiries in the matter and then advised Mr. Bauer that his efforts to obtain the necessary clearances had been unsuccessful.
118. On October 21,1952, Atlántica wrote to three mining equipment dealers:
We enclose a list of equipment and tools which form the first order of the Companhia Atlántica and as a confirmation of our arrangements we hope to receive an offer from the firms you represent.
The Proposal ought to be based on the following points: * * * Price * * * delivery * * * terms * * *
*234 119. During the early evening of October, 22, 1952, Mr. Bauer arrived in Lisbon[84] and immediately phoned Mr. Pulvermann. Throughout the 3 days of his stay in Lisbon, Mr. Bauer pressed Mr. Pulvermann vigorously to arrange for payment to him and Mr. Manley of the “finder’s fee” of $45,000.[85] Mr. Pulvermann told Mr. Bauer that he (Pulver-mann) would advise Atlántica to refuse payment of any sum to Messrs. Manley and Bauer.[86] Mr. Pulvermann did, however, communicate with Dr. Soares, to see if Mr. Bauer could talk with him.[87] Dr. Soares was in Porto and did not return to Lisbon until after Mr. Bauer had left for Paris. Mr. Bauer did not go to Porto.
120. (a) On October 22, 1952, the Counselor of Embassy in London forwarded to General Wilson the following memorandum:
There is attached a personal telegram I have just received from a friend of mine, Mr. Richard Davies, who is President of Pennsalt International in Philadelphia. I would appreciate your office letting me know whether I should acknowledge this telegram and, if so, what I should say.
(b) The text of the telegram follows:[88]
For Penfield our cable seventeenth to GSA London offers Portuguese Wolframite one hundred tons at 55.70 Stop No answer yet but Companhia Atlántica Portugal now offering purchase this lot from us same price for resale to our Government mider their open contract at *235 fifty seven dollars Stop Would appreciate your confidentially advising GSA since immediate cable reply our cable seventeenth would give Government advantage of lower price by buying direct from us as GSA Washington has done under previous contracts. (Signed) Davies Pennsalt.
(c) On the same day, October 22, 1952, another official of Pennsalt called Colonel Brenn about the matter, who recorded the call on October 27 in the following memorandum to the General Counsel of DMPA:
On or about the 22nd of October, a Mr. Shawberg of Penn Salt Company called and asked for advice reference a quantity of tungsten concentrates his company had available for spot delivery. He said his people in Portugal had been offered more money per short-ton unit by Atlántica than the prevailing London market prices. I queried him as to making an offer to EPS. He said he had done so three days previously but had no reply as yet. He said he was interested in this material coming to the United States.
I asked Mr. Shawberg if he had to act that day, or— could he wait a few days to get a reply from EPS; I strongly recommended he wait a few days, and he indicated he would.
121. On October 24,1952, General Wilson replied to Penn-salt’s cable of October 18 from Philadelphia:
Yourtel October 17 offering 100 metric tons Portuguese wolframite * * * at $55.70 * * * your price considered excessive. Maximum buying price being considered by this office commercial grade is $52.50 per short ton unit FOB vessel Portugal * * *
Appreciate your offer and trust it may be possible for you to revise price to conform to our present program.
122. (a) On October 24,1952, General Wilson, in London, telephoned Mr. Larson, in Washington, to advise that he (Wilson) had received “some very strong protests” on the execution of the Atlántica contract from the Embassy in Lisbon; that there were “very strong indications” that the Portuguese Government would not permit shipments to be made under the contract; and that he had information from the Embassy of definite attempts on the part of Atlántica to purchase tungsten “from sources other than the sources which were included in their contract.” Mr. Larson there *236 upon asked General Wilson to forward to Washington any “concrete evidence” he had of the activities by Atlántica “in attempting to purchase tungsten to deliver under the contract to the Government from sources other than their own sources.”
(b) On October 24, 1952, General Wilson sent the following message to “Larson, Walsh and Stott”:
(1) A cable received from Pennsalt states for firm reply by xxx we offer 100 metric tons wolframite of Portuguese origin, containing maximum 0.25 percent arsenic, 65 percent minimum wos and 1.50 percent maximum tin @ 55.70 per STU, C & F New York. Delivery to be made on first available ship. Against shipping documents a payment of 90 percent is to be made.
(2) Subsequent cable from Pennsalt referred to the above offer and advised Atlántica now offering to purchase this lot @ $57 for resale to U. S. Government under their open contract. Since our cable of xxx would give advantage to the U. S. Government of a lower price on direct sale immediately, a reply to our cable xxx would be appreciated.
In view of the price of 410 shillings LTU (approx. 51.25 S. T. U.) published in the London Metal Bulle-ton [sic], we are not prepared to accept Pennsalt’s offer. Instructions received indicate an acceptable price to be $52.50 STU, FOB or London Metal Bulleton quotation as the maximum price to be paid for the commercial grade.
Contrary to the intent of the negotiating parties and the preamble in the contract, it is felt that Atlántica is operating in the open market. Such action by Atlán-tica precludes possibility of obtaining Portuguese supplies by DMPA-3 at or near current market spot price. Direct negotiations by this office with suppliers, as heretofore, may end as a result of possible switch of such suppliers to Atlántica.
It is suggested that the origin of the material offered for delivery by Atlántica be certified as being from properties under its control. Such certification may identify material originating from sources other than those of Atlántica.
We are to be advised of your instructions in the above. We have French offer subject to export license @ $52.25 per STU. CIF New York for commercial grade tungsten, also spot offers for Portuguese tungsten @ $56 and $57 and a Spanish offer @ $57.
*237 Purchases are anticipated on the basis of our instructions of the maximum price of $52.50 STTJ. FOB
123. The foregoing message reached Washington late in the day of Friday, October 24, and was on Mr. Larson’s desk on Monday morning, October 27, 1952. The message represented to Mr. Larson the “concrete evidence” which he had requested of General Wilson. Mr. Larson thereupon called in the General Counsel of DMPA, Mr. Greene, and the Director of the Foreign Expansion Division, Mr. Stott, and conferred with them briefly. He then directed Mr. Greene “to prepare the necessary document to cancel the contract under the provisions of the contract.” Mr. Greene prepared, Mr. Larson signed, and the office dispatched through channels the letter of cancellation set forth in finding 4.
124. (a) On October 28, 1952, the following message was dispatched from Mr. Larson to General Wilson:
To allow this Government to terminate Atlantica’s contract in the event the Portuguese Government would not approve contract and consequently would not issue documents to allow the export of tungsten under the contract, Article XXIV of the contract provides for automatic termination. Such automatic termination to be applicable when an act or a failure to act on the part of the Portuguese Government causes the existance [sic] of any condition or conditions that prevent the performance of 'any of the contract obligations. A formal inquiry is to be immediately lodged by you with the Portuguese Government to determine if said Government will issue necessary export licenses or any other documentation required to permit contract performance.
Consideration is being given the report which questioned Atlantica’s operation in open purchases as contrary to the intentions of the preamble of the contract. You will be advised further as to the action required.
Bequest is made that GSA be furnished with the facts, circumstances and full details surrounding the unofficial report that the Portuguese Government decided not to guarantee the granting of export licenses to Atlántica and the unpopularity of such company with the Portuguese Government.
(b) In conformity with the request contained in the last paragraph, an investigation was launched promptly. Within less than a week (on November 3) a compliance *238 officer from the London office of DMPA was in Lisbon inquiring into the matters specified in Mr. Larson’s message.
125. (a) On October 28,1952, there occurred in the various offices of the New York Herald Tribune, in London, Paris, New York, and Washington, the following activities in relation to the Atlántica contract:[89]
(1) The publisher of the European (Paris) edition sent a telegram from London to the New York office of the paper’s executive vice president in New York, and the New York office promptly relayed the message to the paper’s Washington bureau.
(2) The late Bert Andrews, of the Washington bureau, informed Mr. Larson that Atlántica had agreed to pay a 5-percent commission on sales to Colonel Westbrook and Mr. Pulvermann.[90]
(3) Mr. Andrews telephoned Colonel Westbrook in Dallas and asked for a statement.[91]
(4) Mr. Andrews also reached Mr. Stephen A. Mitchell, Chairman of the Democratic National Committee, and asked for a statement.[92]
(b) On October 29, 1952, the New York office of the Herald Tribune received from the publisher of the European (Paris) edition a photostatic copy of the compensation agreement of February 29, 1952, between Atlántica and the partnership of Westbrook and Pulvermann. The New York office read the agreement to the Washington bureau over the *239 telephone and then forwarded to the Washington bureau either the photostat or a copy of it.
(c) On October 30, 1952, at 9 a. m., Paris time (8 a. m., Lisbon; 3 a. m., New York) the publisher of the European (Paris) edition of the New York Herald Tribune, calling from Paris, reached Dr. Soares in Lisbon by telephone and asked for a statement.[93]
(d) On October 30,1952, a copy (photographic reproduction) of Atlantica’s agreement of February 29, 1952, with Oolonel Westbrook and Mr. Pulvermann appeared in the New York Herald Tribune (1) under a headline reading: “Democratic Official Is Linked to $9,000,000 5 Per Cent Deal, Is Dismissed After Disclosure”; and (2) over a story carrying the by-line of Bert Andrews, containing the statement that: “The latest five percenter controversy was aired in Washington as a result of spadework done in Paris and Lisbon by the European edition of the New York Herald Tribune.” The story further reported that “Gen. Wilson recommended cancellation * * and quoted the following telegram as having been received from the Paris office:
Atlántica was created solely to get United States Government contract stop Atlántica has no mines and will have no money until it can borrow on Government contract stop Atlántica has no sales other than Government sales and no prospects of getting any others stop
126. (a) On November 3, 1952, a compliance officer from the London office of DMPA interviewed Dr. Soares in the latter’s office in Lisbon.[94]
(b) On November 6,1952, the compliance officer reported to the Director of GS A’s Compliance Division—
(1) That Dr. Soares had told him (i) that Atlántica had not received a signed copy of the contract until September 27; (ii) that word had never been received of the issuance of a letter of credit; (iii) that Atlántica had therefore made no effort to secure export licenses; and (iv) that under standard procedure in Portugal, the application for an ex *240 port license would be reviewed only after the material was ready for shipment.
(2) That inquiry directed to the Government of Portugal through the American Embassy to ascertain whether or not Portugal would have denied export licenses to Atlántica had brought the response that it was not the practice of the Ministry of Economy to pass upon applications for export licenses before the material was ready for shipment.
127. (a) On November 11, 1952, Mr. Lobo, President of Atlántica, sent the following message to Mr. Larson:
Atlántica is ready able and willing to perform all terms and conditions of the contract dated September 11, 1952 Stop Unless the contract is immediately reinstated Atlántica will suffer irreparable damage.
(b) On November 17, 1952, Atlántica wired Mr. Larson:
We are sending you letter signed five engineers certifying Atlántica is able ready fulfill terms conditions contract September eleven testifying Atlántica did not rpt not enter open market did not rpt not buy any wolframite.
(c) On November 17, 1952, Mr. Lobo wrote to the President of the United States, stating that Atlántica “is able, ready and willing to fulfill all terms and conditions of the contract”, and that “the reasons put forward for the cancellation of the contract are quite false.” Mr. Lobo added: “No questions were asked to the Company and the Company was not given an opportunity to make any statement.”
(d) On November 24,1952, Mr. Lobo wrote to Mr. Larson confirming the two foregoing cables and urging reinstatement of the contract. Attached to the letter was a statement signed by five of the managers of divisions of Atlántica asserting that they considered it “quite preposterous and baseless the blame that Atlántica entered the open market buying wolframite * * *.”
128. (a) Efforts to obtain reinstatement of the contract were continued by Atlántica. Officials of the retiring administration conferred with representatives of Atlántica as long as they remained in office.
(b) The petition in this case was filed on January 16,1953.
(c) Officials of the incoming administration conferred *241 briefly with representatives of Atlántica concerning reinstatement of the contract.
V. CONCLUSIONS
A. Materiality
129. (a) Specific conclusions relating cause to effect in the parts played in the Atlántica narrative by Bensaude & Company, Messrs. Manley and Bauer, and the New York Herald Tribune are not requisite to the determination of any material issue of fact in the case.
(b) The seeming contradictions and cross-purposes of the Atlántica narrative may be reconciled or explained, to the extent required for determination of factual issues dispositive of the legal issue (default or breach), by (1) recognition of the currents controlling the operation and motivation of responsible channels within the Governments of the United States and Portugal and (2) consideration of the interplay of those divergent forces one upon another.
B. Credibility
130. (a) The rejection of testimony as unworthy of belief because of attacks upon credibility is not warranted with respect to any witness who was a major participant in the Atlántica enterprise or in the negotiation, execution, or cancellation of the contract in suit.
(b) The evidence as a whole does not warrant inferences of misconduct on the part of Dr. Soares[95] or of wrongdoing on the part of General Wilson.[96]
C. Weight
131. The reasonableness of some of the beliefs upon which Colonel Westbrook and Mr. Pulvermann acted is material to *242 the determination of the weight to be accorded to their testimony and that of Dr. Soares.
132. The conclusions that the charges made against Dr. Soares by Mr. Kelsey were not substantiated and that Dr. Soares was a man of upright character and of good repute in his native land were reasonably reached and reasonably held by Colonel "Westbrook and Mr. Pulvermann.[97]
133. Other conclusions reasonably reached and reasonably held by Colonel Westbrook and Mr. Pulvermann include the following:
(1) That their efforts to obtain for Atlántica a contract to sell tungsten to the United States were opposed by Ben-saude [98] & Company,[99] by General Wilson,[1] and possibly by *243 other American officials strategically placed in Lisbon[2] or Washington[3] or both;[4] and
(2) That the cancellation of the contract, 6 weeks after its execution, represented a victory over Atlántica by the same forces which had theretofore opposed the contract.[5]
134. It is not established by the evidence:
(1) That the efforts of Colonel Westbrook and Mr. Pulver-mann to obtain for Atlántica a contract to sell tungsten to the United States were or were not opposed by Bensaude & Company, by General Wilson, or by other American officials in Lisbon[6] or Washington; or
*244 (2) That the cancellation of the contract did or did not represent a victory over Atlántica by the forces which had theretofore opposed the contract.
D. Contingent Compensation
135. At all times material to this action it was accepted practice[7] for business establishments desiring to secure contracts from Government procurement agencies[8] to assign to the task of soliciting or securing such contracts bona fide employees or bona fide established commercial or selling agencies maintained by the potential contractor for the purpose of securing business and to employ or retain such persons (employees) or selling agencies for such purpose upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee.
136. The agreement or understanding between Atlántica and the partnership of Westbrook and Pulvermann for payment of a percentage or contingent fee for the partnership’s services in securing the contract now in suit did not violate the contingent fee warranty clause in the contract unless Colonel Westbrook and Mr. Pulvermann were neither “employees” nor “established commercial or selling agencies maintained by the Contractor for the purpose of securing business.” [9] If Colonel Westbrook and Mr. Pulvermann were either “employees” or “* * * selling agencies * * *” within the meaning of the warranty, they were “bona fide employees” or “bona fide * * * selling agencies * * *.”
137. (a) The agreement whereby Atlántica undertook to pay to Colonel Westbrook and Mr. Pulvermann a percentage of amounts realized from sales under contracts obtained by them was made in good faith[10] on both sides to provide mutually acceptable incentives for participation by Colonel *245 Westbrook and Mr. Pulvermann with Dr. Soares and his Portuguese associates as coventurers in the Atlántica enterprise.
(b) The agreement contemplated the performance of substantial services by the coventurers as quid fro quo for the contingent fee. Substantial services were in fact rendered to Atlántica by both Colonel Westbrook[11] and Mr. Pulvermann.[12]
(c) Colonel Westbrook drew liberally upon years’ accumulation of knowledge of Government procedures and acquaintances with Government officials, elective and appointive. His use of influence was limited to what is known in Washington as the opening of doors.[13] Otherwise, his advocacy was rested on the merits of his case.
E. The Default Provision
138. The standard default provision, including the speculation clause under which the contract in suit was canceled, was inserted in all drafts of the contract and was carried over without change into the contract as executed. The provision was, in the words of the attorney who made up the initial draft, boiler-plate. Neither the default provision in general nor the speculation clause in particular was discussed by the parties prior to the execution (or the cancellation) of the contract.
139. (a) The default provision was derived from a provision that had been used by the War Assets Administration *246 when Mr. Greene, General Counsel of DMPA, was an attorney on the staff of WAA.
(b) War Assets Administration bad required bidders for surplus property to warrant their intention to use (rather than to sell) the property for which they submitted bids. The purpose of the speculation clause[14] in WAA sales contracts was to provide the Government with a remedy against a false warranty.[15]
(c) DMPA adopted the standard default provision, including the speculation clause, in anticipation of procurement contracts with marginal high-cost producers of strategic materials. The expectation was that the pricing of such contracts would be based on the high production and expansion costs of marginal producers, and might have little or no relationship to going market prices. The theory of the speculation clause was to provide the Government with a remedy against a producer who entered into a contract ostensibly to increase production but who lacked honest intention of doing so.
F. Speculation: Intent of Atlántica
140. (a) One of the purposes intended by DMPA to be served by the contract in suit was the expansion of production of tungsten in Portugal. This fact was known to the representatives of Atlántica who negotiated the contract.[16]
(b) One of the purposes intended by Atlántica to be served by the contract in suit was the expansion of production of the participating (affiliated) mines. This fact was known to the representatives of DMPA who negotiated the contract.
(c) Atlántica never lacked honest intention to try to increase the production of its participating (affiliated) mines in accordance with development plans which were known to the DMPA representatives.
*247 141. (a) Atlántica intended, throughout the negotiations and at the time of the execution of the contract in suit, to purchase at least part of the overrun[17] specified in the contract from pilhas who were expected to offer the ores at the various treatment plants of the affiliated mines. In making such purchases Atlántica did not expect to concern itself specifically with the origin of the ores.[18]
(b) Atlántica further intended, at the time of the execution of the contract, to enter the open market, if and to the extent that such action might be found necessary, to purchase part of the first-period overrun.[19]
(c) Atlantica’s intentions, as described in the two preceding paragraphs of this finding, were known to the representatives of DMP A who negotiated the contract.
(d) Any purchases that Atlántica might have made or might have offered to make, in either of the categories described in paragraphs (a) and (b) of this finding,[20] would have reflected prices that Atlántica was willing to pay, while sales could have been consummated only at prices which the owners of the ores were willing to accept. In any such *248 transaction the profits of Atlántica, actual or potential, would have been conjectural and subject to chance.[21]
G. Speculation; The Hunting License
142. (a) Speculative abuses in the sale of tungsten in both Spain and Portugal were brought to the attention of General Wilson during his trip over the Iberian Peninsula in 1950. The abuses consisted of practices arising naturally from the marketing methods inherent in the pilha system of outlets through pickers and dealers. Speculators, finding quantities of ore in the hands of a dealer (or of several pickers), were free to offer a price they were willing to pay and to hold their acquisitions for sale at prices they were willing to accept. They were thus engaged in buying and selling “with the expectation of profiting by fluctuations in price.”[22]
(b) A hunting license was considered to be implicit in any long-term contract whereby the purchaser guaranteed a fixed price to the supplier while leaving the supplier free to seek out and acquire ores through spot purchases in the open market at prices as favorable as he could find.
(c) General Wilson’s recommendation of the appointment of Bensaude & Company[23] as the sole purchasing agent for EPS in Portugal was aimed at the prevention of these speculative abuses.[24]
143. (a) General Wilson’s aims with respect to the negotiation of the contract in suit were (1) to avoid generally the creation of a situation that was conducive to speculation and (2) specifically to prevent the issuance of a hunting license. He would have achieved these aims by having the contract limited strictly to ores produced by mines owned by or affiliated with Atlántica.[25] He would also have required proof in *249 advance of the ability of such mines to produce, in quantity and time, the requisite ores.
(b) The procurement agencies (EPS and, DMPA) required the advance showing of Atlantica’s ability to perform, but only as to that portion of the ores which the negotiators intended should be produced by mines owned by or affiliated with Atlántica. In authorizing the delivery of substantial quantities in excess of the portion to be produced by owned or affiliated mines, DMPA departed entirely from the restrictive element of General Wilson’s counsel.
144. The inferences to be drawn from the evidence as a whole are—
(1) That General Wilson never was fully conversant with the development plans of Atlántica, and never realized that the purchase of some nonproduced ores was inherent in those development plans;
(2) That the representatives of DMPA who negotiated the contract never fully understood the implications of General Wilson’s counsel, and never realized that a hunting license was inherent in the authorization to Atlántica to purchase some nonproduced ores; and
(3) That the Administrator and the General Counsel of DMPA, Mr. Larson and Mr. Greene, understood and approved of General Wilson’s position and attitude toward the hunting license and the speculative abuses associated therewith, but were no more conversant with the development plans of Atlántica or the acceptance thereof by the DMPA negotiators than was General Wilson.
H. Governmental Channels: American
145. (a) Within the United States Government the diffusion of responsibility for determining policy[26] and the com *250 plexity of administrative authority[27] in relation to procurement were sources of confusion.[28]
(b) The administrative procedures in use by the several agencies of which Mr. Larson was head[29] were not adequate to the need for clearances among themselves[30] or for the channeling of information to Mr. Larson as the head administrator.[31]
(c) After General Wilson became European director of DMPA,[32] he was, in practical effect, Mr. Larson’s deputy and alter ego in matters of concern to the American Embassies[33] in European capitals and to the various missions of ECA[34] *251 (later MSA), as well as in matters of concern to EPS and DMPA.[35]
(d) During September and October 1952[36] General Wilson’s interest in Portugal was centered upon efforts (1) to clarify the status of a series of loans that had been made to Portuguese mining companies by ECA[37] and (2) to induce the Government of Portugal to accept German marks in lieu of dollars as payment of ECA counterpart funds.[38]
I. Governmental Channels: Portuguese
146. (a) The Portuguese Government was committed, as a matter of policy, to the maintenance of control by it over mining within the borders of Portugal.[39]
(b) Atlántica was never under the cloud of possible control by non-Portuguese.[40] The Government of Portugal was prepared to accept, possibly to welcome, the functioning of Atlántica if the project had become or could have become operative upon the terms provided by the contract in suit.[41]
*252 (c) Atlántica was never an officially sponsored project of the Portuguese Government.[42] The evidence does not preclude the possibility of opposition to the company, overt or covert, within the Portuguese official family.[43]
(d) During September and October 1952 (covering the time of the execution and the cancellation of the contract in suit), the attention of the Government of Portugal in relation to activities by officials of the United States was absorbed by efforts on the part of American representatives (1) to clarify the status of EC A loans to Portuguese mining-companies and (2) to induce the acceptance by Portugal of German marks in lieu of dollars in payment for ECA counterpart funds.
J. The Administrative Determination[44]
147. (a) When General Wilson, in London, called Mr. Larson, in Washington, on October 24, 1952, to relay the Penn-salt report of Atlantica’s offer to buy from it 100, tons of Portuguese tungsten,[45] his concern reached beyond the po *253 tentials for harm of Atlantica’s hunting license[46] to the following facets over which neither DMPA nor Atlántica had any control:
(1) The probability (in the judgment of the American Embassy in Lisbon[47]) that the Portuguese Government would not grant to Atlántica the export licenses needed to make deliveries under the contract ;[48] and
(2) The possible use of the Atlántica contract by the Government of Portugal as a pawn in negotiations then under way relative to ECA (loans and counterpart) ,[49]
(b) After his conversation with General Wilson on October 24,1952, Mr. Larson pondered not only the hunting license potential of the Atlántica contract hut the other elements (listed above as being beyond the control of either DMPA or Atlántica) and determined then to cancel the contract if the “concrete evidence” to be supplied by General Wilson appeared to support such action as reasonable.
(c) On the following Monday, October 27, 1952, Mr. Larson considered the “concrete evidence” supplied by Gen *254 eral Wilson,[50] concluded that it would afford reasonable support for his action in canceling the contract, resolved thereupon to cancel, and directed the General Counsel of DMPA[51] to prepare the letter of cancellation accordingly.
(d) After the letter of cancellation had been signed and mailed, a cablegram went forward from Mr. Larson to General Wilson directing an investigation to be made, not to ascertain whether or not Atlántica had in fact undertaken open market purchases,[52] but to determine whether or not there had been any wrongdoing in connection with the contract on the part of any personnel of United States agencies.[53]
148. (a) The plain inferences to be drawn from the evidence as a whole are these:
(1) That Mr. Larson’s decision to cancel the contract was based on his conviction (reluctantly formed, painfully acknowledged, but firmly held) that the execution of the Atlán-tica contract had been a mistake as a matter of policy.
(2) That the contract was canceled as a means of getting rid of a situation which Mr. Larson had concluded, at the time of the cancellation, should never have been permitted to exist.
(3) That within the ratiocination which preceded the cancellation any real or present danger of harm to the United States as a result of speculative abuses by Atlántica was so remote as to be altogether secondary.
(b) The conclusion follows that the administrative determination that Atlántica had entered into the contract for purposes of speculation was colorable and not real.
*255 K. The Ability To Perforin
149. (a) Although the representatives of DMPA who conducted the negotiations believed, when the contract was executed, that Atlántica was able as well as ready and willing to perform it according to its terms,[54] the Government, in the defense of this action, has denied Atlantica’s ability to perform.[55]
(b) Determination of the ultimate issue of fact so raised by defendant (i. e., that Atlántica was or was not able to perform) turns upon subsidiary issues of fact relating to (1) financing, (2) raw materials (i. e., the presence of ores and the ability to extract them), and (3) export licenses.
(c) The evidence as a whole warrants determinations favorable to plaintiff with respect to all of these subsidiary facts, wherefore the conclusion follows that Atlántica was able as well as ready and willing to perform the contract according to its terms.
150. With respect to export licenses the inference warranted by the evidence as a whole is that requisite licenses would have been issued to Atlántica by the Government of Portugal if the contract had been performed according to its terms.[56]
*256 151. Atlantica’s arrangements for financing were adequate to the needs and purposes to be served.[57]
152. (a) Atlantica’s financing depended upon (1) its capital structure and (2) its credits (bank and commercial).
(b) The authorized capital of Atlántica was 25,000,000 escudos ($875,000). Subscriptions were made for 5,000,000 escudos ($175,000). Payments were made for 2,865,000 escudos ($100,275). The last figure represents the paid-in capital of Atlántica as of the date of the execution of the contract in suit.
(c) Atlántica had an understanding with Banco Nacional Ultramarino[58] whereby the bank would serve as the repository of the letter (or letters) of credit to be opened by DMPA and on the basis thereof would make available to Atlántica bank credits in amounts and on terms customary in Portugal in similar transactions.
(d) Commercial credits were available to Atlántica, for the purchase of supplies and equipment, in amounts large enough and on terms sufficiently favorable to warrant the inference that representatives in Portugal of European business interests regarded Atlántica as a sound and promising venture, which could be expected to become a going concern immediately upon the issuance by DMPA of the required letter (or letters) of credit.
153. The requisite veins of ore, and the knowledge, skills, and labor with which to extract it in the prescribed quantities and times, were available to Atlántica.[59]
*257 154. (a) In September 1952 (when the contract in suit was signed), the demand for tungsten was off from the peak that had been reached sometime earlier as a result of hostilities in Korea.[60] Price declines accompanied the slackening of demand.
(b) By September 1952 the declines in demand for and prices of tungsten had been under way long enough and had progressed far enough to cause a natural “drying up” of the ore supplies of the pickers and dealers of Portugal.[61] The market for tungsten ore never improved, appreciably or for long, after September 1952 and before July 1955.[62]
(c) As a consequence of the drying up of the ore supplies in the hands of pickers and dealers, Atlántica would have had to look to other sources from the outset to obtain the quantities of ore permissible as overrun. The possibilities of spot purchases in the open market would have been rendered uncertain by the same drying-up process. The sources remaining to Atlántica would have depended upon its ability to stimulate by means of its own devising enough indiscriminate pilha production to make up for the supplies it had expected to buy from the pickers and dealers and through spot purchases in the open market.
(d) The evidence as a whole warrants the inferences (1) that Atlántica could have stimulated production in the manner described above; (2) that in so doing it could have recruited and organized a supply of pilha labor for use on concessions owned by it or its affiliates; and (3) that the availability of a labor supply together with a steady market and the prospect of financial aid would have assured At-lántica of affiliates owning ample ores and willing to supply them at prices Atlántica had agreed to pay to the mines theretofore affiliated with it.
*258 VI. DAMAGES
A. Nature and Extent of Loss
155. (a) The contract required delivery of a minimum of 2,970 short tons of ore. Throughout the negotiations the parties intended for this minimum amount to be produced by mines owned by or affiliated with the plaintiff.
(b) The contract permitted delivery of a maximum of 4,290 short tons. Throughout the negotiations the parties contemplated the procurement by plaintiff of most of the overrun (representing the difference — 1,520 short tons— between the maximum and the minimum) by purchases from pil'has, pickers, and dealers. Just at the end of the negotiations the parties recognized that some of the overrun might have to be acquired by purchases in the open market.[63]
(c) Conditions existing at the time the contract was signed would have made it necessary for plaintiff to arrange for the production from Portuguese mines of virtually all of the ore to be delivered.[64]
(d) The evidence as a whole warrants the conclusion that plaintiff could (and, if it had been permitted to perform the contract, would) have delivered a total of 3,630 short tons.[65]
156. Tables 1A, IB, and 1C, incorporated in this finding, are self-explanatory. Inasmuch as the evidence sustains plaintiff’s contention that the ore it would have delivered would have had a trioxide concentration of 70 percent, table 1C reflects the performance by plaintiff described in the preceding finding, and the concomitant obligation of defendant to pay $13,359,500 for the 3,630 short tons.[66] The sum of $13,359,500 represents the contract price.

*259

*260 157. The extent of the loss suffered by plaintiff in consequence of defendant’s cancellation of the contract is reflected by the difference between the contract price and the cost of performance. Plaintiff contends, and has rested its case on the contention, that the cost of performance must in this instance be measured by the market value of the ore.[67] Defendant contends that, if plaintiff is entitled as a matter of law to recover, the cost of performance should be determined from the actual expense of doing the work, insofar as such actual expense can be estimated.
B. The Market Value
158. (a) The market prices of wolframite concentrates per short-ton unit, c. i. f., United States east coast ports, were as follows on the dates shown:

Date

1st Period: Price
March 12, 1953_$42. 50
June 30,1953_ 42.50
2d Period:
December 31, 1953_ 24.50
June 30,1954_ 22.50
3d Period:
December 31, 1954_ 26.00
June 30, 1955_ 32. 50
(b) Translation of the foregoing c. i. f. prices into prices f. o. b. Portuguese ports (by which plaintiff was bound) shows the following results:[68]

*261
Prices Prices

c. i. f. f. 0. b.

U. S. Portugal[69]
$22. 50 $21. 468280
24. 50 23. 415012
26. 00 24. 928155
32. 50 31. 238835
42. 50 40. 848426
159.(a) Application of tlie foregoing prices to the quantities shown in Table 1C, delivered semiannually after the first period, shows the following results:

(b) The market value of 3,630 short tons of ore, of 70-per-cent trioxide concentration, f. o. b. vessel Portuguese port basis, delivered in semiannual quotas in accordance with contract requirements, was $7,193,044.75.
160. The difference between the contract price ($13,359,-500) and the market value ($7,193,044.75) is $6,166,455.25.
C. The Cost of Performance,[70]
161. The cost of performing the contract would have consisted of the sum of the costs of the following items:
(1) The acquisition of the requisite ores;
(2) Packaging; shipping ores to seaport; and loading onto vessels;
(3) Export taxes;
(4) Sales agents’ fees; and
(5) Operation of Atlántica.
162. (a) Several of Atlantica’s affiliates had contracted with it to supply wolframite ore of the requisite concentrat *262 ion[71] at the price of 60 escudos per kilogram,[72] or $29.308892 per short-ton unit.[73]
(b) The evidence as a whole warrants the conclusion that plaintiff could have acquired the requisite ores for a price not exceeding $29.31 per short-ton unit, and that substantial quantities might have been acquired at prices below that figure.
163. There is no evidence relating to the cost of packaging the ores, or of shipping the packages to the port of shipment, or of loading them onto vessels.
164. Portuguese law made plaintiff responsible for the payment of an export tax of 40 escudos per kilogram,[74] being the equivalent of $18.143600 per short-ton unit.[75]
165. Fees payable to plaintiff’s sales agents, Colonel West-brook and Mr. Pulvermann, would have amounted to $2.628787 per short-ton unit.[76]
166. (a) The operation of Atlántica during the contract period would have involved costs for salaries and wages, rent, communication services, office supplies, and miscellaneous expenses incidental to the maintenance and operation of a business office.
(b) Atlántica contemplated the payment during the contract period of salaries and wages amounting to $0.429593 per short-ton unit.[77]
*263 (c) There is no evidence of the operating costs of the corporation other than for salaries and wages.
167. (a) The sum of the costs of the items listed in finding 161, insofar as there is evidence of such costs, is $50.51 per short-ton unit.[78]
(b) The evidence as a whole warrants the conclusion that plaintiff could have delivered the 3,630 short tons (254,100 short-ton units) for a cost not exceeding $12,851,300, reflecting a margin of profit of $2 per short-ton unit.
168. The difference between the contract price ($13,359,-500) and the amount plaintiff would have had to expend in performing the contract ($12,851,300) is $508,200.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of five hundred eight thousand, two hundred dollars ($508,200).

 The English translation of plaintiff’s corporate name is Atlantic Company for the Development ánd Exploration of Mines. In these findings, as in the requested findings and briefs of the parties, plaintiff is often referred to simply as Atlántica.

 The entire contract was introduced in evidence by the plaintiff, but we will quote only the pertinent provisions.

 Mr. Larson’s signature -was affixed on September 11, 1952. The contract acquired its date from the time of his action.

 Colonel Westbrook signed the contract on September 5, 1952.

 Titles of military rank have been retained in civilian life by several persons who participated in the Atlántica transaction : e. g., Colonel Westbrook, General Wilson, Captain Maull, Colonel Brenn, Colonel Church, General Rodrigues.

 The day of the week of October 27, 1952, was Monday. November 1 fell on Saturday. Consequently, the “first Tuesday after the first Monday,” election day 1952, was November 4, eight days after the letter in reference.

 At the outset of the negotiations Colonel Westbrook had filed with the Government officials a copy of the written agreement which he and Mr. Pul-vermann had made with plaintiff.

 The attorney assigned to the negotiations by DMPA, returning a phone call from Colonel Westbrook, reached him at the offices of the Democratic National Committee.

 The ensuing findings contain thumbnail biographical sketches of four men, Colonel Westbrook, Mr. Heinz Pulvermann, Dr. Celestino Soares, and Mr. Thurman Hill, each of whom had an Important part in the negotiation of the contract in suit. At an early stage of the negotiations the character and reputation of Dr. Soares were called into question by charges of misconduct at various times in his life. In the defense of this suit, defendant reasserted those charges in a direct attack upon the credibility of Dr. Soares. By indirection the credibility, if not the characters and reputations, of Dr. Soares' associates have been similarly impugned. Brief sketches of the personal histories of the men so involved are essential to understanding the nature, extent, and logic of the possible inferences.

 He received a salary of $1,000 per month and expenses.

 In this capacity he was responsible for organizing and directing the national rural rehabilitation program, under which loans totaling approximately $100,000,000 were made to destitute farmers.

 Among the responsibilities of his office was the supervision of the organization of the agency’s regional and state offices.

 Hig assignment was to organize and direct a mutual home-ownership program which would furnish financing and construction patterns for the use of the private construction industry in large-scale housing enterprises.

 He organized and headed a military-economic mission to New Zealand to assist the New Zealand Government in an agricultural and industrial development program designed to increase the flow of supplies needed by American forces.

 His compensation was a salary of $15,000 per year, plus a bonus of 15 percent of the profits.

 The Chairman of the Democratic National Committee at this time was Mr. Prank McKinney.

 Just a few flays before the tender of this position was made, Colonel West-brook had been asked and had agreed to manage the preconvention campaign for the Democratic nomination for President of one of the leading contenders for the 1952 nomination. Before he could accept the later invitation to join the staff of the national committee, he had to arrange a release from the other commitment. Also, before signifying his acceptance of the position to the chairman of the committee, Colonel Westbrook consulted his counsel, Mr. Thurman Hill (further identified in finding 10), as to the propriety of the action in view of his (Westbrook’s) relation to plaintiff and the contract negotiations. Mr. Hill concurred in Colonel Westbrook’s opinion that, in view of the circumstances (as then existing),, no impropriety would be involved in acceptance of the position. Colonel Westbrook also advised Chairman McKinney of his connection with plaintiff.

 Mr. Stephen A. Mitchell.

 He has been living in semiretirement, with much of his time occupied in efforts to clarify the confusion resulting from the unhappy conclusion of this venture in contract brokerage.

 Finding 6 (h). Soeiété EuropSene d’Etudes et d’Entreprises.

 He was engaged in refugee rehabilitation work for a year (1943-44), and then (1944-1946) served as an economic consultant to the Algerian Bureau of Fisheries on matters relating to the procurement of equipment for, and the reorganization of, the Algerian fisheries.

 under the title of Westbrook Associates they were retained to undertake a 6 months’ assignment for a fee of $25,000 and expenses.

 The origin and content of this agreement are described in context in finding 50.

 At one time Re was a responsible officer of the Portuguese affiliate of the Tidewater Oil Company.

 The output of some of these mines had previously been at the disposal of the Germans.

 At that time the mining of tungsten in Portugal had been stopped by the Portuguese Government.

 under date of November 27, 1945, the operating officer of the United States Government Purchasing Mission in Lisbon wrote to Dr. Soares as follows: “Upon the occasion of the closing of this office, we should not like to fail to express to you again in this way our deep appreciation of the many services which you rendered to our office in connection with its purchase activities and our regret that the efforts expended by you could not have been more lucrative for you.
“The number of samples and the manner in which they were presented as well as the reasonable prices and the great amount of work not only in the collection of the samples but in the various ministries was of great Importance to us and facilitated! the work of this office to a great extent.”

 The efficacy of the arrangement is attested by the association of ranking officers of the Portuguese Government in Dr. Soares’ corporate endeavor to promote the domestic mining industry.

 Heretofore mentioned in finding 3 (c), as having witnessed Colonel West-brook’s signature of the contract in suit.

 Also participating in the negotiations, although on a scale much more limited, were two of Mr. Hill’s partners, Mr. James M. Barnes, and Mr. Arthur J. Swaniek.

 He resigned from the Government Service on August 1, 1944, to campaign for election to the United States Senate as the nominee of the Democratic Party in Kansas.

 The ensuing findings indicate the several administrative agencies that were concerned with the transaction in suit, define their authority and their relations to each other, and identify the persons mainly responsible for the exercise of administrative authority.

 “The General Services Administration was established * * * July 1, 1949 [Federal Property and Administrative Services Act of 1949, 63 Stat. 377] to provide for the Government an economical and efficient system for * » * the procurement and supply of personal property and nonpersonal services, including related functions * * Congressional Directory, 81st Congress, 2d session, January 1950, page 706.

 Act of July 23, 1946, 60 Stat. 596.

 The quotation Is from the Congressional Directory, 81st Congress, 2d session, January 1850, page 670. The concept of the Marshall plan was first announced by the Secretary of State In the course of a commencement address at Harvard university In June 1947. Congress Implemented the plan by the Foreign Assistance Act of 1948, approved April 3, 1948, 62 Stat. 137.

 The Invasion of South Korea was begun on June 24, 1950.

 Mr. Larson, the first Administrator of GSA, signed the contract In suit as Administrator of DMPA.

 Cf. finding 11 (b).

 Hid.

 04 Stat. 798.

 No. 10200,16 F. R. 61.

 On February 19, 1951, GSA revised the administrative order establishing EPS “to reflect additional responsibilities assigned to the Service in connection with * * * the Defense Production Act of 1950 and * * *" certain other changes made by Executive order.

 No. 10281,16 F. R. 8789.

 In practice, BPS personnel sometimes acted for DMPA.

 See finding 23. The inference is that the President agreed with the committee on the need for better coordination and more aggressiveness in the procurement of strategic and critical materials.

 The General Counsel of DMPA was Mr. Albert H. Greene. The attorney •assigned to the contract in suit was Mr. Sol Bison. The General Counsel of GSA was Mr. Maxwell Elliott, to whom Colonel Westbrook has referred ns “a personal friend of long standing.”

 Since 1950 General Wilson had served as a consultant to GSA.

 In its pure form tungsten (from the Swedish tang heavy+sten stone) is a white, ductile metal of the chromium family. The pure metal is derived from tungsten concentrate; the concentrate is derived from tungsten ore; and tungsten ore is in its turn, usually separated from grosser ores: wolframite and scheelite. The word “tungsten ” is frequently used indiscriminately to designate either the pure metal, the concentrate, or the ore. Therefore, the meaning of the word must often be derived from the context.

 Most of the facts set forth in this finding relating to the nature and uses of tungsten, its sources throughout the world, and consumption of the metal in the united States, have been drawn from the report (described in finding 23) of the Preparedness Subcommittee of the Senate Armed Services Committee.

 The United States has never had a self-sufficient supply of tungsten in-time of emergency. As of 1950, some of the main sources of supply were either closed or in precarious condition. The Communists had lowered the Bamboo-Curtain on China in 1949, Burma was in turmoil, and Korea had been invalded.

 As Indicated by this report, ECA loans were sometimes made to the producers of minerals, and one or more loans had been made to Portuguese producers of tungsten. Details of the operation of the ECA program in Portugal are not in evidence. There is some indication, however, that the development of a tungsten program in Portugal by ECA was retarded in 1952 by the failure of ECA to clear its commitments in advance with the Government of Portugal. There is even more indication in the evidence as a whole that the Government of Portugal maintained a watchful eye for moves by foreigners, either individuals or Governments, that would impinge on the ready exercise of control by Portugal over operations within its borders.

 Cassiterlte (tin), ilmenlte, tantalite, beryl, and columblte, as well as wolframite and scheelite.

 The Romans used gold and tin from Portugal.

 The development of mining operations during World War II accounted for most of the mechanization existing in 1950.

 Technically, a concession covered a limited area. Strictly speaking, therefore, a mine might extend over several concessions, or it might be restricted to an area even smaller than a concession. The two words are nevertheless often used interchangeably.

 The requirements were: either a certified graduate engineer or “a qualified technical agent.”

 Ore so confiscated was subject to sale at public auction, with the proceeds being divided among the State (one-half), the confiscator (one-quarter), and the informer (one-quarter).

 Virtually all tungsten oro was (and is) exported, there being almost no domestic consumption of it.

 Where the original transport permits had been replaced by the consolidated permits of treatment plants, permit numbers had to be supplied for both the original and the consolidated permits, to assure the accuracy of checking.

 The Central Government concentrated on a franchise tax. Fiscal law made it illegal to deni in ore without filing a declaration of intent accompanied by advance payment of 1 year’s tax, the amount of which depended on the amount of capital to be devoted to the business.

 Such extensive registrations for development by private concessionaires-reflected a marked change from former attitudes which regarded mining as* no more subject to the restrictions of private control than fishing.

 Such operations afforded no indication of the depth of the veins being worked. Some knowledge of depth and quality is usually essential to determination of the risk involved by venture capital used to mechanize a mine..

 The wartime demand in Portugal ended abruptly in 1944, when the Portuguese Government, in cooperation with the Allied Nations, closed the* tungsten mines as a means of denying any of their produce to Germany.

 The Panasqueira property, of the British-owned Beralt Tin Company.

 The Borralha, owned by French interests.

 Five hundred tons (29 percent of 2,500) divided among 100 producers-represents average production of only 5 tons per year by a single producer.

 As peasants the distinguishing feature of these people was that they had 'lost whatever claim of status they once may have had by reason of attachment to the land. The Portuguese pllha was responsible to no one, and no •one was responsible for him.

 This Portuguese -word carries some connotation of theft. The English word “pilferer” suggests a reasonable equivalent. From the testimony of some of the Portuguese witnesses, the inference is that the term was originally applied in derision, but that as the social implications of the position of these-people as a class have become more apparent, the trend is toward acceptance-of the word as having a meaning akin to the American “migrant.”

 The dealers were usually merchants of substantial means. It was their-function to assemble the pickers’ pyramids in quantities large enough to warrant shipment. In or about 1950 there were only five dealers operating in. all of Portugal.

 At the peak of wartime production, pilhas were responsible for mining the-major portion of the tungsten produced. Many of them, moreover, were-organized into steady, stable work forces, some small, some large. The British-owned Panasqueira mine, for example, at one time employed 4,700 pilhas.

 The mining laws required transport permits for the movement and sale of the ores. Theoretically, the transport permit emanated from the concessionaire. Cf. finding 26 (e).

 The evidence raises more questions than it answers as to the extent to which American officials concerned with the transaction in suit were so •Informed.

 There was even less comprehension on the part of American officials of the circumstances under which the Portuguese Government would move to •control the mining industry.

 There was no place in Dr. Soares’ plan for the pickers and dealers. They •would have been eliminated from the scene by (1) the payment of wages to the ipilhas by the owners of concessions and (2) the direct marketing of ores by ■the parent organization.

 Dr. Soares realized, in July 1950, that his cause would almost certainly ■prove hopeless unless he could find buyers who would enter into long-term contracts at substantial prices. At that time (July 1950) the united Nations ■were not so committed in Korea as to indicate a burgeoning market for tungsten •for military uses. On the other hand, disruption of the sources of supply of ¡tungsten in Asia had been evident for some time.

 Mica, palm oil, coconut oil, castor oil, sisal, manganese, tin, zinc, sperm oil, beryl, and asbestos.

 The standard unit of monetary exchange in Portugal is the escudo, which, at the times material here, had an exchange value of $0.035. One conto is 1,000 escudos, and therefore represents an exchange unit of $35.

 Mr. Bauer was related to a German family Mr. Pulvermann had befriended while he was a refugee.

 Before leaving Paris, Mr. Pulvermann had mentioned his interest in Portuguese tungsten to Mr. Manley, who displayed some familiarity of his own with export licenses and the identity of buyers. Mr. Manley told Mr. Pulver-mann that in Portugal, Mr. Pulvermann was authorized to say to the American Embassy or the EGA Mission in Lisbon that he, Manley, acting on the request of General Wilson, had authorized Pulvermann to investigate ore mining projects in Portugal. When Mr. Pulvermann asked Mr. Manley to identify General Wilson, Mr. Manley replied that General Wilson was a retired Army .general with great experience in business and a close friend of his.

 Mr. Pulvermann considered himself under no obligation to Mr. Bauer or Mr. Manley In relation to his dealings with Dr. Soares. Messrs. Bauer and Manley, however, toot a different view of the situation, and ultimately pressed both Pulvermann and Atlántica for compensation in the nature of discoverer’s rights.

A weekend intervened between June 29 (Friday) and July 3 (Tuesday).

 One year had passed since the hostilities in Korea had begun. The forces, of the United Nations had regained the initiative with the recapture of SeouL on March 14, 1951, and had crossed the 38th parallel the following month.

 This was the report on "Tungsten, 1951” described in finding 23.

 Senator Lyndon B. Johnson, of Texas.

 Defendant Infers that Mr. Pulvermann was at some pains to Induce this reply, since direct dealings between Dr. Soares and the Bensaude firm might have eliminated Mr. Pulvermann and his associate, Colonel Westbrook, from the transaction. In support of the inference, defendant cites two cablegrams in which Mr. Pulvermann urged Dr. Soares not to discuss the situation with others. It may be that the answer given by Dr. Soares was the one desired by Mr. Pulvermann.

 Mr. Gumbel then introduced Colonel Westbrook and Mr. Pulvermann to members of the staff of GSA (including Mr. Charles Stott, with whom they later had dealings as an official of DMPA) ; and supplied them with forms sufficient to advise them of the nature and extent of information to be furnished in applying for loans and in other steps in the negotiation.

 Prom the outset both men regarded their participation in the project as that of eoventurers.

 The partners’ first consideration was to obtain payment of their compensation in dollars, since changes in Portuguese currency regulations might affect (curtail or stop) the exchange of escudos for dollars, or the exchange rate might fluctuate to their disadvantage. Both the fixed-fee and the stock-participation patterns entailed the exchange problems. The syndicate idea was rejected because of its apparent duplication of the Soares corporation.

 Counsel responsible for this advice was Colonel Wozencraft, a lawyer who had no connection with Messrs. Barnes and Hill. Their firm was retained a few days later.

 Attention is called to the spelling of “Portuguese” in the foregoing test, which is the first of numerous quotations from the writings of Colonel West-brook. Inasmuch as his typewriter remained constant throughout to its own rendition of “Portuguese,” while dropping or scrambling letters in other words here and there, the court has corrected errors of spelling in subsequent quotations as a concession of time to the reader, rather than to preserve such errors with repetitious “sic’s.”

 In 1949 General Rodrigues had been Chief of the Portuguese Mission which negotiated the entry of Portugal into the North Atlantic Treaty Organization (NATO). He continued as Chief of Staff of the Army until 1955.

 Under corporate practice in Portugal the board of auditors is a supervisory board. General Rodrigues’ position was comparable to the American position of chairman of the board.

 Major Lobo was much interested in Atlantica’s program to relieve chronic unemployment in the Portuguese mining industry and to absorb the pilhas into the regular working force.

 This position was more akin to the American position of president of the corporation. At a later time Major Lobo became president of Atlántica, while Dr. Soares became director general.

 The firm had represented Colonel Westbrook in other matters over a period of 2 years or more. Finding 10 (a).

 Senator Johnson was chairman of the Preparedness Subcommittee of the Armed Services Committee.

 In its requested findings of fact defendant quoted some of the “observations” and some of the “recommendations” contained in the “Tungsten, 1951” report of the Preparedness Subcommittee, and urged, by way of argument, that *123 ■“the committee’s real recommendation on the foreign procurement [was]- that it be handled by ‘government-to-government contracts’ * *

 Dr. Soares was informed to some extent of the operation of the ECA program in Portugal. The inference is that he was apprehensive of the initiation by officials of his own country of government-to-government bargaining on the ECA program, which might wort to his disadvantage in the selling of tungsten to the united States.

 Colonel Westbrook added: “Notwithstanding this, I don’t think we can get anywhere unless * * * our group has the full support of the Portuguese Government.”

 Both Dr. Soares and Mr. Pulvermann had sources of advance information concerning the movements and intentions of Mr. Larson and General Wilson, and the information they received was later proved to be reliable. Dr. Soares’ information came through Government channels in Lisbon. ¡Mr. Pul-vermann’s information came from the American lawyer living in Paris, Mr. Manley, who was in close touch with General Wilson. The information on which Dr. Soares based his decision not to see Mr. Larson was to the effect that Mr. Larson and General Wilson would confine their business in Lisbon to an effort to obtain from the Portuguese Government an endorsement of the American Government’s action in appointing the general manager of Bensaude & Company, Mr. Almeida, as exclusive agent for American purchases of tungsten in Portugal.

 Mr. Kelsey testified that Dr. Soares had intimated to him and Mr. Lynton that he (Soares) knew how the litigation would end because of some action in the nature of a “fix” or an “under-the-table” deal. Dr. Soares, in his testimony, denied any wrongdoing or any improper intent He added that he had had to seek outside explanation of the remarks attributed to him, since his knowledge of English was insufficient to enable him to understand the idiomatic expressions he was said to have used.

 The evidence as a whole warrants the conclusion that some “Portuguese reports” were lacking in foundation.

 At the trial Mr. Kelsey testified that in Lisbon Dr. Soares’ reputation for truth and veracity was bad. Mr. Kelsey’s other specific charges against Dr. Soares were reiterated by defendant throughout the trial, but were not further substantiated. Plaintiff countered Mr. Kelsey’s reputation testimony with the testimony of other witnesses who said Dr. Soares’ reputation was good. Dr. Soares himself categorically denied Mr. Kelsey’s specific charges, and the Portuguese Government certified that there was no record of the conviction of Dr. Soares of crime (other than the court-martial heretofore mentioned).

 Cf. Colonel Westbrook’s language, as quoted in finding 45 (c).

 Specifically, Mr. Pulvermann believed that Bensaude was responsible for the withdrawal from Atlántica of a man upon whom Dr. Soares had relied to furnish a substantial amount of capital, and for the action of the banker who induced the capitalist to withdraw.

 Finding 82.

 The Inferences from the evidence as a whole are (1) that the appointment of Mr. Almeida represented (a) the selection and naming of an individual rather than a company and (b) the appointment of a representative of either GSA or DMPA in lieu of representation of BPS ; and (2) that the substitution of Mr. Almeida for Bensaude & Company had no marked significance in relation to Atlántica except insofar as renewal of the appointment may have revealed a belated effort to make the agency preclusive with official approval by the Portuguese Government.

 Blended into the stories was an announcement of the creation of the Defense Materials Procurement Agency, and Mr. Pulvermann reported to Colonel Westbrook (1) that the news stories had created an impression that Mr. Almeida was being invested with powers of BCA and DMPA and (2) that publication of the stories brought objection from Washington, accompanied by demand for an investigation to determine who among American officials in Lisbon had authorized the release of the information. Two weeks elapsed before DMPA officially came into being.

 The capital structure was not in fact so increased, the share subscriptions upon which the increase was predicated having been canceled.

 The letter was actually written on September 29, 1951. Plaintiff preferred to have It dated as of the first day of its corporate existence.

 By the time the contract In suit was executed, more than a year after the date of the contract in question, the latter contract had been altered in particulars which might have made a substantial difference to Mr. Pulvermann and Colonel Westbrook in their returns under it. The alterations did not, however, materially change the contract in terms of the issue raised by defendant because of it.

 The draft letter to Mr. Larson had been shown to Mr. Reedy, who had thereupon volunteered to talk with Mr. Larson “in order to point out to him the importance, from the Committee’s viewpoint, of proceeding as expeditiously as possible with the negotiations * *

 Colonel Westbrook was prepared to proceed in this manner. At Mr. Reedy's suggestion he withheld sending the letter to Mr. Larson until Mr. Reedy could talk with Mr. Larson and report back. Mr. Reedy did talk with Mr. Larson. Mr. Larson did not suggest proceeding through Mr. Almeida.

 Dr. Soares understood that Mr. Camilo intended (1) to buy stock to the extent of 6 million escudos ($210,000) and (2) to lead Atlántica a like amount. Mr. Camilo’s recollection -was that 6 million was the extent of his undertaking; and that part of the investment was to be in stock and part in the nature of a loan.

 The banker, Mr. Rogerio da Silva, testified (in Lisbon, in the presence of Dr. Soares and his associates) that he intended to create the impression in Mr. Camilo’s mind that Dr. Soares was a man of questionable character. He declined, however, to assert under oath that Dr. Soares’ character was questionable or his reputation bad. He said he had relied on a “report.” (The phrase “Portuguese report” had itself acquired an implication of *134 questionable reliability.) On the evidence as a whole, the inference is that Mr. da Silva used a “Portuguese report” to placate Mr. Camilo for the bank’s refusal to make the loan rather than disclose to him the real reason, which was the long term requested. Mr. Camilo had only recently returned to Portugal after an absence of 34 years and was not very familiar with business practices in his native land.

 The Embassy (or ECA) made Its Investigation of Atlantica’s capacity to deliver tungsten ore without communicating in any way with Atlántica or any of its affiliates. The inference is that Mr. Kelsey, having formed and expressed a judgment adverse to Dr. Soares, considered Dr. Soares’ associates to be likewise suspect and unworthy of belief.

 Mr. Pulvermann was also convinced that Bensaude was responsible for the bank’s refusal to lend money to Mr. Camilo and for Mr. da Silva’s attack on Dr. Soares’ character.

 In his testimony Mr. Hill described the professional services he was requested to perform for Westbrook and Pulvermann as being “principally legal advice on the nature of contracts, upon procurement regulations, on budgetary requirements. As time went on, to sit in on negotiations, any legal matters that might arise in connection with it.”

 On October 11, 1951, Commissioner Walsh forwarded to Captain Maull a note with this message: “Thurman Hill, who states he is attorney for West-brook called 10/10/51 and stated they were in the process of making an offer here for this tungsten. I advised him offer should be specific as to quantity, time period, names of mines, etc.”

 The text of the contract is set forth in finding 50 (b). At the request of Dr. Soares it had been dated August 22, 1951. Mr. Pulvermann forwarded it to Colonel Westbrook on October 2, 1951, and, promptly upon its receipt, Colonel Westbrook referred it to Mr. Hill for review. Mr. Hill advised Colonel Westbrook that in his opinion the contract comprised a commitment that was legally binding on Atlántica under American law.

 As the conference was ending, Captain Maull, having scanned the agreement, offered to return it, but Colonel Westbrook demurred, saying the copy was for the Government’s files, so that its officials would “know just exactly what our position is with this company, what our duties are and what our compensation is to be.” The copy was retained by Captain Maull.

 As reported1 by Colonel Westbrook, much of the discussion related to prices. ¡BPS insisted on lower prices in a long-term contract than it might from time to time pay for spot purchases. This situation presented a serious problem to Aüantica because of the possible appeal of higher spot prices (via black-market outlets) upon potential laborers (pilhas).

 At the time, Colonel Westbrook’s home was in Hot Springs, Arkansas.

 In another memorandum to the file on the same day, Captain Maull recorded the substance of a telephone call “from Mr. Senita, Office of International Trade, Department of Commerce * * * concerning a cablegram being sent to the American Embassy at Lisbon” to the effect that Colonel Westbrook was leaving for Lisbon in connection with tungsten offered to the General Services Administration. Captain Maull recorded the fact that he had suggested that the General Services Administration’s name should not be used in the cablegram “which seemed to provoke Mr. Senita.”

 EPS was engaged in procurement under the 1946 act for the Munitions Board. Procurement under the 1950 act resided in DMPA.

 On the contrary, EPS sometimes used available appropriations for purchases required to remedy shortages in current supplies.

 He returned to Washington on December 10, 195T. The expenses of the trip (transportation, hotel bills, secretarial work, and miscellaneous) were borne by Atlántica. The amount was $1,379.

 This portion of Colonel Westbrook’s memorandum was quite obviously prepared for wider circulation than Atlantica’s board of administrators, the members of which were already familiar with the existing situation and convinced of the validity of the facts and conclusions stated by Colonel Westbrook. By inference the anticipated wider circulation was expected to include, among others, Mr. Richards, commercial attache at the Embassy, Commissioner Walsh, and Captain Maull.

 Alianca’s contract referred to purchases expected to be made at its own mills and not at its concessions.

 Coimbra’s contract applied only to purchases at its own mills and did not refer to its own production.

 Over a period of 3 years, production at the rates specified would have totaled 4,560 tons.

 The 9 mines under contract with Atlántica accounted for 37 of the 43 tons.

 The 9 mines under contract with Atlántica accounted for 87 of the 112 tons.

 The 9 mines under contract with Atlántica accounted for 142 of the 179 tons.

 Mr. Pulvermann was also in Washington at this time.

 Among matters discussed by Colonel Westbrook was tbe delivery of ores not produced by Atlántica or its affiliates. Colonel Westbrook told Captain Maull that Atlántica would first buy up the hoarded materials as a means of malting its first deliveries.

 A revision of the compensation agreement was made on February 29, 1952, when Atlántica gave to Mr. Pulvermann a letter confirming the original agreement modified only by the insertion (after paragraph “a”) of the following paragraph: “It is understood that the payment of a flat five percent commission on the quantities referred to in § 2 of the contract between Coinpanhia Atlántica and the wolframite producing companies might not always [have], been justified. <I£ Portuguese market conditions would not allow the payment of the said 5% commission on the f. o. b. price of wolf-ramite the commission may be reduced to a lower figure which would be not less than 2 (two) percent, the difference to be compensated for by paying to Messrs. Westbrook and Pulvermann a correspondingly higher commission or otherwise in future contracts, particularly in contracts for deliveries under the intended development scheme.”

 Following are excerpts from the Fourth Quarterly Report to the President by the Director of Defense Mobilization, as of January 1, 1952:
“The domestic tungsten mining industry, which closed down almost completely after World War II, is now being revived through Government-guaranteed floor price arrangements. Important tungsten deposits discovered in Montana will be in production late in 1952. * * *
“Some new tungsten production may be expected from Portugal and the Far East, especially Korea. * * *
“Many materials not under CMP are also in short supply. Most of these reflect substantial shortages in imports as well as in domestic production.
“Shortages in some of the alloying materials, already acute, may become even worse. Allocation controls imposed in 1951 on most of these materials, including nickel, cobalt, tungsten, molybdenum, columblum, tantalum, and manganese are being continued. * * *
“The rising demand for materials has led to a reduction in the rate of deliveries of some materials to the national stockpile, which is our strategic reserve of materials available in the event of war.
“The materials affected include aluminum, copper, nickel, tungsten, and zinc. * * **'

 Colonel Westbrook had accepted a position with the Democratic National Committee on January 7,1952. See finding 6 (j).

 Although Dr. Soares was then in Washington, he did not attend the conference. The conferees for plaintiff were accompanied, however, by Mr. Lu-cena, acting commercial attaché of the Portuguese Embassy in Washington, who expressed his Government’s interest in and approval of the Atlántica project.

 Colonel Westbrook again brought up the matter of the escalator clause at this conference, and also told Captain Maull that there was a considerable quantity of tungsten available in Portugal that could be unfrozen through purchases by Atlántica, and Captain Maull said EPS would welcome the ore because of its need for tungsten.

 Mi-. Leonard W. Mooney, staff specialist on tungsten, serving as Assistant Chief, Ores Branch, Purchase Division, BPS. Captain Maull, as Director of the Purchase Division, was Mr. Mooney’s administrative superior. The evidence contains no explanation of Captain Maull’s failure (if failure there was) to acquaint himself with the reactions of his subordinate technical adviser before assuring Atlantica’s representatives that he was satisfied with the terms of the agreement.

 Some months later Mr. Hill’s patience was exhausted and he counseled similar action, only to be discouraged by Colonel Westbrook.

 As noted by defendant In its requested findings of fact, tbis letter stands in tbe record as hearsay evidence.

 Ten days later, on March 12, 1952, Atlántica cabled Mr. Pulvermann, who was then in Washington: “urgent have any authentical [sic] document proving contract purpose include our scheme national development plans under study our government * * * please advise * * On March 13, 1952, Mr. Pulvermann replied “Contract now being drafted expecting it ready Monday * * *.”

 The agreement between Colonel Westbrook and Mr. Mooney noted in this memorandum was carried forward and merged into the negotiations. The rescission of “Part 2 of the offer” did not include withdrawal of the offer to supply ores not produced by Atlántica or its affiliates.

 This “report” is in essence a summary of the document, reflecting primarily the conclusions of the engineers.

 In their “Remarles” the authors said: “The geologic study of many of these deposits has already been made; so has the identification of the mines on the veins. The prospecting of the alluvials was made too. The estimate of the reserves is based on evident facts, although the great number of veins already recognized is likely to cause a long calculation.”

 In their “Remarks” the authors said: “Among the mines of the Atlántica Group those of ‘Alianza/ ‘Sabrosa,’ and ‘Mata da Rainha* are listed, all of which deserved spesial [sic] mentions [sic] in K. C. Li and Chung Yo Wang in ‘Tungstens* * * *. The ‘Pomar da Rainha* (Altos de Sanguinhedo & others), and ‘Campo da Chá,* are part of the same deposit as ‘Borralha’ the biggest mine second to ‘Panasqueira* (Beralt Tin). ‘Costa Meal* mine is next to the above mine, and belongs to the same deposit as ‘Panasqueira.* These remarks give an idea of the importance of the mines, some of them, of the Atlántica Group. * * * It should be noted however that most of the mentioned mines were German-operated during the war, and that is a sure indication of their importance; not to mention the high sums of money which wore spent on them in prospecting and surveying works.”

 This capacity reflects averages of 800 kilograms per separator, 1,350 kilograms per plant.

 The authors stated in their report that: “As to previous output, the existing figures do not deserve much credit. Taxes collected from some mines, those in proportion to the value of the ore produced, on the mine, are known; *184 considering the values at different times, we can state, with regard to some mines, what their output was in average, in certain periods. With those figures we elaborated the attached Chart No. 4.”

 In their “Remarks” the authors said: “In spite of the lack of statistical data covering the previous output of the different mines, the figures contained in Chart No. 4 are encouraging. Thirty tons were estimated for the 14 mines * * * although we are sure their real production has been far bigger. It may be concluded that the 59 mines of the Atlántica Group have already produced in the past, quantities well above those offered to the BPS.”

 Following are the “remarks” of the authors: “The technical director of the mines to whom consults were made, indicated very conservative figures and that is why Chart No. 5 represents such a low estimate. We do not take into account the production of the 12 separating plants * * *. Assuming that those plants have a maximum working capacity of 20 days, * * * we reach 324 tons a month, and as we know, on the other hand, that the purchasing power of a plant depends only upon the price paid for the ore, we will have a producing capacity well above the offer * * *; to obtain that figure each plant would only have to effect a delivery of 4 tons a month * * *, exactly 4,161 kilos.”

 This assignment with MSA was scheduled to terminate on June 30, 1952, and Mr. Kelsey anticipated a reassignment to a State Department post shortly thereafter.

 Details of the difficulties encountered by MSA as a result of proceeding ■without consulting the Portuguese Government are not in evidence. The fact is established that the Portuguese Government frowned upon the MSA action and threatened for a time to withhold clearances which were essential to the validity of the security pledged for the loans.

 Specific results, if any, of the review are not established by the evidence. The fact that the review was made is material to the determination of the weight to be accorded to segments of the evidence relating to transactions of the period.

 EPS had withdrawn from the transaction because all available appropriations had been otherwise committed. DMPA likewise was without funds for the purpose at the time, but could procure funds through borrowing under the Defense Production Act of 1950. In beginning negotiations with DMPA, Colonel Westbrook and Mr. Pulvermann knew that a contract could not be signed until DMPA obtained additional funds. The negotiations were initiated nevertheless in the interest of saving time if and when funds should become available.

 Mr. Maxwell Elliott, described by Colonel Westbrook as a personal friend of long standing.

 Colonel Westbrook and Mr. Pulvermann first met Mr. Stott through Mr. (3 umbel, when Mr. Stott was assigned to EPS, before the creation of DMPA.

 The purchase contract form was altogether different from the drafts subsequently considered for long-term contracting.

 Colonel Westbrook further advised Colonel Church that General Rodrigues “* * * in addition to being a director of ComnanMa Atlántica, is also Chief of Staff of the Portuguese Army * *

 Plaintiff’s negotiations with DMPA extended over the entire period from .Tune until the contract was signed in September. Previous findings have indicated that Colonel Westbrook and Mr. Pulvermann began their DMPA talks with Mr. Stott, Director of DMPA’s Foreign Expansion Division, and continued them with Colonel John A. Church, one of Mr. Stott’s assistants. Sometime toward the end of June, Colonel Church became ill, and his work was taken over by another assistant, Colonel Harry A. Brenn. The active negotiations were conducted by Colonel Brenn and Mr. Elson, who were given summaries of information from the files of EPS, as herein noted. The EPS files themselves were never transmitted to DMPA or reviewed by the officials of that agency. Early in July 1952, DMPA received a copy of the Lynton report.

 DMPA attorney.

 Assistant to the Director of DMPA’s Foreign Expansion Division ; successor in the negotiations to Colonel Church.

 Copies were likewise forwarded to the Comptroller of DMPA and to the Washington attorneys for Westbrook and Pulvermann.

 This document was introduced in evidence by the plaintiff.

 This document was produced by counsel for plaintiff while Mr. Elson was under cross-examination. Counsel for defendant had not theretofore known of its existence. The draft came from Mr. Elson’s file. Counsel for plaintiff offered no explanation of his possession of it. The fact that he built around it a tactic of surprise is some indication of the extent of his reliance throughout the trial upon the arts of adversary litigation.

 Tie statement In Draft A of the scope and purpose of the contract concluded with the contractor’s agreement “* * * to sell * * * tungsten * * * derived from the contractor’s facilities in Portugal.” Colonel Westbrooh pointed out that it was never contemplated that all the ore covered under the contract should come from the production of mines controlled by Atlántica or its affiliates. Colonel Brenn and Mr. Bison agreed to the modification, and the phrase “derived from the contractor’s facilities in Portugal” was deleted.

 July 25, 1952.

 Mr. Bison was joined on this occasion by Colonel Church, and Colonel Brenn did not attend. Colonel Church reported the results of the conference to Colonel Brenn by memorandum. Mr. Swanick likewise summarized the results of the conference in a memorandum to the file.

 Excerpts from the letter of July 9 appear in finding 94.

 Colonel Westbrook noted the effect of DPA’s action in shortening the term to June SO, 1955, but strongly urged against resubmission of the matter to DPA because of the risk of further delay, saying: “The red tape of American bureaucracy cannot be understood even by those who are wrapped up in it.” He also expressed the belief that “the entire situation with respect to requirements for strategic materials is easing substantially,” and that for the Atlántica contract it was now or never.

 This document was introduced in evidence by the defendant.

 Word had been received in Lisbon of the signing of the contract by DMPA. Mr. Pulvermann was returning to Washington to try to expedite the opening of the letter of credit.

 The company’s concern was that, as a result of the shortening of the period, difficulties might be encountered in obtaining from the Bureau of Mines the clearances that were requisite to obtaining the credits that had been promised by a bank and on which Atlántica relied for financing.

 The monthly total was 03,100 escudos ($3,258.50), representing an average per person of 3,325 escudos ($116.375).

 The Director of Technical Services was Engineer Eurico Guilherme Lopes da Silva, and the Assistant Director was Dr. Luis A. T. Sá Fernandes. Dr. Sá Fernandes was the son of the Director of the Bureau of Mines.

 Substantial portions of the report of the Manley-Bauer relation to this case are contained in a letter which Mr. Pulvermann submitted to Mr. Hill in November 1952, and which was offered in evidence by defendant.

 Messrs. Manley and Bauer had from the outset pressed upon Mr. Pulver-mann their claims for consideration in his arrangement with Atlántica. In May 1952, they had demanded of Mr. Pulvermann that he arrange for payment to them by Atlántica of .$45,000 as a “finder’s fee.” Mr. Pulvermann had discussed the matter with Dr. Soares, whose response to the suggestion was negative. The demands of Mr. Bauer upon Mr. Pulvermann steadily became more strident. The name of General Wilson and the potential of his position were mentioned.
Mr. Pulvermann did not know, from Mr. Bauer’s letter (dated September 26), whether or not Mr. Bauer knew the Atlántica contract had been signed. On October 5, 1952, Mr. Pulvermann advised Mr. Bauer of the signing of the contract on September 11.

 The representatives of DMPA told the representatives of Atlántica that General Wilson’s London office had advised DMPA Washington that it had been informed that there was little likelihood of the Portuguese Government’s granting export licenses to Atlántica for the shipment of tungsten under the contract.

 The concluding paragraph of Mr. Stott’s letter said: “We shall be very-anxious to hear the results of your negotiations with the Portuguese Government concerning this contract and its effect on other Portuguese proposed tungsten contracts.”

 Mr. Pulvermann cited the possibility of crossed wires or switchboard confusion, in either Paris or Lisbon, to account for what he heard. He also cited the possibility that the call to him had emanated from the Paris office of the Herald Tribune.

 Mr. Pulvermann’s testimony suggests (rather pointedly) his belief in the inference that arrangements for Mr. Bauer’s entry into Portugal were made by the Paris office of the New York Herald Tribune.

 During their discussions Mr. Pulvermann understood Mr. Bauer to say that the $45,000 would be divided into equal parts among Mr. Manley, Mr. Bauer, and General Wilson.

 Mr. Bauer had expressed concern over the ability of the Atlántica contract, or the Westbrook-Pulvermann relationship with Atlántica, to survive the change of administration in Washington, which Mr. Bauer said he anticipated as a result of the coming election,.

 Mr. Bauer also, according to Mr. Pulvermann, “* * * kept me up all night trying to get hold of a photostat of my contract with Atlántica.” The inference to be drawn from Mr. Pulvermann’s testimony is that Mr. Bauer did not succeed in this endeavor. The evidence as a whole, however, in relation to the activities of Bauer and the Herald Tribune in the closing days of the Atlántica contract, warrants the conclusion that the inference most strongly supported is the inference that Bauer did gain possession of the photostat.

This telegram also originated in Philadelphia.

 Reference has been made to the story which appeared, in the New Yorit Herald Tribune on October 30 for some of the facts herein recited. Others were established by independent evidence.

 Mr. Larson’s response was that if the contract had not been canceled on the ground that it had been obtained for the purpose of speculation, the mere existence of such an agreement would have been ground, for cancellation and would have been so used.
Three years later, in his testimony in this case, Mr. Larson said that the investigation which he had made of the Atlántica contract after its cancellation indicated to him, that Colonel Westbrook had not done anything wrong in connection with it.

 Colonel Westbrook had not received Mr. Larson’s letter and did not know the contract had been canceled.

 Mr. Mitchell’s response was that if Colonel Westbrook signed the contract on September 11, while he was employed by the Democratic National Committee, he would be discharged at once. Mr. Mitchell verified the facts that had been reported to him, and promptly discharged Colonel Westbrook by telephone. Mr. Mitchell’s position was that no official or employee of the committee should represent private interests in negotiations with the Government.

 Ur. Soares had received no word of the letter oí cancellation and did not ltnow that the contract had been canceled until his caller so advised him.

 The compliance officer confined his investigation to the matters defined in the telegram of October 28 from Mr. Larson to General Wilson.

 Defendant has sought to impeach the credibility of Dr. Soares, who testified at great length, by charges of misconduct. The charges are not substantiated.

 Plaintiff’s evidence tending to invite inferences of wrongdoing by General Wilson in connection with the Atlántica contract was directed more to his motivation as an administrator than to his credibility as a witness.
General Wilson's testimony was quite brief. Defense counsel, who called him as a witness, limited the examination to events occurring in October 1952, relating specifically to the transmission to Mr. Larson of information concerning possible speculation by Atlántica. There was no cross-examination.
The chary treatment accorded by both counsel to General Wilson, who undoubtedly knew much more about this case than he was asked to tell, is illustrative of the extent to which the arts of adversary litigation were practiced throughout the trial by both parties.

 Tie investigation made by Mr. Pulvermann and Colonel Westbrook into the character and reputation of Dr. Soares following Mr. Kelsey’s charges against him was reasonably adapted to the purpose to be served by it.
They faced the tasks (1) of satisfying themselves to the point, as Colonel Westbrook later expressed it, of being willing to lay their own reputations on the line in Dr. Soares’ behalf, if they were going to continue their dealings with him; (2) of making their investigations without the kind of probing in the community that would militate against their mutual endeavor; and (3) of exercising reasonable consideration for Dr. Soares’ own feelings in the matter, in the interest of cordiality, if relations were to be continued. In pursuit of their aim they made a direct approach to Dr. Soares. He responded with full cooperation and understanding.

 Bensaude is a Portuguese family name. Some of the members of the family associated with the company were (and are) quite wealthy and possessed of marked influence in the financial and political circles of their country. The Bensaudes, and Mr. Almeida, general manager of the company, were therefore in position to oppose effectively, if in fact they did oppose.

 Sometime before Mr. Larson and General Wilson visited Lisbon (in August 1951), General Wilson spoke of the forthcoming visit in a letter to Mr. Manley, telling him that Mr. Almeida would at that time be named the exclusive agent of the united States for the purchase of tungsten in Portugal. Mr. Manley permitted Mr. Pulvermann to read General Wilson’s letter.
After Mr. Larson and General Wilson had left Lisbon, information reached Mr. Pulvermann (via Dr. Soares’ contacts within the Portuguese Government) to the effect (1) that the American officials had conferred with the Portuguese Under Secretary of Commerce about tungsten; (2) that the American officials endeavored to obtain from the Under Secretary official approval of their contemplated appointment of Mr. Almeida as sole purchasing agent for the United States in Portugal; and (3) that the Under Secretary had said that the Portuguese Government would neither express approval of, nor raise objections against, the appointment of Mr. Almeida.
On the basis of the foregoing information, Colonel Westbrook and Mr. Pulver-mann inferred that the effort by Mr. Almeida (for Bensaude) to obtain exclusive representation (or, next best, to thwart the possible competition by Atlán-tica) was a continuing effort, to which General Wilson extended an occasional assist.

 Mr. Pulvermann had been informed, by sources he considered reliable, that General Wilson had at one time had some business connection with Bensaude & Company. Both Mr. Pulvermann and Colonel Westbrook attributed to General Wilson motives of self-interest to account for the opposition they thought was led by him.

 On the day after General Wilson left Lisbon, in August 1951, the Portuguese press reported (1) the appointment of Mr. Almeida (In lieu of Bensaude & Company) as united States purchasing agent and (2) details of the purposes and functions of DMPA, an agency not yet officially created. The accounts were of such nature as to suggest the American Embassy as the most likely source of information.

 No clarification was ever made of the position initially taken by Mr. Freeman, Assistant Administrator of EPS, that there was no further interest in long-term contracts for the purchase of tungsten, or of his failure (and that of General Wilson) to advise Mr. Pulvermann that the Bensaude appointment was (or should be deemed to be) preclusive.

The investigation of Atlantica’s ability to perform, which was made in April 1952 by Mr. Lynton, was ordered as the result of considerations other than the need or desire for routine estimates or appraisals. The evidence does not disclose what those considerations were. It does appear from the evidence that a few weeks before the investigation was ordered, Captain Maull had thought (1) that the ability of Atlántica to perform had been established and (2) that his opinion that it had been established would suffice as the foundation for a contract.

After the cancellation Colonel Westbrook and Mr. Pulvermann were more convinced than ever that the central figure in the opposition was General Wilson.
Information was available to Colonel Westbrook in Washington concerning the understanding of and attitude toward Atlantica’s proposals on the part of responsible procurement officials. In addition to extensive experience of his own as a procurement officer for the Government, he had the advice of his attorney, Mr. Hill, on more recent procedures and requirements. They had been dealing with two of Mr. Hill’s former associates in the Procurement Division of the Treasury, Commissioner Walsh and Captain Maull.
Both Colonel Westbrook and Mr. Hill noted that Commissioner Walsh and Captain Maull had found it necessary to acquiesce in delaying consideration and determination of Atlantlea’s proposals for reasons not fully apparent to the officials themselves. Always in the course of each delay the name of General Wilson appeared and reappeared.
At one time Colonel Westbrook concluded that the reasons for the delays would have to be sought in Portugal. This conviction influenced his decision to visit Portugal.
His visit to Lisbon was fruitful for Atlántica in other respects, but it brought him no nearer to identification of the purported opposition to Atlántica. Subsequent events indicated to him that the opposition was centered in London rather than Lisbon. General Wilson’s office was then in London.

Excepting, of course, Mr. Kelsey, who did oppose the efforts of Atlántica.

 The practice was common among business concerns and was approved by the procurement agencies.

 Including GSA, BPS, and DMPA.

 The warranty in the contract in suit was that “* * * no person or selling agency has been employed or retained to solicit or secure this Contract upon an agreement * * * for a * * * contingent fee, excepting bona fide employees or l)ona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business” (Italics supplied.) Quaere: Were Colonel Westbrook and Mr. Pulvermann employees of Atlántica, or could they reasonably be said to have been “established commercial or selling agencies maintained by the Contractor * * *”?

 The good faith of the parties to the agreement is not in issue.

 Colonel Westbrook devoted his full time to Atlantlea’s affairs from July through December 1951, and part time thereafter until the cancellation of the contract on October 27, 1952.

 Mr. Pulvermann devoted his full time to Atlantica’s affairs over a period of 15 months. He made six trips from the United States to Portugal and invested upward of $30,000 in expenses.

 There is not in evidence any instance of direct, affirmative use by Colonel Westbrook in his dealings with Government procurement officers of his connection with the Democratic National Committee. On the other hand, there was an occasion, while Colonel Westbrook was employed by the committee, when he induced Presidential Secretary Matthew Connelly to telephone an official of GSA in his behalf to obtain an appointment needed by Westbrook to expedite the Atlántica contract. Prior to his employment by the Democratic National Committee, he called upon and obtained from Senators Johnson and Pulbright similar door-opening favors. While there is some intimation of use by him of the staff and prestige of the Senate's Preparedness Subcommittee for purposes of influencing administrative officials, analysis of the evidence requires the conclusion that the primary use made by him of his access to the Senate committee was to determine factually the need and desire of the United States to obtain tungsten.

 “* * * [T] he Government may, by notice in writing to the Contractor, cancel this contract * * * in the event * * * of the determination by the Government that the Contractor obtained this contract for the purpose of speculation.”

 If the purchaser’s warranty of intended use was false, in that he intended at the time of the warranty to offer the property for resale rather than to use it himself, the Government could cancel the contract. On the other hand, chased for his own use, there was no misrepresentation of intent and no violation of the speculation clause if he should thereafter, in equal good faith, change his intention.

 The prices which DMPA agreed to pay were based more on the production and expansion costs of marginal producers than on market prices.

 By the terms of the contract Atlántica was to deliver not less than 2,970 short tons but not more than 4,290 short tons. The difference between the maximum and the minimum represents the overrun. Atlántica expected to obtain all of the minimum tonnage from the production of the affiliated mines, and intended to supply an increasing share of the overrun from such production as its plans for mechanization became operative.
Atlántica had expected, until the summer of 1952, to acquire part of the first-period overrun through purchases from pickers and dealers, intending by this means to “dry up” the so-called black market as a means of making the pilhas dependent upon Atlántica. During the summer of 1952, however, the pickers and dealers disposed of most of their holdings in the face of falling prices.

 Traditionally, the pilhas were no respecters of boundary lines or ownership claims. They dug where the ore was available and sold where the ore was wanted. Atlántica expected them to offer to the treatment plants of the affiliated mines ores which had been dug from veins which were not within the concessions of the affiliated mines.

 In August 1952, the contract time was unexpectedly reduced from 3 years to less than 34 months. On and after September 11, 1952, when the contract was signed, plaintiff had until June 30, 1953, to make two semiannual deliveries. Inasmuch as the corporation had anticipated the use of 90 to 120 days after the signing for make-ready, the time element of the first-period requirements could have become pressing. The situation was recognized and was discussed by the negotiators when the reduction in the contract time became necessary.

 It is not established by the evidence that Atlántica either made or offered to make any purchase in either category.

 The dictionary definition of “speculate” is (Webster’s New Collegiate Dictionary, 1956) : “To enter into a transaction or venture the profits of which are conjectural or subject to chance; specif., to buy or sell with the expectation of profiting by fluctuations in price.”

 See the dictionary definition of “speculate” in the preceding footnote.

 The first appointment of Bensaude & Company was made in February 1951. The same considerations were present in the appointment of Bensaude’s general manager, Mr. Almeida, as purchasing agent for DMPA in August 1951.

 The inference is that General Wilson intended to put all of his eggs in one basket and to watch the basket.

 The requirement that all ores be produced would have excluded all right to purchase, from pilhas, pickers, or dealers, or by spot purchases in the open market.

 Congressional declarations of procurement policy were contained in the Strategic and Critical Materials Stock Piling Act of 1946, the Foreign Assistance Act of 1948, the Federal Property and Administrative Services Act of 1949, and the Defense Production Act of 1960. under these several acts responsibility for administrative decisions relating to procurement policies was reposed in the Munitions Board (through the joint action of the Secretaries of War, Navy, and Interior), the Economic Cooperation Administrator, and the Administrator of General Services, plus authority in the President, under the Defense Production Act, to reshuffle authority at will, utilizing “such existing departments, agencies, officials, or corporations of the Government as he may deem appropriate, or to create new agencies * *

 Before DMPA came into existence, General Wilson had traveled extensively as a consultant to GSA, examining into problems and practices of the production of marketing of strategic and critical materials throughout much of the Free World.

 Subject to administrative policies determined by the sources defined in the preceding footnote, responsibility for administrative action related specifically to procurement was reposed in the Economic Cooperation Administrator as well as the Administrator of General Services. The latter official operated three procurement offices: EPS, where the administrator’s authority was delegated to a commissioner; GSA, and DMPA, where one administrator had two hats. As ECA, EPS, and DMPA expanded into missions serving world regions, their responsibility for incidental administration increased, as did that of the American Embassies to which the missions were attached.

 Confusion within the procurement program was the gravamen of the critical report by the Preparedness Subcommittee of the Senate.

 Mr. Larson was Administrator of GSA and of DMPA. As Administrator of GSA he was the administrative head of EPS, a subdivision of GSA, although he had delegated the contracting officer’s authority of EPS to Commissioner Walsh and his assistant, Captain Maull.

 During the summer of 1952, when the representatives of Atlántica were negotiating with representatives of DMPA rather than with representatives of EPS, the DMPA representatives never saw the EPS file on the case, which had been in process of formation for one year, and which had been considered of sufficient importance to be sent to London and back. At the same time, it is apparent from the evidence that, in terms of overall administrative responsibility, Mr. Larson and his immediate subordinates were relying on complete interchange of information between EPS and DMPA in relation to the Atlántica contract. Such interchange was lacking, in serious degree.

 The officers of EPS were more fully informed of the development plans of Atlántica, including the operational needs incident thereto, than were the officers of DMPA. Mr. Larson obtained his information from DMPA, however, in relation to the execution as well as the cancellation of the contract in suit.

 Administrative protocol (to coin a phrase) remained the prerogative and the responsibility of the embassies proper, as distinguished from the supporting personnel of various special missions.
The action of the Embassy in Lisbon in relation to Dt. Soares is illustrative. Following the initial investigations by the Lisbon Embassy into the composition and plans of Atlántica, Washington (EPS through the State Department) was advised that the project could never be approved as long as Dr. Soares was the head of the company. On the evidence as a whole it must be concluded that the American Embassy was not reporting a requirement conditioning the approval of the Portuguese Government but a condition precedent of its own approval.

 ECA was concerned with the overall creation and use of counterpart funds in the administration of its programs.

 Although EPS had a staff of Its own In Europe In 1952, the dominance of DMPA (through General Wilson) over EPS in policy matters beyond the immediate function of EPS is apparent from the evidence.

 This period covers the time of the execution and the cancellation of the contract in suit.

 ECA had made these loans in accordance with accepted (American) business practices. In return for advances of money by the lender, the borrowers promised to pay and gave as security the equivalent of mortgages. ECA failed, however, to acquaint the Portuguese Government with the transactions before they were consummated. Later, when ECA sought approval by the Portuguese Government, that Government registered its displeasure with ECA’s failure to give advance notice, and withheld its approval. The absence of such approval placed the validity of the security upon which ECA had relied in doubt.

 ECA had found itself possessed of an oversupply of marks. In order to help restore the balance, the Government of Portugal was asked to accept marks in lieu of dollars as the basis of counterpart funds. The substitution was practical from the standpoint of all Governments concerned and was ultimately made. Portugal, however, imposed certain conditions before it would agree to the scheme. Details are not in evidence.

 The indirect threat to control was the reason for the Portuguese Government’s failure (which looked for a time as if it might become a refusal) to sanction ECA loans to Portuguese mining companies. Without approval by the Portuguese Government there would have been a failure of the security upon which ECA had relied in making the loans.

 The development plans of Atlántica had been fully explained to responsible officers of the Government by men who were connected with Atlántica and who were themselves Government officials.

 It is improbable that General Rodrigues and Major Lobo, holders of responsible posts in the Portuguese Government, would have undertaken, or would have been permitted to continue, to serve as officers of Atlántica without satisfactory understandings and clearances all around. Moreover, there is ample evidence of a positive nature to warrant this finding.

 There is evidence to indicate that if the project had ever got off to a really good start, efforts might have been made to make it somewhat semiofficial.

 The denial by the Government of Atlantica’s application for advance approval of export licenses constitutes some evidence of such opposition, not so much because of the denial itself as because of the wording of it, which suggests the possibility of authorship by American critics of the company. In any event, the denial is in character with other moves by the Portuguese Government, which was jealous in the extreme of its prerogatives and never disposed to extensive commitments in futuro.

 The default provision authorized the Government to cancel the contract in the event “* * * of the determination by the Government that the Contractor obtained this contract for the purpose of speculation.” Article XX, clause (d). Mr. Larson’s letter of October 27, 1952, advised Colonel West-brook “* * * that this Agency has determined that your efforts and conduct in entering the open market for the purchase of wolframite * ■* * for resale to the Government constitutes a violation of said paragraph (d) of Article XX * *

 The only evidence in the record of this purported offer by Atlántica to buy ore in the open market in Portugal is contained in the messages from Pennsalt to various officials of DMPA. Such evidence does not, of course, establish the fact that such an offer was made; it establishes only that officials of DMPA had before them information to that effect. Defendant offered the evidence only for the latter purpose, and rests on the contention that DMPA officials received and acted on the information in good faith.
The good faith of the DMPA officials is not challenged by plaintiff, but plaintiff has denied, and has offered direct evidence in support of its denial, that any such offer was made by Atlántica to Pennsalt or that Atlántica ever entered the open market in Portugal or elsewhere to purchase tungsten for delivery under its contract with DMPA. Insofar as a finding on the issue is material, it would have to be in accord with plaintiff’s evidence, viz, that no such offer was made.

 If Atlántica could Rave been free, under the contract with DMPA, to buy in the open market indiscriminately, its contract would have been equivalent to an exclusive hunting license for all of Spain and Portugal. DMPA would have made Atlántica its exclusive buying agent for as long as prices in the open market were below the prices fixed in the contract. Atlántica was not in fact free, within the intent of the parties, to buy in the open market indiscriminately, but the limitations upon its action were not known to General Wilson.

Various estimates of this judgment by the Embassy are possible: (1) that the Embassy obtained its information from someone in the Portuguese Government who was unfriendly to Atlántica and who was in position to influence the ultimate decision ; (2) that the Portuguese Government was using its position in relation to the Atlántica contract for leverage upon the American Government in relation to the pending problems of ECA (loans and counterpart) ; (3) that someone in the Embassy was unfriendly to Atlántica, as a result of which the prior action of the Portuguese Government in refusing advance clearances of export licenses was being given unwarranted emphasis, consciously or unconsciously.
Independent evidence on the export license issue warrants only the conclusion that the question had never been foreclosed by Portugal and that the probabilities favored the issuance of such licenses if and when Atlántica might have been in position to use them.

 The undertaking by DMPA to open irrevocable letters of credit put the agency in the position of tying up substantial sums of money for considerable periods of time if the Portuguese authorities should prove to be uncooperative in the matter. This fact, of which the Portuguese Government undoubtedly was aware, lends some credence to the hypothesis that Portugal was using the issue for trading purposes.

 The evidence as a whole requires the inference that this aspect of the Atlántica contract troubled General Wilson quite as seriously as the others and that Mr. Larson so understood from their conversation.

 The “evidence” was contained in General Wilson’s cable of October 24, 1952.

 The General Counsel advised Mr. Larson to cancel the contract. His advice appears, however, to have been weighted by administrative considerations more than by legal reasoning, for he testified that in his judgment the situation called for immediate action to cancel the contract to be followed by an investigation to determine the facts.

 Customarily, investigations were made by DMPA before cancellation where charges of abuse were lodged against contractors. No reason has been given for DMPA’s failure in this instance to investigate the facts relating to the contractor either before or after the cancellation.

 The evidence is not clear on the reason for this investigation. Neither are the full results of the investigation in evidence. Such of the results as are in evidence indicate that no wrongdoing was discovered on the part of anyone connected with the transaction on either side.

 The DMPA representatives relied, primarily, on the Lynton report, which, in turn, had accepted and reported Atlantica’s representations concerning its capital structure. The Lynton report was based upon the inspection made by Mr. Lynton, an engineer, to determine the availabUity of tungsten ores in the affiliated mines and the probable ability of the mines, with the aid of Atlántica, to extract and deliver ores in the quantities required.

 At the trial of the action plaintiff’s contention that defendant was estopped to deny plaintiff’s ability to perform was rejected. The effect of the ruling was to recognize (1) that the burden of proving ability to perform was on plaintiff, as part of its affirmative case; (2) that proof of defendant’s belief in plaintiff’s ability to perform at the time the contract was executed raised a presumption that such ability existed in fact; and (3) that the presumption was rebuttable. Accordingly, defendant has offered evidence intended by it to show (1) that plaintiff lacked the necessary financing in terms of both capital structure and bank credit; (2) that plaintiff did not have, among its affiliates, either mines or concessions containing the requisite ores or possessing the requisite ability to extract or otherwise obtain and deliver them; and (3) that plaintiff would have been unable to ship such ores as might have been produced for lack of export licenses (which, defendant contends, the Government of Portugal would have refused to issue).

 The denial by the Government of Portugal of Atlantica’s application for a commitment to issue the necessary export licenses was considered by responsible officers of the corporation as reflecting only the Government’s unwillingness to commit itself in advance to the granting of export licenses for such a quantity of ore over such a period of time. The Government was not deemed by them to have decreed that export licenses would be denied to Atlántica if and when it had ore ready to ship under a subsisting contract *256 with the United States. The officers of the corporation were confident that, once the contract was signed and the ores were packaged ready for shipment, the export licenses would have been granted. On the evidence as a whole such an appraisal of the situation appears to be both reasonable and realistic.

 Atlantica’s obligations to its affiliates were those of a service organization. The affiliates themselves were to produce and purchase the ores. Atlántica expected to advance money to the affiliates for this purpose, but the money was to come from credit sources rather than from corporate capital.

 This was the largest bank in Portugal, and its largest stockholder was the Portuguese Government.

 Throughout the negotiation of the contract and the trial of this action as well, the major emphasis (from the standpoint of the ability to perform) was centered upon estimates of the amounts of tungsten ores reasonably to be anticipated as the product of concessions owned by or affiliated with At-lántica. In both instances, expert opinion was relied upon, pro and con. Little attention was paid to Atlantica’s ability to obtain and deliver the overrun, which could have accounted for 30 percent of the total.

 While no armistice liad been reached in Korea, the United Nations bad made plain their determination to prevent the war from spreading.

 Experience with the mercurial market for tungsten had taught all but the hardiest speculators to dispose of their stocks whenever the market showed signs of continuing decline.

 The contract period expired June 30, 1955.

 It appeared to the negotiators that such purchases might become necessary because of the last-minute shortening of the contract period from 3 years to 34 months.

 The negotiators were unaware of the extent to which the available supply had been depleted when they were discussing open-market purchases as described In the preceding footnote.

 This conclusion rests on the assumptions that during the first period, none of the overrun would have been delivered; that during the second period, half of the overrun would have been delivered; and that during the third period, all of the overrun would have been delivered.

The average price per short-ton unit was $52.573789.

 Plaintiff relies on United States v. Burton Coal Co., 273 U. S. 337 (1927), affirming 60 C. Cls. 294 (1925).

 The translation of prices c. i. f., united States, into prices f. o. b., Portugal, may be made by deducting from the c. i. f. prices the cost of insurance and freight.
The freight rate for transporting wolframite concentrates in bags (which plaintiff intended to use) from Portuguese ports to United States east coast ports, during the period extending from September 11, 1952, to June 30, 1955, was $25 per metric ton, or $22.6796 (computed by algebraic formula 2000: x:: 2204.623 : 25), or $0.324 per short-ton unit (computed by dividing $22.6796 by 70).
The cost of insurance covering all risks on wolframite concentrates shipped from Portugal to United States east coast ports, during the period extending from January 1953 through September 1954, was 3.25 percent of the value of the cargo, and 3 percent of the cargo value during the period extending from September 1954 to June 30, 1955.

 Computed by deducting freight from the c. i. f. price and dividing the result by the insurance rate plus 100.

 Because of its contention that the cost of performance is to be measured by market value, plaintiff offered no evidence of the cost of the items described here.

 The contract requirement was 65 percent.

 If ore containing 65-percent trioxide concentrate was worth 60 escudos per kilogram, ore of 70-percent concentration would have been worth 64.6154 escudos per kilogram. (60: 65 :: x : 70. x=64.6154.)

 The value of 70-percent concentration would have been $2,051.623250 per short ton, as compared with a value of $1,905.078 per short ton for ore of 65-percent concentration. The value per short-ton unit would have been the same in either instance. $2,051.623250-4-70=$29.308892. $1,905.078-4-65= $29.308892. The difference is reflected in the number of short-ton units. 3630X70=254,100, whereas 3630X65=235,950.

 The contract provided that “the price for each short ton of tungsten concentrates * * * shall be determined on an f. o. b. vessel Portuguese port basis, including duties, taxes, and all other levies imposed by any authority other than the united States Government * *

 Computed as follows: 40x$.035=$1.40 per kilogram. $1.40X907.18 = $1,270.052 per short ton. $1,270.052=70 = $18.1436 per short-ton unit.

 Computed by taking 5 percent of the contract price ($13,359,500X ,05=$667,975) and dividing by the number of short-ton units ($667,975-— 254,100=$2.628787).

Computed as follows: 93,100 escudos per monthx$0.35=$3,258.50 per month, or $109,159.75 for 33.5 months (September 15, 1952, through June 30,1955). $109,159.754-254,100=$0.429593.

 The Portuguese tax of 40 escudos per kilogram represents 35.92 percent of this figure. As related to the average market price (finding 159), the tax would have accounted for 64.08 percent. While the evidence is all but silent on the point, the inference must be that the rate of the tax was fixed for purposes of control rather than revenue. It does appear from the evidence that responsible officers of Atlántica were relying upon the willingness of the Portuguese Government, once Atlántica had a firm contract with the united States, to remit substantial amounts of the tax, for use by Atlántica in financing the mechanization of its affiliates, with perhaps the retention of some as profit. It is apparent that the potential of profit, through the remission of taxes, was huge. Absent the tax, Atlántica might have made a profit in excess of $5 million.

♦Average.